IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BOB A. BRINSON (A-82598),

       Plaintiff,

      v.

JACQUELINE LASHBROOK, JOHN TROST,
RANDY PFISTER, SALEH OBAISI, and
WEXFORD HEALTH SOURCES, INC., a Florida
corporation,

       Defendants.

Case No. ___

## COMPLAINT

Plaintiff Bob A. Brinson brings this federal civil rights and Illinois breach of contract

action against Warden Jacqueline Lashbrook, Medical Director John Trost, Warden Randy

Pfister, Medical Director Saleh Obaisi, and Wexford Health Sources, Inc. ("Wexford"). Mr.

Brinson seeks to remedy the violation of his civil rights by defendants' deliberate indifference to

his medical needs, and to remedy Wexford's breach of a 2014 settlement agreement.

## INTRODUCTORY STATEMENT

1.      Mr. Brinson was incarcerated at Stateville Correctional Center ("Stateville") in

June 2009. At the time of his admission, he notified Stateville's medical director that he had

previously been diagnosed with Polycystic Kidney Disease ("PKD"), a painful and life-

threatening condition.

2.      In November 2011, Mr. Brinson brought a civil rights lawsuit alleging deliberate

indifference to his medical needs arising from the Stateville's and its medical personnel's

inadequate accommodation of Mr. Brinson's PKD-related needs.

1245307.v8

3.     In May 2014, Mr. Brinson entered into a settlement agreement (the "Settlement Agreement") with the defendants in that case and Wexford, which coordinates medical care at Stateville and employed the medical professionals named as defendants in that lawsuit.

4.     The Settlement Agreement obligates Wexford and its employees to: (a) monitor and care for Mr. Brinson's PKD; (b) bring Mr. Brinson to an outside PKD specialist for treatment; (c) follow all of the specialist's medical plans and/or recommendations; and (d) ensure a Therapeutic Diet Order for a renal diet is entered and in place for Mr. Brinson.

5.     Over the past year, Stateville and Wexford personnel, including Warden Pfister and Dr. Obaisi, have repeatedly failed to provide Mr. Brinson access to treatment for his PKD.

6.     In late 2016, Mr. Brinson was transferred from Stateville to Menard Correctional Center in Menard, Illinois ("Menard").

7.     Following his transfer, Menard and Wexford personnel, including Warden Lashbrook and Dr. Trost, failed to order or implement a renal diet for Mr. Brinson.

8.     In early 2017, Mr. Brinson was returned to Stateville.

9.     Defendants' conduct constitutes deliberate indifference to serious medical needs and cruel and unusual punishment, in violation of Mr. Brinson's constitutional rights.  The conduct also violates the terms of the Settlement Agreement to which Wexford is a party.

10.     As a result of defendants' deliberate indifference, cruel and unusual punishment, and breach of contract, Mr. Brinson has suffered from severe pain and emotional distress.

## JURISDICTION AND VENUE

11.     This Court has original jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343(a) because Mr. Brinson brings this action under 42 U.S.C. § 1983 to remedy violations of his rights under the Eighth Amendment to the United States Constitution as applied to the

states by the Fourteenth Amendment.

12.     This court has jurisdiction over Mr. Brinson's Illinois breach of contract claim pursuant to 28 U.S.C. § 1367(a), which confers federal court jurisdiction over state claims that form part of the same case or controversy as any action brought under the district court's original jurisdiction.

13.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## PARTIES

14.     Bob A. Brinson is a citizen of the State of Illinois.  For the majority of the time relevant to this matter, Mr. Brinson was incarcerated at Stateville, which is located within this judicial district.  Between late 2016 and early 2017, Mr. Brinson was incarcerated at Menard, which is located in the Central District of Illinois.

15.     On information and belief, Randy Pfister is a citizen of the State of Illinois.  At all relevant times, Mr. Pfister was the warden of Stateville, located in this judicial district.

16.     On information and belief, Saleh Obaisi is a citizen of the State of Illinois.  At all relevant times, Dr. Obaisi was the medical director at Stateville and an employee of Wexford.

17.     On information and belief, Jacqueline Lashbrook is a citizen of the State of Illinois.  At all relevant times, Ms. Lashbrook was the warden of Menard.

18.     On information and belief, John Trost is a citizen of the state of Illinois.  At all relevant times, Dr. Trost was the medical director at Menard and an employee of Wexford.

19.     Wexford is a Florida corporation with its principal place of business located, on information and belief, at 501 Holiday Dr. Plaza 4 in Pittsburgh, PA 15220.

20.     Wexford has operated at all relevant times as a private contractor to the Illinois Department of Corrections ("IDOC"), and coordinates medical services to Illinois prisoners,

including those at Stateville and Menard.

21.     At all times relevant to this Complaint, defendants acted under the color or the authority of the law of the State of Illinois or in active concert with third-parties who are or were so acting.

## FACTS

**A.     Mr. Brinson Suffers From Polycystic Kidney Disease**

22.     In the late 1990s, Mr. Brinson was diagnosed with PKD, a serious and incurable medical condition characterized by kidney and liver cysts, as well as impaired kidney function.

23.     According to the National Institute of Diabetes and Digestive and Kidney Diseases (the "NIDDK"), PKD "is a genetic disorder that causes numerous cysts to grow in the kidneys. A kidney cyst is an abnormal sac filled with fluid. PKD cysts can greatly enlarge the kidneys while replacing much of their normal structure, resulting in chronic kidney disease . . . which causes reduced kidney function over time." *See Polycystic Kidney Disease* (NIDDK 2016) available at: https://www.niddk.nih.gov/health-information/health-topics/kidney-disease/polycystic-kidney-disease-pkd/Pages/facts.aspx. PKD "may lead to kidney failure, described as end-stage kidney disease . . . when treated with a kidney transplant or blood-filtering treatments called dialysis." *Id.*

24.     The NIDDK explains that "PKD cysts are different from the usually harmless 'simple' cysts that often form in the kidneys later in life. PKD cysts are more numerous and cause complications, such as high blood pressure, cysts in the liver, and problems with blood vessels in the brain and heart." *Id.*

25.     In patients suffering from autosomal dominant PKD, the most common inherited disorder of the kidneys, high blood pressure is common. The most common symptoms of this

type of PKD, according to the NIDDK, are pain in the back and sides, and headaches often

caused by high blood pressure. This pain can be "temporary or persistent, mild or severe." *Id.*

26.     Patients with autosomal dominant PKD can experience complications including,

among other things, abnormal heart valves, brain aneurysms, and high blood pressure. *Id.* The

27.     The Mayo Clinic notes: "Controlling high blood pressure may delay the

progression of the disease and slow further kidney damage. Combining a low-sodium, low-fat

diet that's moderate in protein and calorie content with not smoking, increasing exercise and

reducing stress may help control high blood pressure. However, medications are usually needed

to control high blood pressure." *See Polycystic Kidney Disease: Treatment and Drugs* (Mayo

Clinic 2016) available at http://www.mayoclinic.org/diseases-conditions/polycystic-kidney-

disease/basics/treatment/con-20028831.

28.     Although there is no cure for PKD, according to the NIDDK, "treatment can ease

symptoms and prolong life." *Polycystic Kidney Disease.* Among other treatments, the NIDDK

reports that a health care provider can provide treatment for back or side pain resulting from

PKD. *Id.*

**B.     Mr. Brinson Brings A Civil Rights Case And Enters Into The Settlement Agreement**

29.     Mr. Brinson was admitted to Stateville in June 2009, and at that time notified

Stateville's medical director of his PKD diagnosis.

30.     In 2011, Mr. Brinson brought suit in the Northern District of Illinois against three

Wexford employees and other parties involved in his medical care, challenging their refusal to

accommodate his PKD with a medically necessary diet and specialist treatment. That suit was

captioned *Brinson v. Ghosh et al.*, No. 11-cv-4669 (N.D. Ill.).

31.     In May 2014, the parties resolved their dispute with the Settlement Agreement, to which Wexford was also a party. A copy of the Settlement Agreement is attached hereto as **Exhibit A**.

32.     The Settlement Agreement provides that Wexford and those acting under its authority must "monitor Plaintiff's medical condition and care for his [PKD] at any Illinois Department of Corrections facility where Plaintiff is incarcerated and where Wexford is the provider of health care services."  (Ex. A ¶ 1.)

33.     To that end, Wexford agreed under the Settlement Agreement to: (a) "schedule Plaintiff to be seen by a specialist at the University of Illinois Medical Center of Chicago ("UIC") for an evaluation of Plaintiff's PKD"; (b) "follow all medical plans and/or recommendations . . . made by UIC specialists relative to Plaintiff's PKD during or at any time after the Appointment;" and (c) "ensure that a Therapeutic Diet Order for a renal diet . . . is ordered and in place for Plaintiff so long as it is deemed medically indicated by a UIC or other nephrologist."  (Ex. A ¶ 1(a)-(c).)

34.     Mr. Brinson is now in the final stage of chronic kidney disorder, known as end stage renal disease.  Accordingly, Mr. Brinson will imminently begin receiving regular dialysis.

35.     Mr. Brinson's PKD symptoms include high blood pressure and regular severe pain in his kidneys and back.

**C.     Wexford, Dr. Obaisi, and Warden Pfister, and Those Acting Under Their Control Fail To Follow UIC Specialists' Recommendations**

36.     After the parties executed the Settlement Agreement, until August 2014, Mr. Brinson was regularly taken to be treated by outside specialists at UIC for his PKD.

37.     On information and belief, Mr. Brinson's appointments at UIC were facilitated by Wexford and the Illinois Department of Corrections ("IDOC") together.

1245307.v8                                    6

38.     Specifically, Dr. Obaisi or another Wexford employee under Dr. Obaisi's supervision completed an IDOC Medical Special Services Referral and Report form (the "referral report"), which was transmitted to UIC referring Mr. Brinson to UIC for treatment. Once Dr. Obaisi or another Wexford employee working under his direction confirmed with UIC the time and date of Mr. Brinson's appointment, IDOC facilitated Mr. Brinson's transfer to UIC on the day of the appointment.

39.     At or around the time of each appointment at UIC, Mr. Brinson's treating physician at UIC completed the "Report of Referral" section of the IDOC referral form.  That section of the form provides space for the treating physician to record his/her "Findings," "Assessment," and "Recommendations/Plans."

40.     Dr. Obaisi received a copy of each completed referral form upon Mr. Brinson's return to Stateville after each UIC appointment.  He was then obligated to complete the bottom portion of the form which is designated "Facility Medical Director Use Only."  The bottom portion of the referral form includes two check boxes under the heading "I have reviewed the recommendations and": one for "Approve" and another for "Deny or revise as indicated on the Notification for Medical Service Referral Denial or Revision, DOC 0255."  The form then contains a signature line for "Facility Medical Director's Signature."  (*See* referral form, attached hereto as **Exhibit B**.)

41.     During the time period relevant to this Complaint, UIC specialists completed referral forms after each of Mr. Brinson's appointments at UIC recommending a date for Mr. Brinson to return to the clinic for treatment.

42.     Also during the relevant time period, UIC specialists recommended Mr. Brinson continue to receive a special renal diet.

43.     UIC specialists recommended appointments for Mr. Brinson on, among other dates, August 1, 2014, September 18, 2015, October 16, 2015, February 19, 2016, and sometime in September 2016.

44.     Mr. Brinson missed each of those appointments.

45.     Dr. Obaisi failed to accept the recommendation of UIC that Mr. Brinson be taken to UIC for treatment of his PKD on August 1, 2014, September 18, 2015, October 16, 2015, February 19, 2016, and in September 2016.  In the alternative, Dr. Obaisi accepted those recommendations, but IDOC personnel under the supervision of Warden Pfister failed to facilitate Mr. Brinson's transfer from Stateville to UIC on the date of Mr. Brinson's appointments.

46.     The consecutive missed appointments in September and October of 2015 resulted in Mr. Brinson's failure to receive treatment for his PKD in the period between August 21, 2015 and November 20, 2015.

47.     On March 18, 2016, Mr. Brinson filed a grievance regarding his missed appointments.  That grievance has been denied, and Mr. Brinson's appeal was unsuccessful.

48.     On July 29, 2016, when Mr. Brinson was last brought to UIC, the specialist who treated him noted that his PKD had progressed to end stage kidney disease.  The specialist recommended Mr. Brinson return to the UIC clinic in four to six weeks.

49.     Despite receiving the referral report from UIC recommending a follow-up appointment no later than six weeks, Dr. Obaisi and/or IDOC failed to approve and execute UIC's recommendation that Mr. Brinson return to UIC no later than six weeks from July 29, 2016 for further treatment of his PKD.

50.     Dr. Obaisi and the IDOC failed to bring Mr. Brinson back to UIC at any point

thereafter through the time he was transferred to Menard.  As a result, Mr. Brinson went more

than five months without medical care for his PKD, despite UIC specialist's recommendation

that he return to the clinic no later than six weeks from July 29, 2016.

51.     Dr. Obaisi and Warden Pfister were aware that Mr. Brinson's PKD was in an

advanced stage during 2015 and 2016 and could become life-threatening if not properly treated.

**D.      Wexford, Dr. Trost, and Warden Lashbrook, and Those Acting Under Their Control Fail To Follow UIC Specialists' Recommendations**

52.     On or around November 21, 2016, Mr. Brinson was transferred from Stateville to

Menard.

53.     Dr. Obaisi approved Mr. Brinson's transfer to Menard.

54.     Wexford employs the medical professionals who provide health care to inmates at

Menard.

55.     On or immediately after his arrival at Menard, Mr. Brinson asked Dr. Trost, the

medical director at Menard, to enter a Therapeutic Diet Order for a renal diet.  Dr. Trost

informed Mr. Brinson that no therapeutic diets, including no renal diets, are available at Menard.

**E.      Mr. Brinson Requires Emergency Surgery When Defendants Finally Provide Treatment for his PKD**

56.     On January 3, 2017, Mr. Brinson was taken for treatment of his PKD by outside

specialists at Memorial Hospital of Carbondale ("Memorial Hospital").

57.     The specialist treating Mr. Brinson at Memorial Hospital referred Mr. Brinson for

immediate surgery to prepare him for emergency dialysis by putting a catheter in Mr. Brinson's

neck.

1245307.v8                                        9

58.     Mr. Brinson suffered severe pain and discomfort as a result of the emergency surgery and resulting catheter in his neck, and continues to suffer such pain.

### F.  Mr. Brinson Is Returned To Stateville

59.     On or around January 29, 2017, Mr. Brinson was transferred from Menard back to Statevillle.

60.     Since his return to Stateville, Mr. Brinson has been regularly receiving dialysis on site.

61.     Mr. Brinson did not receive a therapeutic diet between his arrival at Menard in late November 2016 and his return to Stateville in January 2017.

## COUNT I
## SECTION 1983 CLAIM FOR DELIBERATE INDIFFERENCE TO MEDICAL NEEDS
### (Against All Defendants)

62.     Mr. Brinson incorporates herein by reference paragraphs 1-61, as though fully set forth in this Count I.

63.     Mr. Brinson's PKD constitutes a serious medical need.

64.     Wexford, Dr. Obaisi, and Warden Pfister failed to bring Mr. Brinson to a specialist for treatment of his PKD on August 1, 2014, September 18, 2015, October 16, 2015, and February 19, 2016, as recommended by specialists at UIC.

65.     Wexford, Dr. Obaisi, and Warden Pfister also failed to bring Mr. Brinson to a specialist for treatment of his PKD at any time between July 29, 2016 and November 21, 2016, despite UIC specialist's recommendation to them that Mr. Brinson return to the UIC clinic within six weeks of July 29, 2016.

66.     Wexford, Dr. Obaisi, and Warden Pfister knew there was as substantial risk to Mr. Brinson's health by failing to provide him with treatment for his PKD, but disregarded that risk.

67.     Wexford, Dr. Trost, and Warden Lashbrook failed to provide Mr. Brinson with a Therapeutic Diet Order for a renal diet to accommodate Mr. Brinson's PKD.

68.     Wexford, Dr. Obaisi, and Warden Pfister knew there was as substantial risk to Mr. Brinson's health by failing to provide him with a Therapeutic Diet Order, but disregarded that risk.

69.     Defendants were acting under the color of law when they failed to bring Mr. Brinson for necessary specialist treatment for his PKD and failed to provide him with a Therapeutic Diet Order.

70.     Defendants' actions were reckless, callous, and grossly negligent, and exhibited deliberate indifference to Mr. Brinson's health in violation of his rights under the Eighth and Fourteenth Amendments to the United States Constitution.

71.     As a direct and proximate result of the action or inaction of Defendants and those acting at their direction, Mr. Brinson has endured severe physical pain, emotional and mental anguish, fear of worsened health and well-being, and the worsening of his PKD-related ailments. Because of Mr. Brinson's pain and suffering, an award of compensatory damages is justified.

72.     Defendants' actions and inactions were undertaken maliciously, intentionally, or with gross negligence and reckless disregard for Mr. Brinson's rights, justifying an award of punitive damages in a fair and reasonable amount.

WHEREFORE, Plaintiff Bob A. Brinson prays that judgment be entered against Defendants on Count I and this Court award Mr. Brinson: (A) a permanent injunction ordering

Wexford and the warden and medical director of any facility at which Mr. Brinson is

incarcerated to provide Mr. Brinson with a Therapeutic Diet Order for a renal diet; (B)

compensatory and punitive damages in an amount to be determined at trial; (C) the costs and

expenses incurred in bringing this claim; and (D) such other and further relief the Court deems

just and proper.

**COUNT II**
**SECTION 1983 CLAIM FOR CRUEL AND UNUSUAL PUNISHMENT**
**(Against All Defendants)**

73.     Mr. Brinson incorporates herein by reference paragraphs 1-61, as though fully set

forth in this Count II.

74.     Wexford, Dr. Obaisi, and Warden Pfister failed to provide Mr. Brinson treatment

for his PKD on numerous occasions, including by failing to bring Mr. Brinson to his PKD

doctors for more than five months between July 2016 and January 2017, despite UIC's

recommendation that Mr. Brinson return to its clinic within six weeks of July 29, 2016.

75.     Wexford, Dr. Trost, and Warden Lashbrook failed to provide Mr. Brinson with a

Therapeutic Diet Order for a renal diet to accommodate Mr. Brinson's PKD.

76.     Mr. Brinson's untreated PKD and inability to receive a medically necessary renal

diet have harmed him by exacerbating his PKD and related symptoms and forcing him to suffer

continuous and untreated pain over a protracted period of time, including pain caused by his

emergency surgery in January 2017.

77.     Those injuries to Mr. Brinson are sufficiently serious to deprive him of minimal

civilized necessities.

78.     Defendants knew there was a substantial risk to Mr. Brinson's health resulting

from the inadequate treatment of his PKD, including inability to access a medically necessary

diet; but they disregarded that risk. As such, Defendants acted with deliberate indifference to Mr. Brinson's deprivation of medical care, a minimal civilized necessity.

79.     Defendants were acting under the color of law when they failed to bring Mr. Brinson for necessary specialist treatment for his PKD and failed to provide him with a Therapeutic Diet Order.

80.     Defendants' conduct amounts to cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments to the United States Constitution.

81.     As a direct and proximate result of the action or inaction of Defendants and those acting at their direction, Mr. Brinson has endured severe physical pain, emotional and mental anguish, fear of worsened health and well-being, and the worsening of his PKD-related ailments. Because of Mr. Brinson's pain and suffering, an award of compensatory damages is justified.

82.     Defendants' actions and inactions were undertaken maliciously, intentionally, or with gross negligence and reckless disregard for Mr. Brinson's rights, justifying an award of punitive damages in a fair and reasonable amount.

WHEREFORE, Plaintiff Bob A. Brinson prays that judgment be entered against Defendants on Count II and this Court award Mr. Brinson: (A) a permanent injunction ordering Wexford and the warden and medical director of any facility at which Mr. Brinson is incarcerated to provide Mr. Brinson with a Therapeutic Diet Order for a renal diet; (B) compensatory and punitive damages in an amount to be determined at trial; (C) the costs and expenses incurred in bringing this claim; and (D) such other and further relief the Court deems just and proper.

## COUNT III
## BREACH OF CONTRACT
### (Against Wexford)

83.     Mr. Brinson incorporates herein by reference paragraphs 1-61, as though fully set forth in this Count III.

84.     The Settlement Agreement is a valid contract, binding on and enforceable against Wexford and Wexford's agents and employees.

85.     Mr. Brinson has met his obligations under the Settlement Agreement.

86.     Wexford breached its obligation under the Settlement Agreement when its employees failed to bring Mr. Brinson for treatment of his PKD by outside specialists on numerous occasions, including between July 2016 and January 2017.

87.     Wexford further breached the Settlement Agreement when its employees failed to ensure a Therapeutic Diet Order was entered for Mr. Brinson at Menard, despite specialists' recommendation that he receive such a diet.

88.     Because Mr. Brinson did not receive a renal diet while he was incarcerated at Menard, he was forced to choose between going without food and consuming food that would inflame his symptoms and put his life at risk.

89.     As a direct and proximate result of the action or inaction of Defendants and those acting at their direction, Mr. Brinson has endured severe physical pain, emotional and mental anguish, fear of worsened health and well-being, and the worsening of his PKD-related ailments. Because of Mr. Brinson's pain and suffering, an award of compensatory damages is justified.

WHEREFORE, Plaintiff Bob A. Brinson prays that judgment be entered against Wexford on Count III and that this Court award Mr. Brinson: (A) a permanent injunction ordering Wexford and the medical director of any facility at which Mr. Brinson is incarcerated, to provide

Mr. Brinson with a Therapeutic Diet Order for a renal diet; (B) compensatory damages in an

amount to be determined at trial; (C) the costs and expenses incurred in bringing this claim; and

(D) such other and further relief the Court deems just and proper.

**JURY DEMAND**

Mr. Brinson hereby requests trial by jury on all claims above triable to or by a jury.

Dated: February __, 2017                    Respectfully submitted,

                                            BOB A. BRINSON

                                            By: */s/ Alison R. Leff*
                                                   One of his attorneys

                                            Steven J. Yatvin
                                            Alison R. Leff
                                            BARACK FERRAZZANO KIRSCHBAUM
                                               & NAGELBERG LLP
                                            200 W. Madison St., Ste. 3900
                                            Chicago, IL 60606
                                            (312) 984-3118 (phone)
                                            (312) 984-3150 (fax)
                                            ed.malone@bfkn.com
                                            alison.leff@bfkn.com

1245307.v8                    15