**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

BOB A. BRINSON,

       Plaintiff,

v.

WEXFORD HEALTH SOURCES, INC. et al.,

       Defendants.

Case No. 17-cv-01659

Hon. John Z. Lee

**PLAINTIFF'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................... 1

FACTS ..................................................................................................................................... 2

I.  Brinson's PKD and the Settlement Agreement ...................................................... 2

II.  Defendants Fail to Provide Brinson with Medical Care.......................................... 3

III.  Defendants Facilitate and Approve Brinson's Transfer to Menard ....................... 4

IV.  Brinson Requires Emergency Dialysis Through a Catheter in His Chest ............... 5

V.  Defendants Fail to Provide Brinson with Medical Care Following His
Emergency Surgery ................................................................................................ 6

LEGAL STANDARD................................................................................................................ 7

ARGUMENT ........................................................................................................................... 8

I.  A Dispute Exists With Respect to Plaintiff's Eighth Amendment Claim ............... 8

    A.  Legal Standard.................................................................................................. 8

    B.  There is Evidence Pfister Acted with Deliberate Indifference to Brinson's Medical
Needs................................................................................................................ 9

        1.  Pfister was indifferent to the risk of Brinson's failure to receive treatment .............. 9

        2.  Pfister was indifferent to the risk of Brinson's transfer to Menard.......................... 11

    C.  There is Evidence Obaisi Acted with Deliberate Indifference to Brinson's Medical
Needs.............................................................................................................. 12

        1.  Obaisi was indifferent to the risk of serious harm from a delay in scheduling the
follow-up nephrology appointment at UIC ............................................................. 13

        2.  Obaisi was indifferet to the risk of serious harm from lifting Brinson's medical
hold....................................................................................................................... 14

        3.  Obaisi was indifferent to the risk of serious harm from delay in removing Brinson's
chest catheter ........................................................................................................ 15

    D.  There is Evidence Hutchinson Acted with Deliberate Indifference to Brinson's Medical
Needs.............................................................................................................. 16

    E.  There is Evidence Trost Acted with Deliberate Indifference to Brinson's Medical
Needs.............................................................................................................. 20

        1.  Trost acted with deliberate indifference to Brinson's dietary needs ......................... 20

        2.  Trost acted with deliberate indifference to the risk of delaying Brinson's referral to a
vascular surgeon ..................................................................................................... 21

i

II.  A Dispute Exists With Respect to Plaintiff's Breach of Contract Claim .............................. 23

    A.  Legal Standard ................................................................................................................. 23

    B.  A Reasonable Jury Could Find That Wexford Breached the Settlement Agreement .... 24

        1. Breach by Failure to Follow UIC Recommendations ................................................ 24

        2. Breach by Failure to Arrange for Insertion of AV Graft ........................................... 25

        3. Breach by Failure to Make Sure A Renal Diet Was "In Place" ................................ 26

CONCLUSION ............................................................................................................................. 27

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ames v. Randle*,
933 F. Supp. 2d 1028 (N.D. Ill. 2013) ....................................................................................19

*Bentz v. Ghosh*,
718 F. App'x 413 (7th Cir. 2017) ...........................................................................................22

*Birch v. Jones*,
No. 02 CV 2094, 2004 WL 2125416 (N.D. Ill. Sept. 22, 2004).............................................11

*Brady v. LaSalle Cty. Municipality*,
No. 1:14-cv-5545, 2019 WL 2754091 (N.D. Ill. June 28, 2019).............................................21

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)...............................................................................................................7

*Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Grp., Inc.*,
218 F. Supp. 2d 974 (N.D. Ill. 2002) .................................................................................23, 24

*Greeno v. Daley*,
414 F.3d 645 (7th Cir. 2005) ........................................................................................8, 9, 15

*Hill v. Tangherlini*,
724 F.3d 965 (7th Cir. 2013) .................................................................................................17

*Lopez v. Obaisi*,
No. 14 CV 7497, 2015 WL 9304352 (N.D. Ill. Dec. 22, 2015) .............................................10

*Payne v. Pauley*,
337 F.3d 767 (7th Cir. 2003) ............................................................................................7, 17

*Riley-El v. Godinez*,
No. 13 C 8656, 2015 WL 4572322 (N.D. Ill. July 27, 2015) ...........................................18, 19

*Roe v. Elyea*,
631 F.3d 843 (7th Cir. 2011) ..............................................................................14, 15, 21, 22

*Sharif v. Ghosh*,
No. 12 C 2309, 2013 WL 228239 (N.D. Ill. Jan. 18, 2013) ..................................................20

*Sherrod v. Lingle*,
223 F.3d 605 (7th Cir. 2000) .................................................................................................10

*Spierer v. Rossman*,
798 F.3d 502 (7th Cir. 2015) ...................................................................................................7

*T.E. v. Grindle*,
599 F.3d 583 (7th Cir. 2010) .................................................................................................19

*Whiting v. Wexford Health Sources, Inc.*,
839 F.3d 658 (7th Cir. 2016) .................................................................................................14

*Wilson v. McRae's, Inc.*,
413 F.3d 692 (7th Cir. 2005) .................................................................................................17

*Zaya v. Sood*,
836 F.3d 800 (7th Cir. 2016) ...............................................................................14, 16, 21, 23

## Other Authorities

U.S. Const. amend. VIII............................................................................................................8, 18

## INTRODUCTION

This case principally involves a 14-month period during which defendants Wexford Health Sources, Inc. ("Wexford"), Saleh Obaisi, Randy Pfister, John Trost, and Jeffrey Hutchinson prevented Plaintiff Bob A. Brinson, a prisoner then incarcerated at Stateville Correctional Center ("Stateville"), from receiving constitutionally adequate treatment for his Polycystic Kidney Disease ("PKD"). This period was touched off by a July 29, 2016 appointment with kidney specialists at the University of Illinois at Chicago hospital ("UIC") where they concluded that Brinson had reached Stage V PKD, would soon need to start dialysis, and would require a follow-up appointment within four weeks.

But instead of adhering to that recommendation, Defendants—individually and acting together—prevented Brinson from receiving any medical care at all until December 2016, after which they again ignored specialists' recommendations. Indeed, there is evidence in the record as to each of the following acts and omissions from which a reasonable jury could find that the individual Defendants acted with deliberate indifference to Brinson's medical needs and Wexford breached its contractual obligation to him:

- Defendants Wexford and Dr. Saleh Obaisi, whose estate is now a defendant, were Brinson's sole medical providers at Stateville, and their conduct prevented Brinson from having his critical follow-up appointment within four weeks of July 29, 2016.

- Brinson sought help from Defendant Randy Pfister, then warden at Stateville, to get to UIC, but Pfister did nothing to help Brinson get access to medical care.

- While failing to get medical care for Brinson, Obaisi and Pfister affirmatively caused Brinson further harm by arranging his transfer from Stateville to Menard Correctional Center ("Menard"), disrupting his nephrology treatment at UIC during this critical period and sending him to a prison that did not have on-site dialysis.

- Once at Menard, Defendants Jeffrey Hutchinson, Menard's warden, and John Trost, Menard's medical director, failed to take steps to secure a medically necessary renal diet for Brinson, notwithstanding Brinson's advanced PKD.

1

- By the time Brinson received a nephrology appointment after his transfer, his need for dialysis was so critical he had to have urgent surgery for a catheter to be inserted into his chest. Though the catheter was a temporary solution and his surgeon recommended Brinson be evaluated for a permanent dialysis access point two to four weeks later, Trost, Obaisi, and Wexford each prevented Brinson from receiving the permanent access point until September 2017, despite knowing the risk of infection presented by his catheter.

This evidence creates a genuine issue of material fact that must be resolved at trial because it shows the individual Defendants knew Brinson faced serious harm, and either did nothing or affirmatively prevented his care. As for Wexford, the evidence shows it breached its obligations under a 2014 settlement agreement with Brinson that required Wexford to follow specialist recommendations and ensure a renal diet was in place for Brinson while he was at Menard. There is thus no basis for an award of summary judgment in Defendants' favor.

## FACTS

### I. Brinson's PKD and the Settlement Agreement

Sixty-one-year-old Brinson has been imprisoned at Stateville since 2009. Before his incarceration, when he was around 43 years old, Brinson was diagnosed with PKD, a serious, chronic illness that ultimately leads to kidney failure and the need for transplant or dialysis. To control the symptoms of his PKD and conserve kidney function, Brinson must be under the care of a nephrologist. The treatment protocol his nephrologist has consistently recommended includes a low-potassium, low-salt, low-phosphorus, healthy diet rich in fruits and vegetables, grains, fiber, white meat, and vegetable protein, known as a "renal diet." (PSOF ¶¶ 1–2.)[1]

Wexford is the private corporation that contracts with the State to provide healthcare to prisoners in Illinois custody. In 2014, Brinson and Wexford entered into a settlement agreement to resolve a 2011 civil rights lawsuit arising from Wexford employees' failure to provide Brinson

---

[1] Citations to "PSOF" refer to Plaintiff's Statement of Additional Facts filed concurrently with this response.

2

with constitutionally required medical care for his PKD. (PSOF ¶ 3.) Going forward, the settlement agreement required Wexford to bring Brinson to UIC for treatment by a nephrologist, and to "follow all medical plans and/or recommendations . . . made by UIC specialists relative to Plaintiff's PKD . . . at any time." In addition, the contract required Wexford to "ensure that a Therapeutic Diet Order for a renal diet . . . is ordered and in place" for Brinson as long as his nephrologist recommended it. (PSOF ¶ 4; Wexford SOF ¶ 2.)[2]

## II. Defendants Fail to Provide Brinson with Medical Care

Brinson began receiving treatment from UIC specialists in 2014 after the settlement agreement was in place; and he also received a renal diet order at Stateville. Before long, however, he began to miss follow-up appointments recommended by his doctors. By July 29, 2016, Brinson's primary nephrologist, Dr. Ana Ricardo, told him he was nearing kidney failure and would soon need to begin dialysis. Her plan was to closely monitor Brinson in the coming weeks so he could undergo surgery to receive a permanent dialysis access point—called an arteriovenous or "AV" graft—just before beginning dialysis. The UIC clinic initially recommended Brinson return within six weeks of his July appointment. But after seeing the reports from his lab work, Dr. Ricardo, shortened the timeframe and requested Brinson's return in four weeks. (PSOF ¶¶ 7–12.)

Stateville's medical director, Defendant Dr. Saleh Obaisi, received paperwork from the UIC clinic memorializing the July appointment, the recommendation that Brinson return to UIC in four weeks, and the recommendation that he continue to receive his renal diet. Obaisi agreed with the recommendations, approved them, and passed them along to Wexford's corporate review department, Utilization Management. Obaisi asked for, and received, Wexford's approval

---

[2] Citations to "Wexford SOF" refer to the Wexford Defendants' Rule 56.1 Statement of Undisputed Material Facts, ECF No. 130.

for Brinson to return to UIC in six weeks. But Brinson never went to UIC in August. Nor did he return to the clinic in September, October, or November. (PSOF ¶ 18.)

Knowing he was nearing—or already suffering from—kidney failure, Brinson pleaded with Obaisi and Stateville's warden, Defendant Randy Pfister, for help getting back to UIC. He sent medical grievances and talked to Pfister in person on several occasions, describing his condition and asking for medical care. Pfister did nothing. Behind the scenes, Wexford and Obaisi were indifferent as well. In mid-September, Wexford flagged that Brinson wasn't scheduled to return to UIC until December, and its corporate department reached out to Obaisi to ask if that was acceptable. Obaisi confirmed that he approved of the delay. (PSOF ¶¶ 20–22.)

### III. Defendants Facilitate and Approve Brinson's Transfer to Menard

Brinson's health rapidly deteriorated between July and November, and he was left languishing in his cell, fearing he would die. Instead of securing medical care for him during this period, Pfister and Obaisi did the opposite: they took affirmative steps to undermine his care. Toward the end of 2016, Brinson's cell house—a building known at Stateville as "F-House"—was slated to close. Since he began his care at UIC, Brinson had been subject to a "medical hold," a status in a prisoner's file that Wexford was contractually obligated to use to prevent prisoners with medical conditions from being transferred if the transfer would interfere with his continuing care or treatment plan. Unbeknownst to Brinson, in October, Obaisi lifted the medical hold from Brinson's file to facilitate Pfister's decision to transfer Brinson to Menard, more than 300 miles south of Stateville. (PSOF ¶¶ 23–25.)

For his part, Brinson learned of the transfer from a correctional officer making rounds in F-House on November 20, 2016, the night before the transfer was scheduled to occur. Brinson suffered a mental breakdown on hearing the news, and asked to speak to a member of the

4

prison's crisis team. He explained his precarious health to the crisis team member and told her he was three months overdue for his nephrology appointment and should have a medical hold in place. Through a nurse in the health care unit, the crisis team member contacted Obaisi. Obaisi knew the transfer would cause Brinson to miss his December appointment at UIC, that it would abruptly sever his continuing treatment at UIC, and that on-site dialysis is not available at Menard. Yet he confirmed the transfer could proceed. (PSOF ¶¶ 28–32.)

### IV. Brinson Requires Emergency Dialysis Through a Catheter in His Chest

Brinson arrived at Menard the next day, November 21, 2016. (IDOC SOF ¶ 12.)[3] During the intake process, Brinson requested his renal diet and explained his medical situation. Brinson was flagged for an urgent visit to the medical director, Dr. John Trost. Trost told Brinson that no renal diet was available at Menard. Brinson appealed to Menard's warden, Jeffrey Hutchinson. Brinson talked to Hutchinson in person on several occasions, wrote him a letter, and sent an emergency grievance, all explaining he had PKD and pleading for a renal diet. At the same time, Hutchinson began receiving emails from IDOC staff noting that Brinson was among a group of prisoners on medical holds who were transferred to Menard and would need to be sent back to Stateville. Hutchinson recognized the seriousness of Brinson's medical condition; but he did nothing to help Brinson get a renal diet upon learning from Brinson that Brinson was being told renal diets were unavailable at Menard. (PSOF ¶¶ 40–54.)

Trost too recognized the seriousness of Brinson's condition. Trost referred Brinson to a community clinic, where he was examined by nephrologist Dr. Muhammad Kamran on December 8, 2016. Brinson's lab reports and symptoms showed his kidneys had failed. Kamran determined he needed dialysis immediately. Kamran noted that Brinson was suffering from,

---

[3] Citations to "IDOC SOF" refer to Defendants' Rule 56.1 Statement of Undisputed Facts filed by Hutchinson and Pfister, ECF No. 128.

among other things, nausea, loss of appetite, night sweats, fatigue, headaches, bloody noses, difficulty swallowing, shortness of breath, bloody coughing, diarrhea, blood in his stool, painful and bloody urination, incontinence, swelling, weakness, and pain in his muscles, joints, low back, chest, and abdomen. (PSOF ¶¶ 55–58.)

Brinson asked Kamran to send him back to UIC for his AV graft so he could start dialysis; but it was too late. Instead, Kamran recommended a surgeon place an emergency catheter into Brinson's chest connecting to his jugular vein. On December 27, 2016, Brinson underwent the emergency surgery and received dialysis through the tunneled catheter. The surgeon, Dr. Lyman Hale, recommended Brinson see a vascular surgeon two to four weeks later so the catheter could be replaced by a permanent dialysis access site. This is because a tunneled catheter is a temporary dialysis access point that should not be used for more than 90 days and, ideally, would never be used. Indeed, because the catheter is a foreign object protruding from the body, it presents a high risk of infection and blood clots to dialysis patients. (PSOF ¶¶ 60–64.)

## V.     Defendants Fail to Provide Brinson with Medical Care Following His Emergency Surgery

Brinson returned to Menard after his surgery. Fearing the risk of infection, Trost ordered that Brinson remain in the infirmary. On December 22, 2016, Trost approved the surgeon's recommendation for a vascular consultation. Trost asked for Wexford's signoff, indicating the request was "urgent," and Wexford approved the referral. But shortly thereafter, around January 11, 2017, Trost changed his mind. He recommended that Brinson's appointment for an AV graft be canceled since Brinson would eventually go back to Stateville. (PSOF ¶¶ 65–67.)

Brinson returned to Stateville on January 29, 2017. The next day, Obaisi requested Wexford's approval to send Brinson to the vascular access clinic at UIC for his AV graft; and Wexford again approved. And again, Obaisi and Wexford washed their hands of Brinson after

signing the paperwork. For months, while he was living in a general population cell at Stateville, Brinson received dialysis through the temporary catheter protruding from his chest three times per week. On September 18, 2017—more than a year after missing his UIC nephrology appointment and more than nine months after receiving the tunneled catheter—Brinson finally underwent surgery for an AV graft. (PSOF ¶¶ 68–73.)

The ordeal Defendants subjected Brinson to cost him greatly. In addition to the grave impact on his health and severe and prolonged risk of infection and blood clot he faced from receiving dialysis through a temporary chest catheter while in prison, Brinson experienced severe emotional distress and anxiety that continue to this day. In his words: "I almost died. And for, like, two or three months it was real—real hectic. It was real scary because it was [] like, we don't care. Just throw you in the cell. And I couldn't see no one. I couldn't get no medical attention or nothing. There was nothing I could do physically about it." (PSOF ¶¶ 74–81.)

## LEGAL STANDARD

To receive summary judgment, Defendants must show that there is no genuine dispute about the material facts, and that, "drawing all inferences in the light most favorable to the non-moving party, . . . [Defendants are] entitled to judgment as a matter of law." *Spierer v. Rossman*, 798 F.3d 502, 507 (7th Cir. 2015); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In adjudicating a summary judgment motion, the Court may not make any credibility determinations, as those must be left for the jury. *Anderson v. Liberty Lobby, Inc.* 477 U.S. 242, 255 (1986). If, from the evidence in the record, a reasonable jury could find for the plaintiff as the non-moving party, the Court must deny the defendant's summary judgment motion. *See Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

7

## ARGUMENT

Because material facts remain in dispute with respect to Brinson's deliberate indifference and breach of contract claims, Defendants are not entitled to summary judgement on any count of the Amended Complaint. (ECF No. 70.) Instead, this case must proceed to trial on every claim against every defendant so that a jury may resolve the factual disputes and determine liability.

### I.     A Dispute Exists With Respect to Plaintiff's Eighth Amendment Claim

#### A.     Legal Standard

"Prison officials violate the Eighth Amendment's proscription against cruel and unusual punishment when they display 'deliberate indifference to serious medical needs of prisoners.'" *Greeno v. Daley*, 414 F.3d 645, 652–53 (7th Cir. 2005) (quoting *Estelle v. Gamble,* 429 U.S. 97, 104 (1976)). To prevail on a deliberate indifference claim, a plaintiff must satisfy both an objective and a subjective test. "To satisfy the objective component, a prisoner must demonstrate that his medical condition is 'objectively, sufficiently serious.' A serious medical condition is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would perceive the need for a doctor's attention." *Greeno*, 414 F.3d at 653 (internal citations and quotations omitted). Here, Defendants do not challenge the evidence of the objective component, that Brinson's PKD amounted to a serious medical condition. Nor could they: even Defendants admit that Plaintiff's PKD required medical treatment. (PSOF ¶¶ 1–4.)

To prevail on the subjective component of an Eighth Amendment deliberate indifference claim, "a prisoner must demonstrate that prison officials acted with a 'sufficiently culpable state of mind,'" meaning the officials "know of and disregard an excessive risk to inmate health." *Greeno*, 414 F.3d at 653 (quoting *Farmer v. Brennan,* 511 U.S. 825, 834 (1994)). The Seventh Circuit has explained that a plaintiff need not "establish that officials intended or desired the

8

harm that transpired. Instead, it is enough to show that the defendants knew of a substantial risk of harm to the inmate and disregarded the risk. Additionally, a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Greeno*, 414 F.3d at 653 (internal citations and quotations omitted). The record contains sufficient evidence to permit a jury to find that each individual defendant is liable for deliberate indifference under this standard.

### B. There is Evidence Pfister Acted with Deliberate Indifference to Brinson's Medical Needs

A reasonable jury could find two instances of Pfister acting with deliberate indifference to Brinson's medical needs. First, in the critical period after July 29, 2016, when Brinson was at Stage V PKD, Pfister did nothing to secure medically necessary, physician-recommended treatment for Brinson. Second, Pfister caused Brinson's transfer from Stateville to Menard in November 2016, which interfered with Brinson's ongoing care for his PKD.

### 1. Pfister was indifferent to the risk of Brinson's failure to receive treatment

Pfister knew that Brinson was not receiving necessary medical treatment, in particular a critical follow-up appointment after Brinson's July 29, 2016 visit to UIC. Brinson spoke with Pfister on three or four occasions about his kidney condition and missed medical appointments at UIC. (PSOF ¶ 20; Resp. to IDOC SOF ¶¶ 25–26). During these conversations, Brinson explained to Pfister that he was in the last stage of kidney disease and that he required—but was not receiving—ongoing medical care, including being taken to UIC for a follow-up appointment, as recommended by UIC nephrologists. (IDOC SOF ¶¶ 27–30.) Brinson also told Pfister, in the fall of 2016, that he was in severe pain due to his PKD. (IDOC SOF ¶ 29.) On the last occasion Brinson spoke with Pfister, he reminded Pfister that he was in the last stage of kidney disease and that he was in severe pain, and told him that he had not seen his doctor at UIC for six

months. (PSOF ¶¶ 20, 35.) During each of these conversations, Pfister told Brinson that he would follow up with medical about Brinson's treatment. (IDOC SOF ¶¶ 27–30.)

A reasonable jury could infer that Pfister acted with deliberate indifference to Brinson's serious medical needs by failing to take any meaningful steps to address Brinson's missed medical appointments. That can be found from the evidence that Brinson was never brought back to UIC after July 2016 and before being transferred to Menard. *See Sherrod v. Lingle*, 223 F.3d 605, 612 (7th Cir. 2000) (the standard is "whether the official knew of and disregarded an excessive risk to the inmate's health, not whether the inmate was ignored"). Moreover, the record is devoid of any evidence that Pfister contacted any medical provider or prison personnel to inquire about Brinson's medical needs and/or his missed appointments. Pfister's argument that Brinson does not know what Pfister did after each of their conversations (ECF No. 127 at 10) falls flat in light of his inability to produce evidence—including his own testimony—that he did *anything* to help Brinson get the medical care he needed. On the contrary, the record supports the inference that Pfister simply ignored Brinson's need for help in getting the medical team to address his very serious medical issues. (PSOF ¶ 21.)

Given Pfister's direct knowledge of Brinson's PKD and lack of treatment, he cannot avoid liability by pointing the finger at medical personnel or his own subordinates. (ECF No. 127 at 10.) *See Lopez v. Obaisi*, No. 14 CV 7497, 2015 WL 9304352, at *2 (N.D. Ill. Dec. 22, 2015) ("non-medical officials can be chargeable with deliberate indifference where they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner"). Moreover, Pfister was responsible for everything going on inside Stateville, including the grievance officers who reviewed medical grievances and who responded to medical grievances in Pfister's name. (IDOC SOF ¶¶ 36–7, 39; Resp. to IDOC SOF ¶¶ 20, 38,

40, 41.) *See Birch v. Jones*, No. 02 CV 2094, 2004 WL 2125416, at *7 (N.D. Ill. Sept. 22, 2004) (recognizing that "[t]hose signing the warden's name effectively act as his agent and their actions are accordingly attributable to him"). Pfister also admitted that he often heard complaints from inmates about medical care, and that he intervened on behalf of inmates to ensure that they obtained appropriate medical care. (PSOF ¶ 21; Resp. to IDOC SOF ¶¶ 19–20.) Moreover, there is no evidence that, with respect to Brinson, Pfister asked medical personnel whether, in their medical judgment, Brinson's follow-up with UIC nephrology should be delayed. (And, as discussed below, Obaisi did not exercise any medical judgment when he delayed Brinson's follow-up appointment.)

### 2. Pfister was indifferent to the risk of Brinson's transfer to Menard

A reasonable jury could find from the record evidence that Pfister knew UIC physicians were treating Brinson for Stage V PKD, and that transferring Brinson to Menard would interfere with that treatment. Indeed, just a few days before Brinson was transferred from Menard, Brinson raised this very issue with Pfister, telling Pfister that he believed he was on a medical hold, was in the last stage of renal disease and would soon require dialysis, and had been missing medical appointments at UIC where kidney specialists were supposed to have been closely monitoring him. (PSOF ¶ 35; IDOC SOF ¶ 30.)

A reasonable jury could also find that Pfister deliberately ignored Brinson's medical needs because he designated Brinson for transfer to Menard despite knowing Brinson's ongoing PKD treatment would be jeopardized by the move. The reasonableness of such a finding is underscored by the fact that Pfister was directly involved in the transfer and in the closing of F-House, which was the precipitating event for Brinson's transfer. Pfister testified that he personally monitored the transfer of inmates housed in F-House. (PSOF ¶ 36.) He worked closely with the transfer coordinator and clinical services at the prison to facilitate prisoners'

transfers, and he helped formulate the criteria used to determine which inmates would be moved and who would stay. (PSOF ¶ 36.) In addition, Pfister failed to apprise IDOC of Brinson's medical needs and ongoing treatment, which would have caused the transfer coordinator's office to question its approval of Brinson's transfer. (PSOF ¶ 39.) In view of this evidence, there is a question of fact over Pfister's assertion that he was "not directly involved" with the inmate transfers that occurred upon the closing of F-House. (ECF No. 127 at 6.)

There is also a question of fact over Pfister's claim that Dr. Obaisi was solely responsible for Brinson's transfer to Menard. (ECF No. 127 at 5–6.) First, there is no evidence that Pfister actually deferred to or relied upon Obaisi's medical judgment in any way, so there is no support for Pfister's claim that this purported fact is uncontested. Second, the fact is contested by the Wexford Defendants, who contend that Brinson's transfer was "in all aspects controlled by IDOC." (ECF No. 131 at 9.) Third, Pfister had independent knowledge of Brinson's condition and medical needs, and was obligated to address those needs, here by keeping Brinson at Stateville. As such, Pfister has not shown he is absolved from liability flowing from Brinson's transfer to Menard.

In view of the evidence, a reasonable jury could return a verdict against Pfister. His motion for summary judgment should be denied.

### C. There is Evidence Obaisi Acted with Deliberate Indifference to Brinson's Medical Needs

A reasonable jury could find three instances of Obaisi acting with deliberate indifference to Brinson's medical needs. First, Obaisi caused a scheduling delay on a critical follow-up appointment with UIC nephrology. Second, Obaisi lifted the medical hold on Brinson, which caused Brinson to be transferred from Stateville to Menard in November 2016 and, in turn, caused Brinson to miss his follow-up appointment with UIC nephrology and interfered with

12

Brinson's ongoing treatment at UIC. Third, after Brinson returned to Stateville, Obaisi delayed in getting Brinson surgery to remove his chest catheter, which presented an ongoing and serious risk of infection.

### 1. Obaisi was indifferent to the risk of serious harm from a delay in scheduling the follow-up nephrology appointment at UIC

Brinson needed to return to UIC within four weeks of July 29, 2016 for a follow-up nephrology appointment. Because his PKD was so advanced, and he would soon need to go on dialysis, having a follow-up appointment as close to the four week mark as possible was critical for Brinson's medical care, and Brinson faced risk of serious harm without it.

A reasonable jury could find that Obaisi knew Brinson faced risk of serious harm the longer he went without a follow-up to his July 29, 2016 appointment. The notes from that appointment reflect that Brinson was at Stage V PKD as of July 29, 2016, that he would soon need to go on dialysis, and that Dr. Charkravarty, the fellow who works under Dr. Ricardo's supervision, recommended a six-week turnaround for a follow-up appointment. (PSOF ¶ 8.) Obaisi was also aware that Dr. Ricardo determined that six weeks was too long given Brinson's deteriorating condition, and that she shortened the timeframe for a follow-up appointment to just four weeks. (PSOF ¶¶ 10–12.) For his part, Obaisi, before Ricardo shortened the follow-up timeframe, requested that Wexford approve a follow-up appointment within six weeks. (PSOF ¶ 17.)

A reasonable jury could find that Obaisi deliberately ignored the risk to Brinson by causing a scheduling delay of the follow-up nephrology appointment. On September 12, 2016, Wexford's Utilization Management team discovered that Brinson had been scheduled for a follow-up appointment in December 2016, over three months after the four-week timeframe Ricardo recommended (August 26, 2016). (PSOF ¶ 22.) Utilization Management asked Obaisi

13

whether he approved of this scheduling delay, and Obaisi said yes. (*See id.*) A reasonable jury could find that by approving the delay, Obaisi deliberately ignored the UIC specialists' recommendations and the serious risk to Brinson from having to wait until December for a nephrology appointment that was supposed to happen by August 26, 2016. *See Zaya v. Sood*, 836 F.3d 800, 806 (7th Cir. 2016) ("A jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist"). Moreover, Obaisi knew better than to delay Brinson's appointment, which is further evidence that he deliberately ignored the risk of serious harm to Brinson. *See Whiting v. Wexford Health Sources, Inc.*, 839 F.3d 658, 662–63 (7th Cir. 2016) ("'where evidence exists that the defendant[ ] knew better than to make the medical decision[ ] that [he] did,' then summary judgment is improper and the claim should be submitted to a jury") (alteration in original). Furthermore, there is no evidence that Obaisi's approval of a December 2016 appointment was based on his medical judgment that a scheduling delay was appropriate. (PSOF ¶ 22.) *See Roe v. Elyea*, 631 F.3d 843, 862 (7th Cir. 2011).

### 2. Obaisi was indifferent to the risk of serious harm from lifting Brinson's medical hold

Obaisi also deliberately ignored the risk of serious harm to Brinson when he lifted the medical hold that was in place to prevent Brinson from being transferred from Stateville. The evidence reflects that Brinson was on a hold as of at least June 2014. (PSOF ¶ 24.) Specifically, Obaisi had twice told Brinson that he was on a medical hold; a note from a Stateville counselor reflected that Brinson was on a hold; the Wexford-IDOC contract required a medical hold for an inmate undergoing treatment (which Wexford's corporate representative acknowledged was the case for Brinson); a post-transfer IDOC email notes that medical holds were lifted on Brinson and other inmates to facilitate their transfer to Menard; and Obaisi wrote on an Offender Outpatient Progress Note in Brinson's medical record dated October 11, 2016 "dc medical hold,"

meaning "discontinue medical hold." (PSOF ¶¶ 37, 52.) In addition to the progress note documenting Obaisi's order to discontinue the hold, evidence that Obaisi caused Brinson's transfer includes a nurse's medical record and testimony that Obaisi told her Brinson could be transferred to Menard.

By lifting the medical hold and authorizing Brinson's transfer to Menard, Obaisi deliberately ignored the serious risk to Brinson from a further delay in receiving his nephrology appointment. Obaisi knowingly caused Brinson to miss his December 2016 appointment at UIC, and also caused Brinson to stop receiving treatment by UIC nephrologists, which Obaisi knew would interfere with Brinson's ongoing care. Underscoring his deliberate indifference is that there is no evidence Obaisi exercised medical judgment in lifting the medical hold. *See Roe*, 631 F.3d at 862.

### 3. Obaisi was indifferent to the risk of serious harm from delay in removing Brinson's chest catheter

Obaisi's deliberate indifference toward Brinson's medical needs resumed when Brinson returned to Stateville on January 29, 2017 with the tunneled catheter protruding from his chest. Obaisi knew that Brinson faced a risk of infection from the catheter as the risk was obvious. *Greeno*, 414 F.3d at 653 (objective component of deliberate indifference satisfied when a plaintiff faces a risk "so obvious that even a lay person would perceive the need for a doctor's attention"). In addition, Dr. Lyman Hale, the surgeon who inserted the catheter on December 27, 2016, recommended that Brinson be evaluated by a vascular surgeon within two to four weeks. Knowing that Brinson needed treatment for the catheter, on January 30, 2017, the day after Brinson returned to Stateville, Obaisi requested that Wexford Utilization Management schedule Brinson for vascular surgery to insert an AV graft and remove the chest catheter. (PSOF ¶ 69.)

But Obaisi stood idly by while Brinson went months without receiving the needed

referral. Brinson did not see a vascular surgeon until July 26, 2017 and did not receive an AV graft until September 18, 2017. Obaisi took no steps, after requesting that Wexford schedule an appointment for Brinson with a vascular surgeon, to make sure that Brinson received an AV graft and had the catheter removed as soon as possible. Brinson accordingly faced a significant risk of infection for the eight months he was at Stateville with a chest catheter instead of an AV graft. Obaisi exacerbated this risk of infection by keeping Brinson in the general prison population rather than in the infirmary, as Dr. Trost had done at Menard. A reasonable jury could find deliberate indifference from this evidence that Obaisi ignored Dr. Hale's recommendation. *See Zaya*, 836 F.3d at 806.

### D. There is Evidence Hutchinson Acted with Deliberate Indifference to Brinson's Medical Needs

The record also contains sufficient evidence to permit a reasonable jury to find Warden Jeffrey Hutchinson liable for deliberate indifference because he knew Brinson was not receiving a renal diet at Menard, but did nothing to help Brinson secure the diet.

The record is replete with evidence that Hutchinson knew about Brinson's condition, need for treatment, and failure to receive medical attention or a renal diet. Brinson testified that he personally told Hutchinson at least three times that he suffered from PKD; should not have been transferred to Menard; and should be on a medical diet. Brinson further testified that he told Hutchinson he was in pain from his kidneys and was supposed to have started dialysis at Stateville; he'd been missing his doctor appointments; and at his last UIC appointment, Dr. Ricardo had told him that the following month (August 2016) she was going to place an artificial graft in his arm so he could start dialysis. (IDOC SOF ¶¶ 53–55; PSOF ¶ 46.) According to Brinson, the first time Hutchinson saw him at Menard, Hutchinson told Brinson he looked sick and Hutchinson could tell he was in a lot of pain. Brinson also testified that he wrote Hutchinson

a letter the first or second day he was at Menard explaining he needed a renal diet; and Hutchinson acknowledged receiving the letter during a subsequent in-person conversation. (PSOF ¶ 48.)

In his motion, Hutchinson takes the meritless position that "there is no evidence to support that the conversations took place." (ECF No. 127 at 9.) Of course, Brinson's testimony *is* evidence the Court must construe in his favor—without making a credibility determination—in deciding whether a disputed fact exists. *See, e.g., Payne*, 337 F.3d at 771 (rejecting defendant's argument that plaintiff's deposition testimony is insufficient to overcome summary judgment, characterizing claim as "simply another way of saying that her testimony is not credible"); *see also Wilson v. McRae's, Inc.*, 413 F.3d 692, 694 (7th Cir. 2005) ("Most affidavits are self-serving, as is most testimony, and this does not permit a district judge to denigrate a plaintiff's evidence when deciding whether a material dispute requires trial."); *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013) (holding a plaintiff may rely on self-serving evidence to create a material factual dispute and overruling cases suggesting the contrary). Moreover, though Hutchinson claimed not to recall speaking with Brinson, he conceded at his deposition that he was warden at Menard while Brinson was there, and that he had a practice of making rounds in the cell houses and talking to prisoners. This evidence, alongside Brinson's testimony that the conversations occurred, is sufficient to create a disputed fact for a jury's determination. *See Payne*, 337 F.3d at 778 ("It is the job of the jury, and not the district court judge at summary judgment, to determine which party's evidence to credit.")

What is more, Hutchinson acknowledged that on December 7, 2016, he received, reviewed, and signed Brinson's emergency grievance reporting that Brinson (a) was in end stage renal disease; (b) was supposed to have started dialysis before his transfer to Menard; (c) missed

his specialist appointments at UIC before being transferred; and (d) was suffering pain. (IDOC SOF ¶ 63; PSOF ¶ 49.) Hutchinson testified that he thought the grievance had merit and needed to be addressed by medical director John Trost on an expedited basis as it appeared Brinson's condition was serious. (IDOC SOF ¶ 64; PSOF ¶ 50.) In addition, Hutchinson acknowledged that on December 8, 2016, he read an email with the subject "Brinson A82298" alerting him that Menard received more than a dozen prisoners from Stateville who had been on medical holds, but were nonetheless transferred. (PSOF ¶ 52.) These facts undermine Hutchinson's dubious claim that he was "not aware of Plaintiff's medical condition." (ECF No. 127 at 7.) And the facts certainly create a sufficient basis for a reasonable jury to find Hutchinson knew about Brinson's serious medical need and inability to get his medical diet at Menard.

The record also establishes that despite this knowledge, Hutchinson failed to take reasonable measures to ensure Brinson received the appropriate diet. Hutchinson argues he is absolved from liability for deliberate indifference because he "expedited" Brinson's emergency grievance "so that it would go directly to the medical department to look into the matter." (ECF No. 127 at 9; *see also id.* at 5 ("Given that Plaintiff's renal diet was a medical decision, Defendant Hutchinson properly deferred to Dr. Trost's judgment.").) That claim fails as a matter of law and fact. The Eighth Amendment does not permit a prison warden to disavow his responsibility to care for prisoners in his custody where he knows those prisoners aren't getting adequate medical care. In *Riley-El v. Godinez*, No. 13 C 8656, 2015 WL 4572322, at *6 (N.D. Ill. July 27, 2015), for example, this Court rejected the argument the warden raises here: that he cannot be liable to the plaintiff as a matter of law because he had no personal involvement the prisoner's medical care. In denying the warden's motion to dismiss, the *Riley-El* Court affirmed the viability of a deliberate indifference claim for the failure to act after learning from a

18

grievance that a prisoner diagnosed with PKD was not receiving a medically appropriate diet or medical care. The court reasoned: "non-medical officials can be chargeable with deliberate indifference where they have reason to believe (or actual knowledge) that prison doctors are mistreating (or not treating) a prisoner." *Id*. (internal citations and quotation marks omitted).

Hutchinson's conduct gives rise to liability under this legal framework because he concedes that there was no renal diet available at Menard, and that he did absolutely nothing to rectify or address that predicament. Hutchinson testified that he recalled no phone call, email, conversation, or any other act directed at helping Brinson secure his medical diet. (PSOF ¶ 51.) Instead, Hutchinson blithely told Brinson no renal diet was available at Menard, and passed him along to Trost. (PSOF ¶ 47.) Hutchinson is likewise precluded from hiding behind the meritless claim that "there is no evidence" he "was responsible for providing Plaintiff with a medical diet once he arrived at Menard." (ECF No. 127 at 5.) In addition to the fact that, as discussed above, this defense is not legally viable, it's also belied by Hutchinson's testimony. Indeed, Hutchinson testified that, as warden at Menard, his responsibilities included making sure medical care was being provided to inmates correctly. (PSOF ¶ 44.)

These facts, analyzed under the correct legal framework, create a basis for liability and preclude summary judgment in Hutchinson's favor. *See, e.g., Ames v. Randle,* 933 F. Supp. 2d 1028, 1037–38 (N.D. Ill. 2013) ("A defendant will be deemed to have sufficient personal responsibility if he directed the conduct causing the constitutional violation, or if it occurred with his knowledge or consent.") (citation and internal quotation marks omitted); *T.E. v. Grindle,* 599 F.3d 583, 588 (7th Cir. 2010) (supervisors may be liable for deliberate indifference if they "know about the [unconstitutional] conduct and facilitate it, approve it, condone it, or turn a blind eye for fear of what they might see") (citation and internal quotation marks omitted).

### E. There is Evidence Trost Acted with Deliberate Indifference to Brinson's Medical Needs

A reasonable jury could find two instances of Trost acting with deliberate indifference to Brinson's medical needs. First, Trost ignored Brinson's need for a renal diet. Second, Trost ignored the risk of infection from delaying Brinson's referral to a vascular surgeon to receive a permanent dialysis access site.

#### 1. Trost acted with deliberate indifference to Brinson's dietary needs

A reasonable jury could find that Trost knew Brinson needed a renal diet, but consciously failed to take reasonable measures to secure the diet. While Brinson was incarcerated at Stateville, specialists at UIC recommended that he receive a renal diet. Obaisi, the medical director at Stateville, agreed with that recommendation and entered an order for a renal diet. Documentation of these facts is in Brinson's medical file, which Trost, as the medical director of Menard, would have reviewed. Brinson also told Trost about his PKD and that he needed a renal diet. Meanwhile, Trost testified that he would counsel renal patients like Brinson to refrain from eating certain substances as part of their treatment, showing that he knew how critical diet is to a PKD patient's treatment. From this evidence, a reasonable jury could find that Trost knew Brinson faced a substantial risk of harm if he did not have a renal diet. (PSOF ¶ 40.)

The evidence also shows Trost disregarded the substantial risk of harm to Brinson. Trost did not enter a renal diet order, did not speak with prison officials or kitchen staff at Menard about providing a renal diet, and did not contact anyone at IDOC to inquire why a diet offered at Stateville could not also be offered at Menard. (PSOF ¶ 40 (Trost explaining that the most he could or would offer was dietary counseling).) *See Sharif v. Ghosh*, No. 12 C 2309, 2013 WL 228239, at *5 (N.D. Ill. Jan. 18, 2013) (failure to take reasonable steps to address serious medical condition is deliberate indifference). Moreover, the reason Trost gave for his failure to enter a

renal diet order is that Menard did not offer any therapeutic diets, including a renal diet. When asked if renal diets were available at Menard, he explained: "To the best of my knowledge, no. I mean, I know that there were no diabetic diets. I believe that there were no cardiac diets. *And I'm certain that there were no renal diets.*" (PSOF ¶ 40 (emphasis added).) Trost's testimony shows that in failing to secure an appropriate diet for Brinson, he did not act pursuant to any medical judgment that the diet was unnecessary; but rather deferred to the administrative belief that Menard would not provide a renal diet. A doctor acts with deliberate indifference when he fails to exercise medical judgment in this way. *Roe*, 631 F.3d at 862. Likewise, a doctor acts with deliberate indifference when medical decisions are based on an inmate's "simple misfortune" of being housed in a facility that does not offer necessary care or, here, a necessary diet. *See Brady v. LaSalle Cty. Municipality*, No. 1:14-cv-5545, 2019 WL 2754091, at *4 (N.D. Ill. June 28, 2019).

A reasonable jury could also find that Trost acted with deliberate indifference because he disregarded UIC specialists' recommendation that Brinson should have a renal diet. While a prison doctor may depart from specialist recommendations, it is deliberate indifference to do so when that decision is not based on medical judgment, as was the case here. *Zaya*, 836 F.3d at 806 ("A jury can infer conscious disregard of a risk from a defendant's decision to ignore instructions from a specialist").

### 2. Trost acted with deliberate indifference to the risk of delaying Brinson's referral to a vascular surgeon

A reasonable jury could also find that Trost knew Brinson faced a substantial risk of harm from infection of the chest catheter that was inserted into Brinson on December 27, 2016 and that he deliberately ignored that risk.

Trost testified that he was aware that having a chest catheter presented a risk of infection to Brinson. Trost even testified that, in view of the risk, Trost kept Brinson in the infirmary at Menard, explaining: "I mean, you could not send an inmate out to a cell house with a catheter exiting their body." (PSOF ¶ 67.) The risk of infection also explains why Trost made an urgent request on December 22, 2016 for Wexford to approve taking Brinson off-site to have an AV graft inserted and the chest catheter removed. (PSOF ¶ 65.)

Despite his ostensible appreciation for the risk of infection that Brinson faced, Trost prevented Brinson from having surgery to insert an AV graft, which would have allowed the catheter to be removed. Brinson was scheduled for that surgery on January 12, 2017. But as reflected in a Wexford business record, Trost prevented the surgery by recommending that Wexford cancel it. By preventing Brinson's AV graft insertion, Trost necessarily caused Brinson to continue to face risk of infection from the chest catheter. Trost made this decision knowing that Brinson would be exposed to infection during his transfer back to Stateville and while incarcerated at Stateville. Indeed, it was not until September 18, 2017, eight months after Brinson was scheduled to have the AV graft insertion and more than nine months after he first received the catheter, that the catheter was finally removed. Because Trost was aware of the serious risk of infection and prevented that risk from being promptly addressed, a reasonable jury could find that he acted with deliberate indifference. *See Bentz v. Ghosh*, 718 F. App'x 413, 417 (7th Cir. 2017)

Moreover, a jury could find that Trost acted with deliberate indifference in cancelling the AV graft insertion and removal of the catheter because that decision was not based on medical judgment. *Roe*, 631 F.3d at 862. Trost's reason for cancelling the surgery, according to Wexford's records, was that "[s]ince Brinson will only be getting a few dialysis treatments here

22

before being transferred . . . the surgeon and hospital he will be using to get the dialysis treatments [should] do the consult." (PSOF ¶ 66.) The Wexford business record reflects no medical reason for postponing the procedure. And Trost, for his part, did not recall any detail other than that the procedure was postponed. (PSOF ¶ 66.) Moreover, by cancelling the surgery, Trost ignored the recommendation of Dr. Hale that Brinson be evaluated by a vascular surgeon within two to four weeks of having the chest catheter inserted. *See Zaya*, 836 F.3d at 806 (7th Cir. 2016).

## II.    A Dispute Exists With Respect to Plaintiff's Breach of Contract Claim

### A. Legal Standard

"Under well-settled Illinois law the elements for a breach of contract claim are (1) the existence of a valid and enforceable contract, (2) plaintiff's performance of the contract, (3) defendant's breach of the contract and (4) a resulting injury to the plaintiff." *Fabrica de Tejidos Imperial, S.A. v. Brandon Apparel Grp., Inc.*, 218 F. Supp. 2d 974, 976 (N.D. Ill. 2002) (footnote omitted) (citing *Priebe v. Autobarn, Ltd.,* 240 F.3d 584, 587 (7th Cir. 2001)). As in this case, where a plaintiff has adduced undisputed evidence of all the elements to support his breach of contract claim, summary judgment in his favor is appropriate. *Fabrica de Tejidos Imperial, S.A.*, 218 F. Supp. 2d at 976 (resolving cross-motions for summary judgment on breach of contract claim in plaintiff's favor and ordering trial on the amount of damages only).

Here, Wexford does not even address, let alone contest, three of the four required elements to prove Brinson's breach of contract claim. As a result, there appears to be no dispute that Wexford's settlement agreement with Brinson is a valid and enforceable contract; Brinson performed his obligation under the contract by dismissing his prior lawsuit without prejudice; and Brinson was damaged by Wexford's alleged breach of the settlement agreement. (PSOF ¶¶ 74–81.) Instead, Wexford focuses its entire motion on the sole issue of whether it breached

23

the settlement agreement by failing to provide Brinson with appropriate medical care, including a renal diet. Because the record contains copious evidence that Wexford indeed breached its obligations under the agreement, Wexford is not entitled to summary judgment on the breach of contract claim.

### B. A Reasonable Jury Could Find That Wexford Breached the Settlement Agreement

Wexford's motion for summary judgment should be denied because a reasonable jury could find that Wexford breached the settlement agreement in three ways. First, a reasonable jury could find that Wexford breached its obligation "to follow all medical plans and/or recommendations (the 'Recommendations') made by UIC specialists relative to plaintiff's PKD." (Wexford SOF ¶ 2.) Second, a reasonable jury could find that Wexford breached its obligations to follow the recommendations made by Dr. Hale, the surgeon who implanted Brinson's tunneled catheter when he was at Menard. Third, a reasonable jury could find that Wexford breached its obligation to "ensure that a therapeutic diet order for a renal diet, per IDOC guidelines and/or directives, is ordered **and in place**" while Brinson was incarcerated at Menard. (*Id.* (emphasis added).)

### 1. Breach by Failure to Follow UIC Recommendations

With respect to the "Recommendations" breach, Brinson must prove that a UIC specialist set forth a medical plan or recommendation that Wexford failed to follow. The record contains evidence from which a jury could find both these facts.

The jury could find from the evidence that UIC specialists recommended Brinson return to UIC for a follow-up nephrology appointment within four to six weeks of July 29, 2016. The jury could also find that Wexford failed to follow this recommendation. Wexford's corporate representative, Dr. Neil Fischer, testified that Wexford's Utilization Management team

24

discovered in September 2016 that Brinson had not been scheduled for a follow-up until December 2016. Utilization Management raised this issue with Obaisi, who despite having notes from UIC stating that Brinson should return within just four weeks, approved the December 2016 follow-up appointment. (PSOF ¶¶ 9–12, 22.) Wexford deferred to Obaisi rather than meet its contractual obligation to follow the Recommendation of UIC specialists that Brinson return for a follow-up appointment within four to six weeks of July 29, 2016. Wexford thus breached the Settlement Agreement. (PSOF ¶ 4.) These facts likely support a summary finding for Brinson on his breach of contract claim. But at the very least, they preclude entry of summary judgment for Wexford.

Wexford nevertheless argues that judgment should be entered in its favor in view of its defenses to this breach. Wexford's first defense is that the law presumes a reasonable time for performance. (ECF No. 131 at 14.) This principle only applies, however, when the parties do not set a time for performance. Here, the Settlement Agreement set the time for performance by reference to the Recommendation, and the UIC specialists recommended that Brinson return for follow-up *within four weeks*. Brinson's follow-up appointment was scheduled 19 weeks later, and Brinson ultimately missed it. Those facts unequivocally demonstrate a breach of contract.

Wexford's second defense is that the Settlement Agreement "specifically allowed that any recommendations by UIC must take into account the security environment in which Plaintiff resides." (ECF No. 131 at 14.) But Wexford cites no evidence suggesting that its failure to follow the Recommendation that Brinson return to UIC for a follow-up appointment within four weeks resulted from the security environment at Stateville. As a result, Wexford's defense rings hollow and should be rejected.

**2.  Breach by Failure to Arrange for Insertion of AV Graft**

A reasonable jury could find that Wexford further breached the settlement agreement by failing to follow the Recommendations of Dr. Hale, the specialist who treated Brinson while he was at Menard. The Settlement Agreement provides that if UIC could not treat Brinson for any reason, including Brinson's transfer, Wexford could "substitute treatment at UIC for treatment at another facility or community specialist." (PSOF ¶ 64.) But Wexford would still be required to follow the recommendations of any "substitute" specialists treating Brinson, and Wexford failed to meet that obligation.

While Brinson was at Menard, Dr. Hale recommended that he see a vascular surgeon within two to four weeks of the December 27, 2016 catheter insertion surgery. (PSOF ¶ 64.) Trost accepted this recommendation and passed it along to Wexford for approval; but then he cancelled the appointment on the grounds that Brinson would be returning to Stateville. (PSOF ¶ 66.) Once Brinson returned to Stateville, Obaisi again requested Wexford's approval for a referral to an outside vascular surgeon; and Wexford again approved. (PSOF ¶ 69.) But Brinson did not receive an AV graft and have the chest catheter removed until *September 28, 2017*. (PSOF ¶¶ 72–73.) These facts show that Wexford was aware of Dr. Hale's recommendation that Brinson see a vascular surgeon sometime in January 2017; but it allowed him to go *months* beyond that recommended timeframe without receiving care. As Dr. Hale testified at his deposition, by delaying Brinson's vascular surgery consultation, Wexford failed to follow his recommendation. (PSOF ¶ 73.) This too provides a basis for a reasonable jury to find that Wexford breached the Settlement Agreement.

### 3. Breach by Failure to Make Sure A Renal Diet Was "In Place"

The Settlement Agreement also provides that "Wexford will ensure that a therapeutic diet order for a renal diet, per IDOC guidelines and/or directives, is ordered and in place for plaintiff

26

so long as it is deemed medically indicated by a UIC or other nephrologist." (Wexford SOF ¶ 2 (emphasis added)). To prove Wexford breached this obligation, Brinson has to show that UIC recommended a renal diet and that Wexford either failed to order the diet or, having ordered it, failed to make sure it was "in place."

There is uncontested evidence that UIC specialists recommended a renal diet for Brinson. There is also evidence in the record that Brinson did not receive a renal diet while he was incarcerated at Menard and that no order was ever even entered for a renal diet. (PSOF ¶¶ 40– 41.) A reasonable jury could find from this evidence that Wexford breached its obligation to order a renal diet for Brinson while he was incarcerated at Menard.

Wexford nevertheless argues that summary judgment should be entered in its favor because the Settlement Agreement provides that "It is agreed and understood that Plaintiff's diet is provided by IDOC in accordance with the IDOC dietary guidelines and directives over which Wexford has no direct control." (ECF No. 131 at 14.) Wexford has cited no evidence to support its position that IDOC has dietary guidelines and directives that prohibit a renal diet. There is evidence that no renal diet was offered at Menard. But Menard is a single facility, and the Settlement Agreement refers to *IDOC's* dietary guidelines. Moreover, this language does not absolve Wexford from ordering a renal diet; it merely protects Wexford in the event that a renal diet is not delivered to Brinson. As such, the language Wexford relies upon does not provide a basis for judgment in its favor.

## CONCLUSION

As set forth above and in Plaintiff's Response to Defendants' Statements of Fact and Statement of Additional Facts, there is substantial evidence of Plaintiff's claims against

Defendants, which creates a dispute for the jury. The Court should therefore deny Defendants'

motions and permit this case to proceed to trial.

Dated:  September 20, 2019                     Respectfully submitted,


                                               BOB A. BRINSON

                                               By: *s/ Steven J. Yatvin*
                                                    One of His Attorneys

                                               Steven J. Yatvin
                                               Megan R. Grant
                                               BARACK FERRAZZANO
                                               KIRSCHBAUM & NAGELBERG LLP
                                               200 W. Madison St., Ste. 3900
                                               Chicago, IL 60606
                                               (312) 984-3100
                                               steve.yatvin@bfkn.com
                                               megan.grant@bfkn.com

                                               -and-

                                               Alison R. Leff
                                               Loevy & Loevy
                                               311 N. Aberdeen St., 3rd Fl.
                                               Chicago, IL 60607
                                               (312) 243-5900
                                               alison@loevy.com

                                               *Attorneys for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on September 20, 2019, I filed the foregoing document using the

Court's CM/ECF system, which will send an electronic notice of filing to all counsel of record.

*s/ Steven J. Yatvin*