**THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHER DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| BRINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 17 CV 1659 |
| | ) | |
| LASHBROOK, *et al.*, | ) | Honorable John Z. Lee |
| | ) | Judge Presiding |
| Defendants. | ) | |

**DEFENDANTS' RESPONSE TO**
**PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS**

Defendants Randy Pfister and Jeffrey Hutchinson ("Defendants"), by and through their attorney, Kwame Raoul, Attorney General of Illinois, and pursuant to Local Rule 56.1, respond to Plaintiff's Statement of Additional Facts as follows:

**A. Plaintiff's Medical Condition and His Medical Care at Stateville**

1.     Before his incarceration, when he was around 43 years old, Plaintiff was diagnosed with Polycystic Kidney Disease ("PKD"), a chronic kidney illness that requires treatment. (ECF No. 130-9, Brinson Tr. at 40:7–22; see also ECF No. 130-5, Ricardo Tr. at 38:15–39:18 (describing PKD, the treatment it requires, and the symptoms and complications it causes in patients).)

**RESPONSE: Admit that Plaintiff testified to being diagnosed with PKD before his incarceration around age 43; and that PKD is a chronic kidney disease that requires treatment. Disputed as to any medical diagnosis implied by Plaintiff.**

2.     As a result of his PKD, Plaintiff requires, among other things, a low-potassium, low-salt, low-phosphorus, healthy diet rich in fruits and vegetables, grains, fiber, white meat, and vegetable protein. (ECF No. 130-5, Ricardo Tr. at 44:2–19.)

**RESPONSE: Objection, move to strike and disregard. The allegations in paragraph 2 are not supported by the evidence in the record and mischaracterize the cited testimony. Subject to and without waiving these objections, disputed to the extent Plaintiff implies that his PKD "required" a low-potassium, low-salt, low-phosphorus, healthy diet rich in fruits and vegetables, grains, fiber, white meat, and vegetable protein. Dr. Ricardo testified that she "recommends" a low potassium diet for patients with high potassium; and that "for high blood pressure it's very important that the diet is low in salt;" "recommend[s] that they don't eat a diet that is rich in phosphorous;" and "advocate[s]…a healthy diet, fruits and vegetables, grains, fiber, white meat…[and] vegetable protein. ECF No. 130-5, Ricardo Tr. at 44:6-45:14.**

### B. Plaintiff's Prior Lawsuit and the Settlement Agreement with Wexford

3.     In 2014, Plaintiff and Wexford entered into a settlement agreement to resolve a 2011 civil rights lawsuit in which Plaintiff alleged that Wexford employees failed to provide him with constitutionally required medical care for his PKD. (ECF No. 70-1.)

**RESPONSE: Admit.**

4.     The settlement agreement provides, among other things:

(1)(b)  Wexford agrees to follow all medical plans and/or recommendations (the "Recommendations") made by UIC specialists relative to Plaintiff's PKD during or at any time after [Plaintiff's initial

UIC] Appointment, to the extent that any such recommendations must take into account the security environment in which Plaintiff resides. . . .

(1)(c) Wexford will ensure that a Therapeutic Diet Order for a renal diet, per IDOC guidelines and/or directives, is ordered and in place for Plaintiff so long as it is deemed medically indicated by a UIC or other nephrologist.

(2) Wexford reserves the right to substitute treatment at UIC for treatment at another facility or community specialist should UIC be unwilling or unable to provide treatment, otherwise disrupt the contractual relationship between it and IDOC, or if Plaintiff should be moved to another facility by IDOC from which transport to UIC would not be feasible or reasonable.

(Id. at ¶¶ 1.b-c, 2; see also ECF No. 130-1, Fischer Tr. at 9:4–24.)

**RESPONSE: Admit.**

5.    Following the execution of the settlement agreement, Plaintiff began receiving a renal diet at Stateville. (ECF No. 130-9, Brinson Tr. at 26:1–6.)

**RESPONSE: Admit.**

### C. Defendants Failed to Follow Specialists' Recommendations Regarding Follow up Appointments

6.    Since at least 2014, Plaintiff has been treated at the nephrology clinic at the University of Illinois at Chicago Hospital (UIC) under the care of Dr. Ana Ricardo. Dr. Ricardo is an associate professor of medicine at UIC and a board-certified nephrologist with extensive training and experience treating PKD patients. (See, e.g., IDOC000684–87, attached hereto as Exhibit 1; see also ECF No. 130-5, Ricardo Tr. at 17:18–19:9, 34:18–35:11; 38:3–14.)

**RESPONSE: Admit.**

*Recommendations Regarding Follow-Up Appointments*

7.      Over the years since Plaintiff began treatment at UIC, the nephrologists have recommended he return to their clinic for follow-up appointments typically every six weeks. (See, e.g., RB_IDOC0000080–86, attached as Exhibit 3 (May 2016 recommendation for follow-up in six weeks).) On several occasions, however, Plaintiff has missed scheduled appointments. (RB_UIC0000083-88, attached hereto as Exhibit 2; ECF No. 130-5, Ricardo Tr. at 50:5–16 (testifying she recalls between two and five occasions on which Plaintiff missed his appointments).)

**RESPONSE: Admit that May 13, 2016 Medicine Note recommends "return to general nephrology clinic in 6 weeks." Pl.'s Ex. 3. Admit that UIC records note a "failed appointment" on October 16, 2015, September 18, 2015 (re-scheduled), and August 1, 2014 (rescheduled). Disputed to the extent it suggests that Defendants were responsible for the missed appointments, or aware of any such missed appointments.**

8.      On July 29, 2016, Dr. Ricardo and a fellow working under her supervision, Dr. Bishan Charkravarty, saw Plaintiff at UIC. The nephrologists observed that Plaintiff was in stage five – also known as "end stage" – PKD, and recommended that he receive an arteriovenous ("AV") graft no more than one week before he would start dialysis. Dr. Ricardo also recommended that Plaintiff continue to receive a renal (low-sodium, low-phosphorus) diet. (RB_UIC0000154–159, attached hereto as Exhibit 4; ECF No. 130-5, Ricardo Tr. 51:10–59:14.)

**RESPONSE: Admit that on July 29, 2016, Dr. Ricardo and a fellow working under her supervision, Dr. Bishan Charkravarty, saw Plaintiff at UIC, noted he was in stage five or "end stage" PKD, and noted "Plan for AV graft near dialysis starting time." Pl.'s**

**Ex. 4. Admit that the medical note also recommended that Plaintiff continue to receive a renal (low-sodium, low-phosphorus) diet.** *Id.* **Disputed as to the allegation that Dr. Ricardo "recommended that he receive an arteriovenous ("AV") graft no more than one week before he would start dialysis," as this is not supported by the cited testimony or evidence. Rather, Dr. Ricardo testified that they would typically want the graft put in 1-14 days before the initiation of dialysis. ECF No. 130-5, Ricardo Tr. at 58:16-21.**

9.      Dr. Charkravarty, originally recommended that Plaintiff return to the UIC clinic in six weeks. (RB_IDOC0000093, attached hereto as Exhibit 5.)

**RESPONSE: Admit.**

10.      After Plaintiff left the clinic, however, his lab work was processed and returned to UIC. Upon reviewing Plaintiff's lab work, Dr. Ricardo determined that Plaintiff needed to return to UIC sooner. Dr. Ricardo therefore updated the recommendation in Plaintiff's medical record indicating Plaintiff should return to the clinic within four weeks of July 29, 2016. (Ex. 4; ECF No. 130-5, Ricardo Tr. at 67:2–17.)

**RESPONSE: Disputed to the extent that the allegations in paragraph 10 mischaracterize the evidence and suggests that Dr. Ricardo recommended that he return to the UIC clinic 4 weeks from July 29, 2016. Dr. Ricardo's August 2016 addendum to the medical note merely states "return to general nephrology clinic in 4 weeks (given rising serum creatinine)."** *See* **Pl.'s Ex. 4.**

11.      Dr. Ricardo explained that it was important for Plaintiff to return to the clinic within four weeks because the clinic was monitoring Plaintiff's lab work and

symptoms to evaluate when he would need surgery to create an access point for dialysis. (ECF No. 130-5, Ricardo Tr. at 59:16–67:17, 111:10–14.)

**RESPONSE: Admit.**

12. UIC's original recommendation and Dr. Ricardo's later addendum shortening the timeframe for Plaintiff's return visit were transmitted by the UIC clinic to Dr. Obaisi at Stateville. (Ex. 4; ECF No. 130-5, Ricardo Tr. at 59:16–67:17; Ex. 5.)

**RESPONSE: Admit.**

13. There are multiple options to create an access point in the body for a patient to receive dialysis. One option is a tunneled catheter, which is a plastic tube that "goes in the upper chest and tunnels underneath the skin to go into one of the major veins in the neck or upper chest." Another option is an AV graft, which is an internal plastic tube that connects the artery in the arm or thigh to the vein, enabling the dialysis nurse to place a large needle into the tube to perform dialysis. A third option is an AV fistula, which functions like the graft, but connects a patient's own vein to his artery rather than using a plastic tube, enabling dialysis nurses to put the needle directly into the patient's vein. (ECF No. 130-4, Hale Tr. at 26:7–28:3.)

**RESPONSE: Admit.**

14. AV fistula is the preferred choice for permanent vascular access; the next best option is an AV graft; and the least desirable option of those three is the tunneled catheter. This is because the graft has more longevity and a lower risk of infection than a tunneled catheter. A tunneled catheter has the shortest lifespan of any dialysis option and, "because they come out of the skin and they're a foreign object," "they get infected

easily. They can also get clotted." (ECF No. 130-4, Hale Tr. at 28:11–30:9; ECF No. 130-5, Ricardo Tr. at 85:15–22 (AV graft is recommended over tunneled catheter for dialysis because catheters are "prone to infections and other complications").)

**RESPONSE: Disputed to the extent it suggests that the tunneled catheter is the only option that is prone to infection, as Dr. Hale testified the AV graft "does have the risks of infection, and sometimes the graft has to be removed if it gets infected." ECF No. 130-4, Hale Tr. at 29:4-9.**

15. Because Plaintiff was not a candidate for an AV fistula due to small veins, the UIC nephrologists' plan was for him to receive an AV graft before starting dialysis. (IDOC000295–299, attached hereto as Exhibit 6 (2/3/15 Medical Special Services Referral and Report from UIC specialist to Obaisi reporting vein mapping shows Brinson a candidate for AV graft); Ex. 4.)

**RESPONSE: Admit.**

16. Dr. Ricardo told Plaintiff at his appointment in July 2016 that she expected he would have to start dialysis sometime in the next eight weeks. (ECF No. 130-9, Brinson Tr. at 73:23–74:7.)

**RESPONSE: Objection, move to strike and disregard. Plaintiff's allegation contains inadmissible hearsay and self-serving statements without any factual support in the record. Subject to and without waiving these objections, disputed to the extent it suggests that Plaintiff was supposed to start dialysis within 8 weeks of his July 2016 visit with Dr. Ricardo, as this is not supported by the evidence in the record. Dr.**

Ricardo's August 1, 2016 medical note states "No indication to initiate dialysis at this time." Pl.'s Ex. 4.

17.     Following Plaintiff's July 2016 UIC visit, Dr. Obaisi received and approved the recommendation that Plaintiff return to the clinic within six weeks. He submitted the referral to Wexford's Utilization Management department for final approval, which Wexford provided. (Ex. 5; ECF No. 130-1, Fischer Tr. at 34:8–19; RB_IDOC0000078, attached hereto as Exhibit 7; see also ECF No. 130-9, Brinson Tr. at 45:9–25 (Dr. Obaisi never told Plaintiff he disagreed with the UIC doctors' recommendation as to when Plaintiff should return to UIC for medical treatment).)

**RESPONSE: Admit.**

18.     Between July 29, 2016 and December 8, 2016, however, Plaintiff was never brought to UIC or any other nephrology clinic. (ECF No. 130-1, Fischer Tr. at 20:19–25:12.)

**RESPONSE: Disputed to the extent it suggests that any failure to bring Plaintiff to the UIC nephrology clinic was caused by Defendants, or that Defendants were personally aware of Plaintiff's appointments. Defendant Pfister did not know that Plaintiff had PKD or that he was receiving medical care at UIC, did not know that PKD requires continuing medical care, or dialysis. Defs' Ex. 3 at 77:4-23, 102:15-18. Furthermore, Pfister was not involved in scheduling inmate medical appointments at outside facilities, as this was the responsibility of the healthcare unit staff. *Id*. at 54:16-19, 122:13-16.**

19.     Dr. Ricardo testified that her recommendations for Plaintiff to return to the UIC clinic and to receive an AV graft before dialysis start time were not followed. (ECF No. 130-5, Ricardo Tr. at 106:6–23.)

**RESPONSE: Admit.**

*Defendants' Knowledge*

20.     Defendant Randy Pfister knew Plaintiff was missing his medical appointments at UIC. On three or four occasions beginning in early 2016, while Pfister was making rounds in Plaintiff's cell house or Plaintiff was moving through the prison, Plaintiff spoke with the warden face-to-face. During those conversations, Plaintiff told the warden he'd been missing medical appointments with his kidney specialist at UIC. In 2016, Plaintiff told Warden Pfister he was in the last stage of kidney disease and it had been six months since he'd seen the specialist at UIC. (ECF No. 130-9, Brinson Tr. at 31:8–33:17.)

**RESPONSE: Objection, move to strike and disregard. The facts asserted in Paragraph 20 constitute inadmissible hearsay and self-serving statements without any factual support.** *See Hartford Fire Ins. Co. v. Taylor***, 903 F. Supp. 2d 623, 626, 640 (N.D.Ill. Oct. 17, 2012);** *Palmer v. Marion Cty.***, 327 F.3d 588, 596 (7th Cir. 2003);** *Palmer v. Circuit Court, Social Serv. Dep't***, 905 F. Supp. 499, 501 (N.D.Ill. October 30, 1995) (self-serving affidavits without factual support in the record will not defeat a motion for summary judgment, and a party seeking to avoid summary judgment may not establish a dispute of material fact on unsubstantiated assertions in its factual summary). Subject to and without waiving these objections, disputed to the extent Plaintiff's**

characterization suggests that the conversations between Plaintiff and Pfister actually occurred and that it suggests Pfister had knowledge that he was missing his medical appointments at UIC. Defendants further dispute the allegations to the extent it suggest that Pfister was aware of a serious risk to Plaintiff's health. Defendant Pfister testified that he does not recall speaking with Plaintiff about any health concerns, or being made aware of his medical issues, treatment plans, or appointments at outside facilities in November 2016. Defs' Ex. 3 at 76:18-20, 94:4-6, 122:5-12. In addition, Pfister did not know that Plaintiff had PKD or that he was receiving medical care at UIC, did not know that PKD requires continuing medical care, or dialysis. *Id*. at 77:4-23, 102:15-18. Furthermore, Pfister was not involved in scheduling inmate medical appointments at outside facilities, as this was the responsibility of the healthcare unit staff. *Id*. at 54:16-19, 122:13-16.

21. Warden Pfister took no meaningful steps to address Plaintiff's failure to receive his medical visits. (ECF No. 128-3, Pfister Tr. at 48:15-50:8 (warden might choose to question an inmate's medical care and contact the Medical Director or Wexford's Regional Director, including that warden might take steps to expedite medical care).)

RESPONSE: Objection, move to strike and disregard. The facts asserted in paragraph 21 are not supported by the cited testimony; and thus, are inadmissible as self-serving statements without any factual support. *See Palmer*, 905 F. Supp. at 501 (a party seeking to avoid summary judgment may not establish a dispute of material fact on unsubstantiated assertions in its factual summary). Subject to and without waiving these objections, disputed to the extent Plaintiff mischaracterizes the

evidence to suggest Warden Pfister "took no meaningful steps to address Plaintiff's failure to receive his medical visits." Plaintiff admits that he does not know what steps Pfister took after he allegedly told him he was missing appointments. Defs' Ex. 2 at 38:24-39:9; Pl.'s Resp. to DSOF, Dkt. 145, p. 24, ¶ 31.

22.     Dr. Obaisi and Wexford also knew that Plaintiff did not return to UIC in the recommended timeframe following his July 2016 visit. Rather than schedule a return visit in August 2016, as recommended by Dr. Ricardo, Plaintiff was scheduled to return to UIC in December. Wexford's corporate representative testified that its corporate office reached out to Stateville on September 12 to ask whether Dr. Obaisi approved of Plaintiff delaying his visit until December. On September 15, 2016, Dr. Obaisi informed Wexford corporate that he "was accepting of the December appointment." (ECF No. 130-1, Fischer Tr. at 25:13–45:4 (discussing utilization management process generally and Obaisi's approval of delayed appointment).)

**RESPONSE:** Admit.

### D. Plaintiff is Transferred to Menard with Defendants' Approval

23.     The contract under which Wexford provides medical care to Illinois prisoners creates an obligation to place a "medical hold" on certain prisoners, which would prevent them from being transferred between prisons. To that end, under the heading "Transferring/Transferred Offenders", the contract states: "Offenders undergoing treatment care or procedures . . . shall be placed on a 'Medical Hold', if the transfer will interfere with the treatment, care, and procedures of the offender . . . ." (Wexford 1081–1363 § 2.2.3.1.2., attached hereto as Exhibit 8; Wexford 1364–1376

(contract renewal), attached here to as Exhibit 9; see also ECF No. 130-7, Stephens Tr. at 67:9–20 (medical department is supposed to place a transfer hold on a prisoner with a scheduled appointment or consultation).)

**RESPONSE: Admit.**

24. From at least some time in 2014 through November 2016, Plaintiff had been on a medical hold preventing him from being transferred away from Stateville. (See, e.g., ECF No. 130-9, Brinson Tr. at 49:22–51:4 (Dr. Obaisi told Plaintiff in 2014 and again in 2016 he was on a medical hold); ECF No. 130-1, Fischer Tr. at 67:12–16 (Wexford corporate representative conceding Plaintiff was undergoing treatment and care in November 2016); BRINSON0000001, attached hereto as Exhibit 10.)

**RESPONSE: Disputed to the extent it suggests that Plaintiff had a medical hold in place at the time of his transfer from Stateville to Menard in November 2016, and disputed to the extent the allegations imply that Defendants were aware of any such medical hold or continuing care Plaintiff was receiving that prevented his transfer from Stateville. Defendant Pfister testified that he does not recall speaking with Plaintiff about any health concerns, or being made aware of his medical issues, treatment plans, or appointments at outside facilities in November 2016. Defs' Ex. 3 at 76:18-20, 94:4-6, 122:5-12. In addition, Pfister was not personally involved in the medical unit's decision to place an inmate on a medical hold, and had no personal involvement in placing transfer stops on inmates for medical reasons. *Id*. at 120:10-14, 19-22. Furthermore, Pfister did not know if Plaintiff had a medical hold leading up to the F-House closure. *Id*. at 111:23-112:2.**

25.     Menard's former medical director, Menard's former warden, and a Stateville nurse, all testified that the medical director had the exclusive authority to place or remove a medical hold on inmates at Stateville, including Plaintiff. (ECF No. 130-2, Trost Tr. at 45:6–21; ECF No. 130-6, Hutchinson Tr. at 37:6–38:1; ECF No. 130-8, Angeloff Tr. at 26:10–27:13; see also ECF No. 128-3, Pfister Tr. at 65:13-15 (testifying medical department must be involved to remove a medical hold).)

**RESPONSE: Admit.**

26.     IDOC's transfer coordinator Douglas Stephens oversees the movement of inmates to and between IDOC prisons. (ECF No. 130-7, Stephens Tr. at 26:2–17, 19:20–25:8 (describing job responsibilities).)

**RESPONSE: Disputed to the extent it misstates the cited testimony. Doug Stephens testified that, as the transfer coordinator, he oversees the entire operation of the department, which includes "dealing with movements," among other things. Defs' Ex. 5 at 25:16-18, 26:2–17.**

27.     Stephens testified that the "medical department at each facility" was responsible for placing medical holds or transfer stops on inmates. (Id. at 45:18–21.)

**RESPONSE: Disputed to the extent it misstates the cited testimony. Doug Stephens testified that, he believes the medical department at each facility is responsible for placing a transfer stop on an inmate. Defs' Ex. 5 at 45:18-21.**

28.     On November 20, 2016, a correctional officer came to Plaintiff's cell and told him he would be transferred from Stateville to Menard Correctional Center.

Plaintiff told the officer he had a medical hold and should not be transferred; and he asked to speak to a crisis team member. (ECF No. 130-9, Brinson Tr. at 46:18–47:12.)

**RESPONSE: Admit that Plaintiff testified that he "told the officer he had a medical hold and should not be transferred; and he asked to speak to a crisis team member." Disputed to the extent that the allegations suggest that, at the time of Plaintiff's transfer, he had a medical hold and should not have been transferred; and disputed to the extent that the allegations imply that Defendant Pfister or Hutchinson were aware of the statements Plaintiff allegedly made to the officer on November 20, 2016. Plaintiff has not cited to any admissible evidence to support his statements, which are inadmissible hearsay.**

29.     Nurse Franzen, a member of the crisis team, responded about an hour later. She told Plaintiff she would go to the Health Care Unit and review Plaintiff's medical chart with a nurse. Plaintiff told her he was having a mental breakdown. (ECF No. 130-9, Brinson Tr. at 47:13–48:13.)

**RESPONSE: Objection, move to strike and disregard Plaintiff's allegation that he "told her he was having a mental breakdown," as this constitutes inadmissible hearsay and self-serving statements without any factual support. *See Hartford Fire Ins. Co.*, 903 F. Supp. 2d at 626, 640; *Palmer*, 905 F. Supp. at 501 (self-serving affidavits without factual support in the record will not defeat a motion for summary judgment, and a party seeking to avoid summary judgment may not establish a dispute of material fact on unsubstantiated assertions in its factual summary).**

**Additionally, Plaintiff lacks the medical foundation to opine on matters related to the causation and diagnosis of any alleged medical condition(s).**

30. Nurse Franzen contacted licensed practical nurse Jerri Angeloff, a Wexford employee working at Stateville. Nurse Angeloff called Defendant Saleh Obaisi, then the medical director of Stateville, for clarification. Dr. Obaisi told Nurse Angeloff that Plaintiff could be transferred to Menard, and Nurse Angeloff documented the conversation in Plaintiff's medical record. (ECF No. 133, IDOC000203; ECF No. 130-8, Angeloff Tr. at 36:12–39:19; Id. at 41:11– 42:10 (authenticating medical record and testifying about phone call to Dr. Obaisi).)

**RESPONSE: Admit.**

31. Wexford's corporate representative testified that Obaisi was aware on-site dialysis was unavailable at Menard. (ECF No. 130-1, Fischer Tr. at 68:8–15.)

**RESPONSE: Admit.**

32. Nurse Franzen returned to Plaintiff and told him Obaisi said he could be transferred. (ECF No. 130-9, Brinson Tr. at 48:17–49:14.)

**RESPONSE: Admit.**

33. On November 21, 2016, Plaintiff was transferred to Menard. (ECF No. 130-9, Brinson Tr. at 9:13–15.)

**RESPONSE: Admit.**

34. Defendant Randy Pfister knew of and approved Plaintiff's transfer out of Stateville in November 2016. (ECF No. 128-3, Pfister Tr. at 98:1-99:10; 101:19-102:6; see also ECF No. 130-7, Stephens Tr. at 54:4–15; 55:14–20 (testifying warden made the final

decision to transfer Plaintiff from Stateville to Menard and "would have been ultimately responsible" for the decision).)

RESPONSE: **Objection, move to strike and disregard. Plaintiff's allegation mischaracterizes the evidence and is not supported by the evidence cited. Subject to and without waiving these objections, disputed to the extent it suggests that Defendant Pfister "knew of and approved" Plaintiff's November 2016 transfer. Defendant Pfister testified that he "was somewhat working directly with the Clinical Services supervisor" and "monitoring a lot of this personally" to review non-segregation inmates living in F-House at the time it closed in November 2016 to determine if they could recommend that the inmate be reclassified. Defs' Ex. 3 at 95:7-98:16. Pfister further testified that, as for the segregation inmates, he did not look at specific names. *Id*. at 100:15-102:6. Rather, he made *recommendations* based on how much segregation time the inmate had left; and Clinical Services would have looked at whether there was a medical hold, and discussed it with the medical department if necessary. *Id*. (emphasis added). Furthermore, Pfister testified that he had very limited involvement in inmate transfers, and his office did not review the list of inmates scheduled to be transferred. *Id*. at 62:7-9, 21-23. In addition, Stephens testified that at the facility level, the warden makes a *suggestion* or *recommendation* for which facility the inmate should go to; and the Transfer Coordinator's Office makes the final determination after reviewing the paperwork and the offender's information. Defs' Ex. 5 at 54:12-58:11 (emphasis added).**

35.    A few days before November 21, 2016, Plaintiff spoke to Warden Pfister while the warden was making rounds in Plaintiff's cell house. Plaintiff told the warden that he was on a medical hold; he had been missing his medical appointments; he was in the last stage of renal disease; his doctor at UIC had told him he needed to be monitored closely; it had been six months since he'd been to UIC; and he was in severe pain. (ECF No. 130-9, Brinson Tr. at 31:8– 34:3; see also ECF No. 128-3, Pfister Tr. at 111:1-112:15 (an agent of Pfister at Stateville knew Plaintiff was receiving regular medical care at UIC and, and that Plaintiff went to UIC appointments between March and July 2016).)

**RESPONSE: Objection, move to strike and disregard. The facts asserted in Paragraph 35 constitute inadmissible hearsay and self-serving statements without any factual support.** *See Hartford Fire Ins. Co.*, **903 F. Supp. 2d at 626, 640;** *Palmer*, **327 F.3d at 596;** *Palmer*, **905 F. Supp. at 501 (self-serving affidavits without factual support in the record will not defeat a motion for summary judgment, and a party seeking to avoid summary judgment may not establish a dispute of material fact on unsubstantiated assertions in its factual summary). Subject to and without waiving these objections, disputed to the extent Plaintiff's characterization suggests that the conversation between Plaintiff and Pfister actually occurred and that it suggests Pfister had knowledge that "he was on a medical hold; he had been missing his medical appointments; he was in the last stage of renal disease; his doctor at UIC had told him he needed to be monitored closely; it had been six months since he'd been to UIC; and he was in severe pain." Defendant Pfister testified that he does not recall**

speaking with Plaintiff about any health concerns, or being made aware of his medical issues, treatment plans, or appointments at outside facilities in November 2016. Defs' Ex. 3 at 76:18-20, 94:4-6, 122:5-12. In addition, Pfister was not personally involved in the medical unit's decision to place an inmate on a medical hold, and had no personal involvement in placing transfer stops on inmates for medical reasons. *Id.* at 120:10-14, 19-22. Furthermore, Pfister did not know if Plaintiff had a medical hold leading up to the F-House closure. *Id.* at 111:23-112:2.

36.     Pfister testified that when Plaintiff's cell house at Stateville closed at the end of 2016, Pfister personally monitored the transfer of inmates housed there, and worked with the transfer coordinator and clinical services at the prison to facilitate prisoners' transfer. (ECF No. 128-3, Pfister Tr. at 98:1-99:10; 101:19-102:6; see also ECF No. 130-7, Stephens Tr. at 54:4–15; 55:14–20 (testifying warden made the final decision to transfer Plaintiff from Stateville to Menard and "would have been ultimately responsible" for the decision).)

RESPONSE: Objection, move to strike and disregard. Plaintiff's allegation mischaracterizes the evidence and is not supported by the evidence cited. Subject to and without waiving these objections, disputed to the extent it suggests that Defendant Pfister "knew of and approved" Plaintiff's November 2016 transfer. Defendant Pfister testified that he "was somewhat working directly with the Clinical Services supervisor" and "monitoring a lot of this personally" to review non-segregation inmates living in F-House at the time it closed in November 2016 to determine if they could recommend that the inmate be reclassified. Defs' Ex. 3 at

95:7-98:16. Pfister further testified that, as for the segregation inmates, he did not look at specific names. *Id.* at 100:15-102:6. Rather, he made *recommendations* based on how much segregation time the inmate had left; and Clinical Services would have looked at whether there was a medical hold, and discussed it with the medical department if necessary. *Id.* (emphasis added). Furthermore, Pfister testified that he had very limited involvement in inmate transfers, and his office did not review the list of inmates scheduled to be transferred. *Id.* at 62:7-9, 21-23. In addition, Stephens testified that at the facility level, the warden makes a *suggestion* or *recommendation* for which facility the inmate should go to; and the Transfer Coordinator's Office makes the final determination after reviewing the paperwork and the offender's information. Defs' Ex. 5 at 54:12-58:11 (emphasis added).

37. Defendant Saleh Obaisi also facilitated Plaintiff's transfer to Menard by lifting the medical hold in Plaintiff's file so the transfer coordinator's office could approve the necessary paperwork. On October 11, 2016, Obaisi reviewed Plaintiff's chart in connection with his planned transferred to Menard and entered an order to "discontinue" his medical hold. (IDOC000194, attached hereto as Exhibit 11.) And on the eve of Plaintiff's transfer, Obaisi informed the crisis team member working with Plaintiff that he approved the transfer. (ECF No. 133, IDOC000203.)

RESPONSE: Disputed to the extent it suggests that Obaisi lifted the medical hold in order to facilitate the transfer at the request of the transfer coordinator's office. Admit that Dr. Obaisi removed Plaintiff's medical hold prior to his transfer, and consequently, the transfer could be approved. Defs' Ex. 5 at 62:3-13, 93:9-23.

38.     Stephens testified that at the time his office approved Plaintiff's transfer, there was no medical hold, also known as a "transfer stop," in place for Plaintiff. (ECF No. 130-7, Stephens Tr. at 45:13–17; 46:10–16.)

**RESPONSE: Admit.**

39.     Neither Pfister nor Obaisi informed the transfer coordinator's office that Plaintiff was getting ready to start dialysis. If Stephens' office had known as much, according to Stephens, "we would have questioned that" and may not have approved the transfer. (ECF No. 130-7, Stephens Tr. at 61:4–62:6; id. at 77:10–78:1.)

**RESPONSE: Objection, move to strike and disregard, as the above assertion that "neither Pfister nor Obaisi informed the transfer coordinator's office that Plaintiff was getting ready to start dialysis" is not supported by the materials cited and assumes facts not in evidence. There is no evidence that Plaintiff was "getting ready to start dialysis" or that Pfister knew Plaintiff was "getting ready to start dialysis." Subject to and without waiving these objections, disputed to the extent it suggests that Pfister knew that Plaintiff was getting ready to start dialysis and could not transfer to Menard. Pfister was not personally involved in Plaintiff's medical care or treatment decisions at any time; and was not involved in the scheduling of inmate medical appointments at outside facilities. Defs' Ex. 2 at 30:10-14; Defs' Ex. 3 at 122:13-16, 123:7-10. In addition, Pfister testified that he does not recall Plaintiff, did not know that he had PKD or that he was receiving medical care at UIC, and did not know that PKD requires continuing medical care, or dialysis. Defs' Ex. 3 at 77:4-23, 102:15-18.**

**E. Plaintiff Did Not Receive a Renal Diet or On-Site Dialysis at Menard**

40.     According to Menard's medical director, when Plaintiff was imprisoned there, there were no therapeutic diets, including no renal diets, available. Consequently, there was "no means" for the prison to actually provide a patient with a renal diet even if an outside specialist recommended such a diet. The most that Menard could offer to inmates who needed therapeutic diets was counseling on foods to avoid. (ECF No. 130-2, Trost Tr. at 48:23–50:6 (in response to a question about whether any therapeutic diets were available at Menard, explaining "[t]o the best of my knowledge, no. I mean, I know that there were no diabetic diets. I believe that there were no cardiac diets. And I'm certain that there were no renal diets."); Id. at 98:1–6.)

**RESPONSE: Admit.**

41.     Consequently, Plaintiff did not receive a renal diet for the entire period during which he was imprisoned at Menard. (ECF No. 130-9, Brinson Tr. at 64:13–24 (describing diet at Menard).)

**RESPONSE: Admit.**

42.     Menard also does not have a facility on site where inmates can receive dialysis. (ECF No. 130-6, Hutchinson Tr. at 47:21–4.)

**RESPONSE: Admit.**

*Defendants' Knowledge*

43.     Jeff Hutchinson was serving as warden of Menard when Plaintiff was transferred there in November 2016. (ECF No. 130-6, Hutchinson Tr. at 24:9–14.)

**RESPONSE: Admit.**

44.     As warden at Menard, Hutchinson's responsibilities included: (a) overseeing the dietary staff, including the dietary manager; (b) reviewing grievances; and (c) making sure medical care was being provided to inmates correctly. (ECF No. 130-6, Hutchinson Tr. at 31:15–21.)

**RESPONSE: Objection, move to strike and disregard. The citation provided by Plaintiff does not support the facts contained in Paragraph 44. Subject to and without waiving this objection, Warden Hutchinson testified that his responsibilities relating to medical care were to make sure the assistant warden of programs was on top of that area. Defs' Ex. 4 at 31:15-22.**

45.     Warden Hutchinson had a practice of making rounds in the cell houses to talk to inmates. (ECF No. 130-6, Hutchinson Tr. at 39:21–40:24.)

**RESPONSE: Disputed to the extent it mischaracterizes the evidence in the record. Warden Hutchinson testified that he tried to make rounds at least once a week. Defs' Ex. 4 at 40:4-5.**

46.     Plaintiff spoke to Hutchinson at least three times while he was at Menard. During those conversations, Plaintiff explained that because of his medical condition, he should not be at Menard; he should be on a medical diet; he was in pain from his kidneys and was supposed to have started dialysis at Stateville; he'd been missing all his doctor appointments; and at his last UIC appointment, Dr. Ricardo had told him that the following month (August 2016) she was going to place an artificial graft in his arm so he could start dialysis. (ECF No. 130-9, Brinson Tr. at 20:2–22:12; id. at 23:23–25:5.)

**RESPONSE:** Objection, move to strike and disregard. The facts asserted in Paragraph 46 constitute inadmissible hearsay. In ruling on a motion for summary judgment, the court only considers evidence that would be admissible at trial. Hearsay is inadmissible on summary judgment to the same extent that it is inadmissible at trial. Moreover, the proponent of hearsay bears the burden of establishing that the statement is admissible. *Hartford Fire Ins. Co.*, 903 F. Supp. 2d at 626, 640. Plaintiff has not satisfied his burden of establishing that the statements set forth in Paragraph 46 are admissible. Objecting further, Plaintiff's asserted facts are inadmissible as self-serving statements without any factual support. *Palmer*, 327 F.3d at 596. Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment, and a party seeking to avoid summary judgment may not establish a dispute of material fact on unsubstantiated assertions in its factual summary or affidavits. *Palmer*, 905 F. Supp. at 501. Subject to and without waiving these objections, disputed to the extent Plaintiff's characterization suggests that Defendant Hutchinson was aware of any specific medical issue or a serious risk to Plaintiff's health. Defendant Hutchinson does not recall having any conversations with Plaintiff. See Defs' Ex. 4 at 39:10-12.

47.     The first time Hutchinson and Plaintiff spoke in person, the warden said Plaintiff looked sick and that he could tell Plaintiff was in a lot of pain. Hutchinson said to his knowledge, no renal diet was available at Menard. (ECF No. 130-9, Brinson Tr. at 24:11–22.)

**RESPONSE**: Objection, move to strike and disregard. The facts asserted in Paragraph 47 constitute inadmissible hearsay. In ruling on a motion for summary judgment, the court only considers evidence that would be admissible at trial. Hearsay is inadmissible on summary judgment to the same extent that it is inadmissible at trial. Moreover, the proponent of hearsay bears the burden of establishing that the statement is admissible. *Hartford Fire Ins. Co.*, 903 F. Supp. 2d at 626, 640. Plaintiff has not satisfied his burden of establishing that the statements set forth in Paragraph 47 are admissible. Objecting further, Plaintiff's facts asserted in Paragraph 3 are inadmissible as self-serving statements without any factual support. *Palmer*, 327 F.3d at 596. Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment, and a party seeking to avoid summary judgment may not establish a dispute of material fact on unsubstantiated assertions in its factual summary or affidavits. *Palmer*, 905 F. Supp. at 501. Subject to and without waiving these objections, disputed to the extent Plaintiff's characterization suggests that Defendant Hutchinson was aware of any specific medical issue or a serious risk to Plaintiff's health. Defendant Hutchinson does not recall having any conversations with Plaintiff. See Defs' Ex. 4 at 39:10-12.

48.     Plaintiff also wrote a letter to Hutchinson the first or second day he was at Menard. In the letter, Plaintiff told the warden he needed a renal diet. Warden Hutchinson told Plaintiff during a subsequent in-person conversation that he received Plaintiff's letter. (ECF No. 130-9, Brinson Tr. at 27:6–28:19.)

**RESPONSE: Objection, move to strike and disregard. The allegations in paragraph 48 constitute inadmissible hearsay and self-serving statements without factual support in the record. Subject to and without waiving these objections, disputed to the extent it suggests that Hutchinson knew Plaintiff needed a renal diet or that he received a letter from Plaintiff informing him of such. Defendants further dispute the truth of the statements Plaintiff claims were made by Hutchinson, as these allegations are also based on inadmissible hearsay.**

49.     On December 7, 2016, Hutchinson received, reviewed, and signed Plaintiff's emergency grievance reporting that Plaintiff (a) was in end stage renal disease; (b) was supposed to have started dialysis before his transfer to Menard; (c) missed his specialist appointments at UIC before being transferred; and (d) was suffering pain. (ECF No. 130-6, Hutchinson Tr. at 42:24–47:17.)

**RESPONSE: Objection, move to strike and disregard to the extent the allegations in paragraph 49 suggest that Plaintiff was in end stage renal disease, was supposed to have started dialysis before his transfer to Menard, missed his specialist appointments at UIC before being transferred, and was suffering pain on or about December 7, 2016. The contents of Plaintiff's grievance constitute inadmissible hearsay. In addition, Plaintiff is not qualified to provide medical opinions and diagnosis. Subject to and without waiving these objections, admit that Hutchinson reviewed and signed Plaintiff's emergency grievance on December 7, 2016.**

50.     Hutchinson determined that the grievance had merit and consequently needed to be addressed by medical director John Trost on an expedited basis as it appeared Plaintiff's condition was serious. (ECF No. 130-6, Hutchinson Tr. at 49:2–24.)

**RESPONSE: Admit.**

51.     After reviewing Plaintiff's grievance and checking a box to "expedite" review, Hutchinson does not recall taking any steps to address Plaintiff's emergency: Hutchinson does not recall making any phone calls, sending any emails, speaking to any person, or doing anything to determine why Plaintiff had been transferred to Menard. (ECF No. 130-6, Hutchinson Tr. at 52:10–53:1.)

**RESPONSE: Disputed to the extent it mischaracterizes the testimony to imply that Hutchinson did not take any further actions, as Hutchinson testified that, after checking the box for expedite emergency grievance, he put it in the outbox for the secretary to pick up and send to the proper department. Defs' Ex. 4 at 52:5-9. Hutchinson further stated that he may have taken other steps and may have sent emails, but he does not recall. *Id.* at 52:10-18.**

52.     On December 8, 2016, Hutchinson received an email with the subject "Brinson A82298" alerting him that Menard received about 17-20 prisoners "who were in [Wexford's collegial review] process, on a medical hold and then removed to transfer." The email attached correspondence related to Plaintiff's emergency grievance reporting his medical condition and immediate need for care. (IDOC 001658–62, attached hereto as Exhibit 12; see also ECF No. 130-6, Hutchinson Tr. at 53:9–62:20.)

**RESPONSE:** Objection, move to strike and disregard to the extent it suggests that the email informed Hutchinson of an "immediate need for care," as this is mischaracterizes the evidence and is not supported by the cited records. Subject to and without waiving these objections, disputed to the extent it suggests that Hutchinson was aware of an obvious risk to Plaintiff's health, or that he was receiving inadequate medical care on December 8, 2016. Hutchinson testified that he does not recall receiving the email, was not really aware of all the medical holds at that time, and does not recall the issue with inmates on medical holds being transferred to Menard being raised while he was warden. Defs' Ex. 4 at 56:10-18, 57:10-13.

53.     Dr. Trost is an internist and board-certified general surgeon, but he has no specialized training or accreditation in nephrology, and has not managed the medical treatment of patients with chronic kidney disease. (ECF No. 130-2, Trost Tr. at 34:15–36:3.)

**RESPONSE: Admit.**

54.     Shortly after arriving at Menard, Plaintiff met with Dr. Trost. At that meeting, Plaintiff told Trost about his kidney disease and need to be on a renal diet. Trost reviewed Plaintiff's medical record. He was surprised that Plaintiff had been transferred to Menard, told Plaintiff he should not be there, and told another person over the phone (in Plaintiff's hearing) that Plaintiff should be transferred back to Stateville immediately. (ECF No. 130-9, Brinson Tr. at 24:1–12; Id. at 55:22–57:8; ECF No. 130-2, Trost Tr. at 55:12–17.)

**RESPONSE:** Objection, move to strike and disregard to the extent Plaintiff's assertion that Dr. Trost "told Plaintiff he should not be there, and told another person over the phone (in Plaintiff's hearing) that Plaintiff should be transferred back to Stateville immediately" contains inadmissible hearsay and is not supported by the evidence cited. Subject to and without waiving these objections, disputed to the extent the allegations suggest that Dr. Trost stated Plaintiff should be transferred back to Stateville immediately and could not be at Menard. Dr. Trost testified that Plaintiff came to see him, and he was made aware that he had end-stage renal disease. ECF No. 130-2, Trost Tr. at 55:12–17.

### F. Plaintiff Required Emergency Surgery Shortly After Arriving at Menard

55. On December 8, 2016, Plaintiff was brought to Kidney Disease and Medicine Specialty Consultants, a private medical practice near Menard in Carbondale, Illinois, where he was treated by Dr. Muhammad Kamran. (IDOC000528–533, attached hereto as Exhibit 13; see also ECF No. 130-3, Kamran Tr. at 22:2–26:6, 34:2–20.)

**RESPONSE: Admit.**

56. Dr. Kamran is a board-certified nephrologist with extensive training and experience treating patients with chronic kidney disease, including PKD. (ECF No. 130-3, Kamran Tr. at 10:2–26:2.)

**RESPONSE: Admit.**

57. Upon examining Plaintiff's symptoms and his blood work from a couple months before the visit, Dr. Kamran determined that Plaintiff needed to start dialysis "right away," "as soon as possible." (ECF No. 130-3, Kamran Tr. at 46:19–47:7, 57:5–21.)

**RESPONSE:** **Disputed to the extent it misstates the cited testimony. Dr. Kamran testified that his assessment was that Plaintiff needed to start dialysis right away, which was based in part on the fact that he had a GFR level of less than 10 a couple months before he saw him; "based on his review of everything;" and "also his review of [symptoms]." ECF No. 130-3, Kamran Tr. at 46:24–47:7, 57:5–21.**

58.     Dr. Kamran recommended Plaintiff receive a catheter for immediate dialysis access. In addition to recording his findings in the medical records, which his clinic provided to Menard following the visit, Dr. Kamran sent a note with Plaintiff's attendant for the doctor at Menard asking that Plaintiff be transferred to a place where he could start dialysis, or offering to arrange placement of a catheter locally. (ECF No. 130-3, Kamran Tr. at 47:17–50:12, 55:5–19.)

**RESPONSE:** **Disputed to the extent the allegations mischaracterize the cited testimony to imply that Dr. Kamran recommended "immediate dialysis access. Dr. Kamran recommended a catheter be put in Plaintiff's chest wall as "the best way to start him urgently" on dialysis. ECF No. 130-3, Kamran Tr. at 47:17–49:21.**

59.     Without notice to the UIC nephrology clinic, Plaintiff missed his December 9, 2016 appointment. (RB_UIC0000251–52, attached hereto as Exhibit 14.)

**RESPONSE:** **Objection, argumentative and not supported by the cited evidence with respect to "without notice to the UIC nephrology clinic." Subject to and without waiving these objections, admit that Plaintiff had a "failed appointment" with UIC on December 9, 2016.** *See* **Pl.'s Ex. 14.**

60.     More than three weeks later, on December 27, 2016, Plaintiff was brought to Memorial Hospital of Carbondale, where he underwent surgery by Dr. Lyman Hale, a board-certified general surgeon. (RB_MHC0000006–24, attached hereto as Exhibit 15; ECF No. 130¬4, Hale Tr. at 14:6–21; 16:22–24.) Dr. Hale has significant experience doing dialysis access surgeries. (Id. at 19:7–10.)

**RESPONSE: Objection, argumentative and misstates the evidence in the record. Subject to and without waiving these objections, admit that Plaintiff underwent surgery by Dr. Hale, a board-certified surgeon with significant experience doing dialysis access surgeries, at Memorial Hospital of Carbondale. Disputed to the extent it suggests the surgery occurred on December 27, 2016. Dr. Hale performed surgery on Plaintiff on January 3, 2017.** *See* **Pl.'s Ex. 15; and ECF 130-4, Hale Tr. at 38:5-39:3.**

61.     Dr. Hale performed surgery to place a tunneled catheter through Plaintiff's chest into his jugular vein so he could receive dialysis urgently. (ECF No. 130-4, Hale Tr. at 31:9–21.)

**RESPONSE: Objection, move to strike and disregard "so he could receive dialysis urgently," as this allegation is argumentative and not supported by the cited testimony. Dr. Hale testified that when he saw Plaintiff, he believed it was necessary for him to undergo surgery for the tunnel dialysis catheter placement.** *See* **ECF 130-4, Hale Tr. at 31:9-13.**

62.     A tunneled catheter is a temporary dialysis access point that, ideally, would never be used. In any event, a tunneled catheter should be use for less than 90 days because of the risk of infection and blood clots. (ECF No. 130-5, Ricardo Tr. at

85:23–86:15; see also ECF No. 130-4, Hale Tr. at 34:2–21, at 41:8–21 (explaining tunneled catheter is "not the ideal method of access because of increased risk of infection, and, really tunneled catheters just get clotted. They have to be removed"; thus, they should not be left in "longer than necessary unless the patient doesn't have another dialysis option and they have to have a catheter").)

**RESPONSE: Disputed to the extent it suggests that Plaintiff was at a constant risk of blood clots and infection the entire time he had the tunneled catheter. Dr. Ricardo testified that "we don't want to use [tunneled catheters] for long periods of time because the longer we use them, the higher the risk of infections and other complications" and that there's a risk of blood clots and infections using a tunneled catheter beyond 90 days.** *See* **ECF No. 130-5, Ricardo Tr. at 86:4-15. Dr. Hale testified generally, that the tunneled catheter is not the ideal method of access because of increased risk of infection, and they get clogged; and they try not to leave them in for more than three to six months because of the risk of infection.** *See* **ECF No. 130-4, Hale Tr. at 34:11-32. However, Dr. Hale has seen patients keep the tunneled catheter in for three to five years with no issue because they haven't gotten them infected or clotted.** *Id*. **at 41:11-15.**

63.     Thereafter, Plaintiff began receiving dialysis for the first time. (ECF No. 130-9, Brinson Tr. at 64:24–4.)

**RESPONSE: Admit.**

64.     After the surgery, Dr. Hale recommended Plaintiff be evaluated in two to four weeks by a vascular surgeon for a more permanent dialysis access option. (ECF No. 130-4, Hale Tr. at 37:11–24.)

**RESPONSE: Disputed to the extent it misstates the cited testimony. Dr. Hale testified that he recommended a follow-up consultation with the vascular surgeon in 2-4 weeks for possible graft placement.** *See* **ECF No. 130-4, Hale Tr. 37:11-24; Pl.'s Ex. 15.**

65.     On December 22, 2016, Trost submitted a form to Wexford corporate referring Plaintiff to a general surgeon to receive an AV graft. Trost indicated on the referral form that his request was "urgent." (Wexford 64, attached hereto as Exhibit 16; ECF No. 130-2, Trost Tr. at 74:1–77:4.)

**RESPONSE: Admit.**

66.     Sometime around January 11, 2017, however, Trost recommended to Wexford's Utilization Management department that Plaintiff's appointment for an AV graft be cancelled. (Wexford 24, attached hereto as Exhibit 17 ("Since Brinson will only be getting a few dialysis treatments here before being transferred, they recommended the surgeon and hospital he will be using to get the dialysis treatments to do the consult."); IDOC 000540, attached hereto as Exhibit 18; ECF No. 130-2, Trost Tr. at 78:6–80:25.)

**RESPONSE: Admit.**

## G. Plaintiff Did Not Receive a Permanent Dialysis Access Point until September 2017

67.     Plaintiff remained in the infirmary at Menard after the tunneled catheter was in place. Trost testified that the risk of infection from the catheter insertion was

"certainly" a reason for him to be observed in the infirmary. He explained: "I mean, you could not send an inmate out to a cell house with a catheter exiting their body." (ECF No. 130-2, Trost Tr. at 88:6–14.)

**RESPONSE: Objection, move to strike and disregard to the extent it suggests that Dr. Trost testified that "the risk of infection from the catheter insertion" was a reason why Plaintiff remained in the infirmary at Menard. This allegation is not supported by the cited testimony. Dr. Trost testified that the catheter insertion would certainly be a reason to have him observed, and that "you could not send an inmate out to a cell house with a catheter exiting their body." ECF No. 130-2, Trost Tr. at 88:6–14.**

68.     Plaintiff was transferred from Menard back to Stateville on January 29, 2017, where he is currently imprisoned. (ECF No. 130-9, Brinson Tr. at 19:19–23.)

**RESPONSE: Admit.**

69.     On January 30, 2017, the day after Plaintiff returned to Stateville, Dr. Obaisi referred Plaintiff to the vascular access clinic at UIC to be evaluated for a permanent dialysis access option; and Wexford corporate approved the referral the next week. (RB_IDOC0000504– 505, attached hereto as Exhibit 19.)

**RESPONSE: Admit.**

70.     Shortly after his return, Plaintiff was released into the general population at Stateville with the catheter still protruding from his chest. (ECF No. 128-7; ECF No. 130-9, Brinson Tr. at 15:2–6 (Brinson testifying he was released into general population shortly after returning to Stateville in January 2017).)

**RESPONSE: Objection, move to strike and disregard. The allegations in paragraph 70 are argumentative and not supported by any admissible evidence in the record. Subject to and without waiving these objections, disputed to the extent that Plaintiff suggests he had a catheter "protruding from his chest" while in general population at Stateville.**

71.    Since then, Plaintiff has received dialysis on-site three times per week. (ECF No. 130-9, Brinson Tr. at 64:4–13.)

**RESPONSE: Admit Plaintiff testified to receiving dialysis on-site three times a week.**

72.    Plaintiff was not seen by a vascular surgeon until July 26, 2017 (RB_UIC0000292–294, attached hereto as Exhibit 20), and did not receive surgery to have the graft placed until September 18, 2017 (RB_UIC0000235–250, attached hereto as Exhibit 21), more than nine months after Dr. Hale placed the tunneled catheter, or three times as long as Dr. Ricardo would recommend a patient use a tunneled catheter. (ECF No. 130-5, Ricardo Tr. at 94:18–96:18.)

**RESPONSE: Objection, argumentative. Subject to and without waiving this objection, admit that Plaintiff saw a vascular surgeon on July 26, 2017 and received surgery to have a graft placed on September 18, 2017.**

73.    Plaintiff's failure to see a vascular surgeon until September 2017 was inconsistent with Dr. Hale's recommendation that Plaintiff follow up with a vascular surgeon in two to four weeks. (ECF No. 130-4, Hale Tr. at 45:12–46:9.)

**RESPONSE: Disputed to the extent it implies that Dr. Hale recommendation to follow-up with a vascular surgeon was urgent. Dr. Hale testified that he**

recommended Plaintiff follow-up with a vascular surgeon in 2-4 weeks because "it's a standard follow-up time" and he does not "have a great reason for that," as there was "no emergent rush to see him once we have the dialysis access in." ECF No. 130-4, Hale Tr. at 37:14-17.

### H. Plaintiff's Damages

74.    Plaintiff's failure to receive dialysis when his kidneys failed – sometime between July and December 2016 – caused him to experience loss of appetite, loss of energy, fatigue, daytime sleepiness, night sweats, headache, bloody nose, difficulty swallowing, chest pain, shortness of breath, cough, blood when coughing, abdominal pain, nausea, diarrhea, blood in his stool, painful urination, blood in his urine, urinary incontinence, a weak urine stream, urinary sediment or solids, edema, neuropathy, weakness, joint pain, muscle pain, and low back pain. (Ex. 13.)

**RESPONSE: Objection, move to strike and disregard. The assertions in paragraph 74 consist of inadmissible hearsay, self-serving statements without any factual support, and are not supported by the cited evidence. Subject to and without waiving these objections, disputed as to any medical diagnosis or causation implied by Plaintiff. Plaintiff is not a doctor and lacks the medical foundation to opine on matters related to the causation and diagnosis of his medical condition(s). Furthermore, the evidence shows that Plaintiff reported certain symptoms to Dr. Kamran on December 8, 2016. See Pl.'s Ex. 13. However, there is no evidence that Plaintiff actually experienced each of the reported symptoms.**

75. Plaintiff's delayed dialysis also put him at risk of death. (See, e.g., ECF No. 130-5, Ricardo Tr. at 47:4–15 ("[I]n general, if somebody has complications so severe or symptoms so severe that medically one recommends dialysis and they opt not to receive it, then the end point will be death.").)

**RESPONSE: Objection, move to strike and disregard. The assertion in paragraph 75 consists of a self-serving statement without any factual support, and is not supported by the cited testimony. Subject to and without waiving these objections, disputed to the extent Plaintiff implies, based on Dr. Ricardo's testimony, that he was put at risk of death (Dr. Ricardo was testifying generally, not specifically to Plaintiff), and disputed to the extent it implies that Defendants were aware of or responsible for any alleged delay in starting his dialysis.**

76. When Plaintiff learned he would be transferred to Menard in November 2016, he asked to speak to a member of the crisis team because he experienced a mental breakdown. (ECF No. 130-9, Brinson Tr. at 72:3–14.)

**RESPONSE: Objection, move to strike and disregard the assertion in paragraph 76 that Plaintiff "experienced a mental breakdown," which inadmissible as hearsay and a self-serving statement without factual support. Objecting further, Plaintiff is not a doctor and lacks the medical foundation to opine on matters related to the causation and diagnosis of his medical condition. Subject to and without waiving these objections, dispute that Plaintiff experienced a mental breakdown, but admit that he asked to speak to a member of the crisis team when he learned he was being transferred in November 2016.**

77. While Plaintiff received dialysis through the temporary catheter in his chest, he was subjected to constant risk of blood clot and infection. (ECF No. 130-5, Ricardo Tr. at 85:23– 86:15; ECF No. 130-4, Hale Tr. at 34:2–21, 41:8–21.)

**RESPONSE: Objection, move to strike and disregard to the extent the allegations in paragraph 77 are not supported by the cited testimony and mischaracterizes the evidence. Subject to and without waiving these objections, disputed to the extent it suggests that Plaintiff was at a constant risk of blood clots and infection the entire time he had the tunneled catheter. Dr. Ricardo testified that "we don't want to use [tunneled catheters] for long periods of time because the longer we use them, the higher the risk of infections and other complications" and that there's a risk of blood clots and infections using a tunneled catheter beyond 90 days. ECF No. 130-5, Ricardo Tr. at 86:4-15. Dr. Hale testified generally, that the tunneled catheter is not the ideal method of access because of increased risk of infection, and they get clogged; and they try not to leave them in for more than 3-6 months because of the risk of infection. ECF No. 130-4, Hale Tr. at 34:11-32. Dr. Hale has seen patients keep the tunneled catheter in for 3-5 years with no issue because they haven't gotten them infected or clotted. *Id*. at 41:11-15.**

78. Indeed, for the two-and-a-half months Plaintiff was imprisoned at Menard, he was housed in the infirmary because he was so ill from his PKD and at such high risk for infection from the catheter protruding from his chest. (ECF No. 130-2, Trost Tr. at 87:9–88:14; ECF No. 130-9, Brinson Tr. at 14:17–22; 57:12–19.)

**RESPONSE: Objection, move to strike and disregard the allegations in paragraph 78 that are argumentative, mischaracterize the evidence, and are not supported by the cited testimony. Objecting further, Plaintiff cites to portion of his own testimony, which are inadmissible as self-serving statements without factual support. Subject to and without waiving these objections, disputed to the extent Plaintiff implies he was "so sick" and "at such a high risk for infection" that he could not have been housed in general population. Dr. Trost merely testified that he placed him in the infirmary for careful and close observation; that the catheter insertion would certainly be a reason to have him observed; and that "you could not send an inmate out to a cell house with a catheter exiting their body." ECF No. 130-2, Trost Tr. at 87:9-13, 88:6–14.**

79.     Plaintiff's risk of blood clot or infection from the catheter was exacerbated when he was housed in general population after returning to Stateville in January 2017. (ECF No. 128-7.)

**RESPONSE: Objection, move to strike and disregard. The allegations in paragraph 79 are argumentative and not supported by the cited documents, or any of the evidence in the record. Subject to and without waiving these objections, disputed that Plaintiff's risk of blood clots or infection from the catheter was exacerbated when he was housed in general population at Stateville.**

80.     Moreover, because of his failure to promptly see a vascular surgeon as recommended by Dr. Hale, Plaintiff was forced to keep the catheter protruding from his chest until September 2017, which amplified the already serious risks he faced. (ECF No. 130-4, Hale Tr. at 46:10–24.)

**RESPONSE: Objection, the allegations in paragraph 81 are argumentative, misstate the evidence, and are not supported by the cited testimony. There is no evidence to support Plaintiff's allegation that Dr. Hale recommended he "promptly see a vascular surgeon" or that "Plaintiff was forced to keep the catheter protruding from his chest until September 2017, which amplified the already serious risks he faced." Dr. Hale testified generally as to the risks associated with a tunneled catheter and his recommendation to see a vascular surgeon. ECF No. 130-4, Hale Tr. at 46:10–24. Dr. Hale also testified that they try not to leave the tunneled catheter in for more than 3-6 months because of the risk of infection, but that he has seen patients keep the tunneled catheter in for 3-5 years with no issue because they haven't gotten them infected or clotted. *Id.* at 34:11-32, 41:11-15.**

81.    Plaintiff suffered and continues to suffer severe emotional distress as a result of the ordeal described in his complaint. Plaintiff explained:

> I almost died. And for, like, two or three months it was real—real hectic. It was real scary because it was [] like, we don't care. Just throw you in the cell. And I couldn't see no one. I couldn't get no medical attention or nothing. There was nothing I could do physically about it."

(ECF No. 103-9, Brinson Tr. at 72:15–73:4.)

**RESPONSE: Objection, move to strike and disregard. The assertions in paragraph 81 are inadmissible as self-serving statements without any factual support. *Palmer*, 327 F.3d at 596. Self-serving affidavits without factual support in the record will not defeat a motion for summary judgment, and a party seeking to avoid summary judgment may not establish a dispute of material fact on unsubstantiated assertions in its factual summary or affidavits. *Palmer*, 905 F. Supp. at 501. Additionally,**

**Plaintiff lacks the medical foundation to opine on matters related to the causation and diagnosis of his medical condition(s). Subject to and without waiving these objections, disputed to the extent Plaintiff's statement mischaracterizes the evidence and suggests that Defendants Hutchinson and Pfister caused him to suffer severe emotional distress.**

Dated: October 25, 2019

Respectfully submitted,

KWAME RAOUL
Attorney General of Illinois

/s *Colleen M. Shannon*
COLLEEN M. SHANNON
Assistant Attorney General
General Law Bureau
100 W. Randolph St., 13th Fl.
Chicago, Illinois 60601
(312) 814-4451
cshannon@atg.state.il.us

## CERTIFICATE OF SERVICE

The undersigned certifies that on October 25, 2019, the foregoing document was electronically filed using the Court's CM/ECF system, and a copy was thereby served on all attorneys of record.

/s *Colleen M. Shannon*