# UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| BOB A. BRINSON, | |
| Plaintiff, | |
| | No. 17-cv-1659 |
| v. | |
| | Hon. John Z. Lee, District Judge |
| WEXFORD HEALTH SOURCES, INC., JOHN TROST, GHALIAH OBAISI, as Independent Executor of the Estate of SALEH OBAISI, RANDY PFISTER, and JEFF HUTCHINSON, | Hon. Susan E. Cox, Magistrate Judge |
| Defendants. | |

## DEFENDANTS WEXFORD HEALTH SOURCES, INC., GHALIAH OBAISI, AS INDEPENDENT EXECUTOR OF THE ESTATE OF SALEH OBAISI, M.D., DECEASED, AND JOHN TROST, M.D.'S RESPONSE TO PLAINTIFF'S STATEMENT OF ADDITIONAL FACTS

Defendants, WEXFORD HEALTH SOURCES, INC., GHALIAH OBAISI, as Independent Executor of the Estate of SALEH OBAISI, M.D., Deceased, and JOHN TROST, M.D., by and through their attorneys of CASSIDAY SCHADE LLP, and for their Response to Plaintiff, BOB A. BRINSON's Statement of Additional Facts, state as follows:

### A. Plaintiff's Medical Condition and His Medical Care at Stateville

1. Before his incarceration, when he was around 43 years old, Plaintiff was diagnosed with Polycystic Kidney Disease ("PKD"), a chronic kidney illness that requires treatment. (ECF No. 130-9, Brinson Tr. at 40:7–22; *see also* ECF No. 130-5, Ricardo Tr. at 38:15–39:18 (describing PKD, the treatment it requires, and the symptoms and complications it causes in patients).)

**RESPONSE: It is disputed that the cited testimony from the Plaintiff and Dr. Ricardo (ECF No. 130-9, Brinson Tr. at 40:7–22; *see also* ECF No. 130-5, Ricardo Tr. at 38:15–**

**39:18), states that the Plaintiff's kidney disease is an illness that requires treatment as stated in paragraph 1. The remainder of this paragraph is undisputed.**

2.      As a result of his PKD, Plaintiff requires, among other things, a low-potassium, low-salt, low-phosphorus, healthy diet rich in fruits and vegetables, grains, fiber, white meat, and vegetable protein. (ECF No. 130-5, Ricardo Tr. at 44:2–19.)

**RESPONSE: It is disputed that the cited testimony from Dr. Ricardo (ECF No. 130-5, Ricardo Tr. at 44:2–19.), states the type of diet that the Plaintiff's specifically requires as the doctor was offering general testimony regarding diet recommendations.**

**B.      Plaintiff's Prior Lawsuit and the Settlement Agreement with Wexford**

3.      In 2014, Plaintiff and Wexford entered into a settlement agreement to resolve a 2011 civil rights lawsuit in which Plaintiff alleged that Wexford employees failed to provide him with constitutionally required medical care for his PKD. (ECF No. 70-1.)

**RESPONSE:  Undisputed.**

4.      The settlement agreement provides, among other things:

(1)(b) Wexford agrees to follow all medical plans and/or recommendations (the "Recommendations") made by UIC specialists relative to Plaintiff's PKD during or at any time after [Plaintiff's initial UIC] Appointment, to the extent that any such recommendations must take into account the security environment in which Plaintiff resides. . . .

(1)(c) Wexford will ensure that a Therapeutic Diet Order for a renal diet, per IDOC guidelines and/or directives, is ordered and in place for Plaintiff so long as it is deemed medically indicated by a UIC or other nephrologist.

(2) Wexford reserves the right to substitute treatment at UIC for treatment at another facility or community specialist should UIC be unwilling or unable to provide treatment, otherwise disrupt the contractual relationship between it and IDOC, or if Plaintiff should be moved to another facility by IDOC from which transport to UIC would not be feasible or reasonable.

(*Id.* at ¶¶ 1.b-c, 2; *see also* ECF No. 130-1, Fischer Tr. at 9:4–24.)

**RESPONSE: It is undisputed that the Plaintiff has cited to *portions* of the settlement agreement, the more complete contents of which is set forth in Defendants' Statement of Facts. (<u>Doc. #130</u>, para. 2).**

5. Following the execution of the settlement agreement, Plaintiff began receiving a renal diet at Stateville. (ECF No. 130-9, Brinson Tr. at 26:1–6.)

**RESPONSE: Disputed to the extent the Plaintiff testified that he actually started receiving a renal diet "Immediately. As soon as I got to Stateville, like, '09 –2009." (ECF No. 130-9, Brinson Tr. at 26:7-9).**

C. **Defendants Failed to Follow Specialists' Recommendations Regarding Follow up Appointments**

6. Since at least 2014, Plaintiff has been treated at the nephrology clinic at the University of Illinois at Chicago Hospital (UIC) under the care of Dr. Ana Ricardo. Dr. Ricardo is an associate professor of medicine at UIC and a board-certified nephrologist with extensive training and experience treating PKD patients. (*See, e.g.,* IDOC000684–87, attached hereto as Exhibit 1; *see also* ECF No. 130-5, Ricardo Tr. at 17:18–19:9, 34:18–35:11; 38:3–14.)

**RESPONSE: Undisputed.**

*Recommendations Regarding Follow-Up Appointments*

7. Over the years since Plaintiff began treatment at UIC, the nephrologists have recommended he return to their clinic for follow-up appointments typically every six weeks. (*See, e.g.,* RB_IDOC0000080–86, attached as Exhibit 3 (May 2016 recommendation for follow-up in six weeks).) On several occasions, however, Plaintiff has missed scheduled appointments. (RB_UIC0000083-88, attached hereto as Exhibit 2; ECF No. 130-5, Ricardo Tr. at 50:5–16 (testifying she recalls between two and five occasions on which Plaintiff missed his appointments).)

**RESPONSE: It is disputed that the cited medical record supports the Plaintiff's asserted fact that he return to the UIC clinic "typically" every six weeks because the Plaintiff has cited only <u>one</u> medical record with a plan for a six week follow-up. (<u>Doc. #145-3</u>). It is disputed that the Plaintiff "missed" appointments on "several occasions." The cited medical records (<u>Doc. #145-2</u>), show that the Plaintiff's appointment dates were rescheduled, contrary to his claim that he missed appointments.**

8.     On July 29, 2016, Dr. Ricardo and a fellow working under her supervision, Dr. Bishan Charkravarty, saw Plaintiff at UIC. The nephrologists observed that Plaintiff was in stage five – also known as "end stage" – PKD, and recommended that he receive an arteriovenous ("AV") graft no more than one week before he would start dialysis. Dr. Ricardo also recommended that Plaintiff continue to receive a renal (low-sodium, low-phosphorus) diet. (RB_UIC0000154–159, attached hereto as Exhibit 4; ECF No. 130-5, Ricardo Tr. 51:10–59:14.)

**RESPONSE: Disputed as Dr. Ricardo testified that the AV graft would be placed one to fourteen days before the initiation of dialysis. Also disputed that the Plaintiff required dialysis at the time of this note as the records state that there was "[n]o indication to initiate dialysis at this time." (<u>Doc. # 130-5</u>, Ricardo Tr., 58:14-21; <u>Doc. #145-4</u>, RB_UIC0000154).**

9.     Dr. Charkravarty, originally recommended that Plaintiff return to the UIC clinic in six weeks. (RB_IDOC0000093, attached hereto as Exhibit 5.)

**RESPONSE: Disputed only as to the use of the doctor "originally," making that recommendation, which is not supported by the cited record. (<u>Doc. 145-5</u>).**

10.    After Plaintiff left the clinic, however, his lab work was processed and returned to UIC. Upon reviewing Plaintiff's lab work, Dr. Ricardo determined that Plaintiff needed to return to UIC sooner. Dr. Ricardo therefore updated the recommendation in Plaintiff's medical record indicating Plaintiff should return to the clinic within four weeks of July 29, 2016. (Ex. 4; ECF No. 130-5, Ricardo Tr. at 67:2–17.)

**RESPONSE: Disputed only as to Dr. Ricardo updating the recommended time for RTC, as the doctor did not offer any testimony that she updated Dr. Obaisi or Stateville on the change to the initial recommended RTC time, and the document transmitted to Stateville set forth a 6 week follow-up time. (<u>Doc. #130-5</u>, Ricardo Tr. at 68:4-7; <u>Doc. #145-5</u>).**

11.    Dr. Ricardo explained that it was important for Plaintiff to return to the clinic within four weeks because the clinic was monitoring Plaintiff's lab work and symptoms to evaluate when he would need surgery to create an access point for dialysis. (ECF No. 130-5, Ricardo Tr. at 59:16–67:17, 111:10–14.)

**RESPONSE: Disputed only as to the "importance," of the recommended time for RTC, as the doctor did not offer any testimony that she updated Dr. Obaisi or Stateville on the change to the initial recommended RTC time, and the document transmitted to Stateville set forth a 6 week follow-up time. (Doc. #130-5, Ricardo Tr. at 68:4-7; Doc. #145-5).**

12.     UIC's original recommendation and Dr. Ricardo's later addendum shortening the timeframe for Plaintiff's return visit were transmitted by the UIC clinic to Dr. Obaisi at Stateville. (Ex. 4; ECF No. 130-5, Ricardo Tr. at 59:16–67:17; Ex. 5.)

**RESPONSE: Disputed as the doctor did not offer any testimony that she updated Dr. Obaisi or Stateville on the change to the initial recommended RTC time, and the document transmitted to Stateville set forth a 6 week follow-up time. (Doc. #130-5, Ricardo Tr. at 68:4-7, 62"; Doc. #145-5).**

13.     There are multiple options to create an access point in the body for a patient to receive dialysis. One option is a tunneled catheter, which is a plastic tube that "goes in the upper chest and tunnels underneath the skin to go into one of the major veins in the neck or upper chest." Another option is an AV graft, which is an internal plastic tube that connects the artery in the arm or thigh to the vein, enabling the dialysis nurse to place a large needle into the tube to perform dialysis. A third option is an AV fistula, which functions like the graft, but connects a patient's own vein to his artery rather than using a plastic tube, enabling dialysis nurses to put the needle directly into the patient's vein. (ECF No. 130-4, Hale Tr. at 26:7–28:3.)

**RESPONSE: Undisputed.**

14.     AV fistula is the preferred choice for permanent vascular access; the next best option is an AV graft; and the least desirable option of those three is the tunneled catheter. This is because the graft has more longevity and a lower risk of infection than a tunneled catheter. A tunneled catheter has the shortest lifespan of any dialysis option and, "because they come out of the skin and they're a foreign object," "they get infected easily. They can also get clotted." (ECF No. 130-4, Hale Tr. at 28:11–30:9; ECF No. 130-5, Ricardo Tr. at 85:15–22 (AV graft is

recommended over tunneled catheter for dialysis because catheters are "prone to infections and other complications").)

**RESPONSE: Disputed. An AV fistula could not be the preferred choice for the Plaintiff, nor an AV graft the next best option. Dr. Ricardo's note stated that the Plaintiff was "[n]ot a candidate for AV fistula due to small veins." (Doc. #145-4, RB_UIC0000154). Additionally. Dr. Hale testified that the Plaintiff had no veins adequate for graft placement for dialysis and his plan was for the Plaintiff to return for placement of a tunneled catheter for dialysis access. (Defendants' Ex. "D," 22:19-20, 25:6-10). Dr. Hale also testified that a tunnel catheter can be left in for three to six months, but some patients can keep a tunneled catheter in for three to five years. (Ex. "D," 34:14-16, 41:11-14). Relative to his lack of vein access, the Plaintiff had a history of IV drug use. (Ex. "D," 48:3-7, 15-16).**

15.     Because Plaintiff was not a candidate for an AV fistula due to small veins, the UIC nephrologists' plan was for him to receive an AV graft before starting dialysis. (IDOC000295–299, attached hereto as Exhibit 6 (2/3/15 Medical Special Services Referral and Report from UIC specialist to Obaisi reporting vein mapping shows Brinson a candidate for AV graft); Ex. 4.)

**RESPONSE: Disputed. Dr. Hale testified that the Plaintiff had no veins adequate for graft placement for dialysis and his plan was for the Plaintiff to return for placement of a tunneled catheter for dialysis access. (Defendants' Ex. "D," 22:19-20, 25:6-10).**

16.     Dr. Ricardo told Plaintiff at his appointment in July 2016 that she expected he would have to start dialysis sometime in the next eight weeks. (ECF No. 130-9, Brinson Tr. at 73:23–74:7.)

**RESPONSE: Disputed. The records from that state that there was "[n]o indication to initiate dialysis at this time." (Doc. # 130-5, Ricardo Tr., 58:14-21; Doc. #145-4, RB_UIC0000154). Dr. Ricardo testified that they would monitor the Plaintiff relative to when he would need dialysis. (Defendants' Ex. "E," 61:4-8). Additionally, the Plaintiff was not determined to need dialysis until December of 2016, when he Dr. Hale saw the Plaintiff his plan was for the Plaintiff to return for placement of a tunneled catheter for dialysis access, which occurred on January 3, 2017. (Ex. "D," 22:19-20, 25:6-10, 39:4-7, 16).**

17.     Following Plaintiff's July 2016 UIC visit, Dr. Obaisi received and approved the recommendation that Plaintiff return to the clinic within six weeks. He submitted the referral to Wexford's Utilization Management department for final approval, which Wexford provided.

(Ex. 5; ECF No. 130-1, Fischer Tr. at 34:8–19; RB_IDOC0000078, attached hereto as Exhibit 7; *see also* ECF No. 130-9, Brinson Tr. at 45:9–25 (Dr. Obaisi never told Plaintiff he disagreed with the UIC doctors' recommendation as to when Plaintiff should return to UIC for medical treatment).)

**RESPONSE: Undisputed.**

18. Between July 29, 2016 and December 8, 2016, however, Plaintiff was never brought to UIC or any other nephrology clinic. (ECF No. 130-1, Fischer Tr. at 20:19–25:12.)

**RESPONSE: Disputed to the extent this paragraph asserts that an appointment was medically necessary during the said timeframe as Wexford was monitoring the Plaintiff's follow-up appointment at UIC after his July, 2016, visit, and the notes in the Wexcare system for the Plaintiff show that Wexford's corporate office contacted Stateville and was advised that the Plaintiff's appointment was going to occur in December of 2016. There were two notes in the Wexford system, from September 12th and 15th, 2016, indicating that Wexford's corporate office contacted Stateville and confirmed that Dr. Obaisi was accepting of the December appointment date from UIC. (Defendants' Ex. "A," 25:16-14, 26:1-6, 41:21-24, 42:1-2. 44:1-6). As planned, the Plaintiff was seen by a nephrologist in December of 2016. (Defendants' Ex. "C," 37:13-17).**

19. Dr. Ricardo testified that her recommendations for Plaintiff to return to the UIC clinic and to receive an AV graft before dialysis start time were not followed. (ECF No. 130-5, Ricardo Tr. at 106:6–23.)

**RESPONSE: Disputed. Dr. Hale testified that the Plaintiff had no veins adequate for graft placement for dialysis and his plan was for the Plaintiff to return for placement of a tunneled catheter for dialysis access. (Defendants' Ex. "D," 22:19-20, 25:6-10). Additionally, the Plaintiff had been transferred by the IDOC to Menard C.C., and Menard (located in far southern Illinois) does not utilize UIC (in Chicago) for specialist referrals. (Defendants' Ex. "A," 24:6-9).**

*Defendants' Knowledge*

20. Defendant Randy Pfister knew Plaintiff was missing his medical appointments at UIC. On three or four occasions beginning in early 2016, while Pfister was making rounds in Plaintiff's cell house or Plaintiff was moving through the prison, Plaintiff spoke with the warden face-to-face. During those conversations, Plaintiff told the warden he'd been missing medical

appointments with his kidney specialist at UIC. In 2016, Plaintiff told Warden Pfister he was in

the last stage of kidney disease and it had been six months since he'd seen the specialist at UIC.

(ECF No. 130-9, Brinson Tr. at 31:8–33:17.)

**RESPONSE: This paragraph is not directed at these moving Defendants. To the extent that a response to this paragraph is deemed necessary, it is disputed that the Plaintiff had "been missing medical appointments with his kidney specialist at UIC," because Wexford was monitoring the Plaintiff's follow-up appointment at UIC after his July, 2016, visit, and the notes in the Wexcare system for the Plaintiff show that Wexford's corporate office contacted Stateville and was advised that the Plaintiff's appointment was going to occur in December of 2016.  There were two notes in the Wexford system, from September 12th and 15th, 2016, indicating that Wexford's corporate office contacted Stateville and confirmed that Dr. Obaisi was accepting of the December appointment date from UIC. (Defendants' Ex. "A," 25:16-14, 26:1-6, 41:21-24, 42:1-2. 44:1-6). It is also disputed that "it had been six months since he'd seen the specialist at UIC," as the Plaintiff fails to provide a timeframe for the alleged six-month span.**

21.    Warden Pfister took no meaningful steps to address Plaintiff's failure to receive

his medical visits. (ECF No. 128-3, Pfister Tr. at 48:15-50:8 (warden might choose to question

an inmate's medical care and contact the Medical Director or Wexford's Regional Director,

including that warden might take steps to expedite medical care).)

**RESPONSE: This paragraph is not directed at these moving Defendants. To the extent that a response to this paragraph is deemed necessary, it is disputed that the cited testimony supports the fact asserted in this paragraph.**

22.    Dr. Obaisi and Wexford also knew that Plaintiff did not return to UIC in the

recommended timeframe following his July 2016 visit. Rather than schedule a return visit in

August 2016, as recommended by Dr. Ricardo, Plaintiff was scheduled to return to UIC in

December. Wexford's corporate representative testified that its corporate office reached out to

Stateville on September 12 to ask whether Dr. Obaisi approved of Plaintiff delaying his visit

until December. On September 15, 2016, Dr. Obaisi informed Wexford corporate that he "was

accepting of the December appointment." (ECF No. 130-1, Fischer Tr. at 25:13–45:4 (discussing

utilization management process generally and Obaisi's approval of delayed appointment).)

**RESPONSE: Disputed. The appointment in December was provided by UIC. (Defendants' Ex. "A," 26:7-10, 46:24, 47:1). Additionally, the cited testimony does not support any fact that Wexford or Dr. Obaisi "delayed" the Plaintiff's appointment at UIC. (Defendants' Ex. "A," 25:16-14, 26:1-6, 41:21-24, 42:1-2. 44:1-6.**

### D. Plaintiff is Transferred to Menard with Defendants' Approval

23.     The contract under which Wexford provides medical care to Illinois prisoners creates an obligation to place a "medical hold" on certain prisoners, which would prevent them from being transferred between prisons. To that end, under the heading "Transferring/Transferred Offenders", the contract states: "Offenders undergoing treatment care or procedures . . . shall be placed on a 'Medical Hold', if the transfer will interfere with the treatment, care, and procedures of the offender . . . ." (Wexford 1081–1363 § 2.2.3.1.2., attached hereto as Exhibit 8; Wexford 1364–1376 (contract renewal), attached here to as Exhibit 9; *see also* ECF No. 130-7, Stephens Tr. at 67:9–20 (medical department is supposed to place a transfer hold on a prisoner with a scheduled appointment or consultation).)

**RESPONSE: Disputed that there is an obligation upon Wexford to place a "medical hold," on certain prisoners. Relative to the IDOC contract, a medical hold is a client-based procedure that involves the movement of inmates; in this case, an IDOC function. The medical hold process is per Wexford's client's procedures on how the client wishes the process to be done. (Defendants' Ex. "A," 51:16-24, 59:12-14). The medical hold procedure is not in the hands of the site medical director. The health care unit administrator, who is an IDOC employee, will receive notice of inmates who are to be transferred and will review a list of inmates to determine if any have upcoming medical appointments. (Defendants' Ex. "A," 53:12-23, 56:17-24, 57:10-15). Additionally, even if a particular inmate who is to be transferred has an upcoming medical appointment, IDOC may still have reasons to move the inmate. (Defendants' Ex. "A," 54:2-4).**

24.     From at least some time in 2014 through November 2016, Plaintiff had been on a medical hold preventing him from being transferred away from Stateville. (*See, e.g.,* ECF No. 130-9, Brinson Tr. at 49:22–51:4 (Dr. Obaisi told Plaintiff in 2014 and again in 2016 he was on a medical hold); ECF No. 130-1, Fischer Tr. at 67:12–16 (Wexford corporate representative

conceding Plaintiff was undergoing treatment and care in November 2016); BRINSON0000001, attached hereto as Exhibit 10.)

**RESPONSE: Disputed. At the time that the Transfer Coordinator's Office received the transfer paperwork for the Plaintiff (a week before the transfer), he was not on a medical hold. (Defendants' Ex. "G," 56: 13-17, 72:12-13).**

25.     Menard's former medical director, Menard's former warden, and a Stateville nurse, all testified that the medical director had the exclusive authority to place or remove a medical hold on inmates at Stateville, including Plaintiff. (ECF No. 130-2, Trost Tr. at 45:6–21; ECF No. 130-6, Hutchinson Tr. at 37:6–38:1; ECF No. 130-8, Angeloff Tr. at 26:10–27:13; *see also* ECF No. 128-3, Pfister Tr. at 65:13-15 (testifying medical department must be involved to remove a medical hold).)

**RESPONSE: Disputed. The Plaintiff cites to testimony from Menard (not Stateville) employees and a nurse (not a physician) to support his assertion as the placement of medical holds. Dr. Fisher, who has actual knowledge of the process testified that a medical hold is an IDOC function. (Defendants' Ex. "A," 51:16-24, 59:12-14). The medical hold procedure is not in the hands of the site medical director. The health care unit administrator, who is an IDOC employee, will receive notice of inmates who are to be transferred and will review a list of inmates to determine if any have upcoming medical appointments. (Defendants' Ex. "A," 53:12-23, 56:17-24, 57:10-15). Additionally, even if a particular inmate who is to be transferred has an upcoming medical appointment, IDOC may still have reasons to move the inmate. (Defendants' Ex. "A," 54:2-4).**

26.     IDOC's transfer coordinator Douglas Stephens oversees the movement of inmates to and between IDOC prisons. (ECF No. 130-7, Stephens Tr. at 26:2–17, 19:20–25:8 (describing job responsibilities).)

**RESPONSE: Undisputed.**

27.     Stephens testified that the "medical department at each facility" was responsible for placing medical holds or transfer stops on inmates. (*Id.* at 45:18–21.)

**RESPONSE: Disputed. A medical hold is an IDOC function. (Defendants' Ex. "A," 51:16-24, 59:12-14). The medical hold procedure is not in the hands of the site medical director. The health care unit administrator, who is an IDOC employee, will receive notice of inmates who are to be transferred and will review a list of inmates to determine if any have**

upcoming medical appointments. (Defendants' Ex. "A," 53:12-23, 56:17-24, 57:10-15). **Additionally, even if a particular inmate who is to be transferred has an upcoming medical appointment, IDOC may still have reasons to move the inmate. (Defendants' Ex. "A," 54:2-4).**

28.     On November 20, 2016, a correctional officer came to Plaintiff's cell and told him he would be transferred from Stateville to Menard Correctional Center. Plaintiff told the officer he had a medical hold and should not be transferred; and he asked to speak to a crisis team member. (ECF No. 130-9, Brinson Tr. at 46:18–47:12.)

**RESPONSE: It is undisputed that the Plaintiff testified as set forth in this paragraph. It is disputed that the Plaintiff was on a medical hold that would have kept IDOC from transferring him out of Stateville because at the time that the Transfer Coordinator's Office received the transfer paperwork for the Plaintiff (a week before the transfer), he was not on a medical hold. (Defendants' Ex. "G," 56: 13-17, 72:12-13). Additionally, Wexford was given no option in reference to the patients in the Round House who were to be transferred to Menard; it was an IDOC decision and Wexford was not involved in the process. (Ex. "A," 54:7-11, 60:4-10). Wexford had no choice relative to the IDOC's transfer of inmates who had been housed in the Round House. (Ex. "A," 62:8-11).**

29.     Nurse Franzen, a member of the crisis team, responded about an hour later. She told Plaintiff she would go to the Health Care Unit and review Plaintiff's medical chart with a nurse. Plaintiff told her he was having a mental breakdown. (ECF No. 130-9, Brinson Tr. at 47:13–48:13.)

**RESPONSE: It is disputed that the Plaintiff was having a mental breakdown as the records relative to this encounter do not reflect any medial or mental health provider finding that the Plaintiff was having a mental breakdown. (Defendants' Ex. "H," Angeloff deposition exhibit 1).**

30.     Nurse Franzen contacted licensed practical nurse Jerri Angeloff, a Wexford employee working at Stateville. Nurse Angeloff called Defendant Saleh Obaisi, then the medical director of Stateville, for clarification. Dr. Obaisi told Nurse Angeloff that Plaintiff could be transferred to Menard, and Nurse Angeloff documented the conversation in Plaintiff's medical record. (ECF No. 133, IDOC000203; ECF No. 130-8, Angeloff Tr. at 36:12–39:19; id. at 41:11–42:10 (authenticating medical record and testifying about phone call to Dr. Obaisi).)

**RESPONSE: This paragraph is disputed to the extent that it does not set forth the complete documented record by Nurse Angeloff, which also provides a directive for the Plaintiff to "[follow-up with] medical care @ final destination." (Defendants' Ex. "H," Angeloff deposition exhibit 1). Additionally, Nurse Angeloff testified that she did not recall if she asked Dr. Obaisi if the Plaintiff had a medical hold. (Defendants' Ex. "H," 45:7-9).**

31.    Wexford's corporate representative testified that Obaisi was aware on-site dialysis was unavailable at Menard. (ECF No. 130-1, Fischer Tr. at 68:8–15.)

**RESPONSE: It is undisputed that Dr. Fisher testified that it was common knowledge, which IDOC facilities have dialysis services, however, Wexford did not have any control over the IDOC's transfer of the Plaintiff to Menard. (Defendants' Ex. "A," 51:1-5, 54:7-11, 60:4-10; Ex. "G," 19:2-7).**

32.    Nurse Franzen returned to Plaintiff and told him Obaisi said he could be transferred. (ECF No. 130-9, Brinson Tr. at 48:17–49:14.)

**RESPONSE: This paragraph is disputed to the extent that it does not accurately reflect the complete documented record by Nurse Angeloff. (Defendants' Ex. "H," Angeloff deposition exhibit 1). Additionally, Nurse Angeloff testified that she did not recall if she asked Dr. Obaisi if the Plaintiff had a medical hold. (Defendants' Ex. "H," 45:7-9).**

33.    On November 21, 2016, Plaintiff was transferred to Menard. (ECF No. 130-9, Brinson Tr. at 9:13–15.)

**RESPONSE: Undisputed.**

34.    Defendant Randy Pfister knew of and approved Plaintiff's transfer out of Stateville in November 2016. (ECF No. 128-3, Pfister Tr. at 98:1-99:10; 101:19-102:6; *see also* ECF No. 130-7, Stephens Tr. at 54:4–15; 55:14–20 (testifying warden made the final decision to transfer Plaintiff from Stateville to Menard and "would have been ultimately responsible" for the decision).)

**RESPONSE: Undisputed.**

35.    A few days before November 21, 2016, Plaintiff spoke to Warden Pfister while the warden was making rounds in Plaintiff's cell house. Plaintiff told the warden that he was on a medical hold; he had been missing his medical appointments; he was in the last stage of renal

disease; his doctor at UIC had told him he needed to be monitored closely; it had been six

months since he'd been to UIC; and he was in severe pain. (ECF No. 130-9, Brinson Tr. at 31:8–

34:3; *see also* ECF No. 128-3, Pfister Tr. at 111:1-112:15 (an agent of Pfister at Stateville knew

Plaintiff was receiving regular medical care at UIC and, and that Plaintiff went to UIC

appointments between March and July 2016).)

**RESPONSE: It is disputed that: the Plaintiff was on a medical hold (At the time the Transfer Coordinator's Office received the transfer paperwork for the Plaintiff - a week before the transfer - he was not on a medical hold (Defendants' Ex. "G," 56: 13-17, 72:12-13)); or that the Plaintiff had been missing his medical appointments (the medical records (<u>Doc. #145-2</u>), show that the Plaintiff's appointment dates were rescheduled).**

36.     Pfister testified that when Plaintiff's cell house at Stateville closed at the end of

2016, Pfister personally monitored the transfer of inmates housed there, and worked with the

transfer coordinator and clinical services at the prison to facilitate prisoners' transfer. (ECF No.

128-3, Pfister Tr. at 98:1-99:10; 101:19-102:6; *see also* ECF No. 130-7, Stephens Tr. at 54:4–15;

55:14–20 (testifying warden made the final decision to transfer Plaintiff from Stateville to

Menard and "would have been ultimately responsible" for the decision).)

**RESPONSE: Undisputed.**

37.     Defendant Saleh Obaisi also facilitated Plaintiff's transfer to Menard by lifting the

medical hold in Plaintiff's file so the transfer coordinator's office could approve the necessary

paperwork. On October 11, 2016, Obaisi reviewed Plaintiff's chart in connection with his

planned transferred to Menard and entered an order to "discontinue" his medical hold.

(IDOC000194, attached hereto as Exhibit 11.) And on the eve of Plaintiff's transfer, Obaisi

informed the crisis team member working with Plaintiff that he approved the transfer. (ECF No.

133, IDOC000203.)

**RESPONSE: Disputed. Dr. Obaisi did not facilitate the Plaintiff's transfer to Menard because Wexford was given no option in reference to the patients in that housing unit who were to be transferred to Menard; it was an IDOC decision and Wexford was not involved**

in the process. (Defendants' Ex. "A," 54:7-11, 60:4-10). **Additionally, the cited record does not indicate any "approval" of the Plaintiff's transfer by Dr. Obaisi. Dr. Obaisi could not approve a transfer, because the final decision and ultimate responsibility for the Plaintiff's transfer to Menard would have been with the warden at Stateville and that decision was then approved by the IDOC Transfer Coordinator's Office. (Defendants' Ex. "G," 54:4-15, 55:14-20).**

38.     Stephens testified that at the time his office approved Plaintiff's transfer, there was no medical hold, also known as a "transfer stop," in place for Plaintiff. (ECF No. 130-7, Stephens Tr. at 45:13–17; 46:10–16.)

**RESPONSE: Undisputed.**

39.     Neither Pfister nor Obaisi informed the transfer coordinator's office that Plaintiff was getting ready to start dialysis. If Stephens' office had known as much, according to Stephens, "we would have questioned that" and may not have approved the transfer. (ECF No. 130-7, Stephens Tr. at 61:4–62:6; *id.* at 77:10–78:1.)

**RESPONSE: It is disputed that the Plaintiff "was getting ready to start dialysis," as the cited testimony in this paragraph (which is not from a medical provider), supports no such fact.**

### E.     Plaintiff Did Not Receive a Renal Diet or On-Site Dialysis at Menard

40.     According to Menard's medical director, when Plaintiff was imprisoned there, there were no therapeutic diets, including no renal diets, available. Consequently, there was "no means" for the prison to actually provide a patient with a renal diet even *if an outside specialist recommended such a diet.* The most that Menard could offer to inmates who needed therapeutic diets was counseling on foods to avoid. (ECF No. 130-2, Trost Tr. at 48:23–50:6 (in response to a question about whether any therapeutic diets were available at Menard, explaining "[t]o the best of my knowledge, no. I mean, I know that there were no diabetic diets. I believe that there were no cardiac diets. And I'm certain that there were no renal diets."); *id.* at 98:1–6.)

**RESPONSE: This paragraph is disputed to the extent that it asserts that Dr. Trost, the Menard medical director at the time, had any control over the availability of such**

**therapeutic or renal diets because the dietary department at Menard was overseen and supervised by IDOC staff: Mr. Hutchinson; the assistant warden of programs; and, the dietary manager. (Defendants' Ex. "F," 32:2-17). Dr. Trost was not able to actually provide or facilitate diets to inmates. (Defendants' Ex. "B," 97:16-25, 98:1-6).**

41.     Consequently, Plaintiff did not receive a renal diet for the entire period during which he was imprisoned at Menard. (ECF No. 130-9, Brinson Tr. at 64:13–24 (describing diet at Menard).)

**RESPONSE: Undisputed.**

42.     Menard also does not have a facility on site where inmates can receive dialysis. (ECF No. 130-6, Hutchinson Tr. at 47:21–4.)

**RESPONSE: Undisputed.**

### *Defendants' Knowledge*

43.     Jeff Hutchinson was serving as warden of Menard when Plaintiff was transferred there in November 2016. (ECF No. 130-6, Hutchinson Tr. at 24:9–14.)

**RESPONSE: Undisputed.**

44.     As warden at Menard, Hutchinson's responsibilities included: (a) overseeing the dietary staff, including the dietary manager; (b) reviewing grievances; and (c) making sure medical care was being provided to inmates correctly. (ECF No. 130-6, Hutchinson Tr. at 31:15–21.)

**RESPONSE: Undisputed.**

45.     Warden Hutchinson had a practice of making rounds in the cell houses to talk to inmates. (ECF No. 130-6, Hutchinson Tr. at 39:21–40:24.)

**RESPONSE: Undisputed.**

46.     Plaintiff spoke to Hutchinson at least three times while he was at Menard. During those conversations, Plaintiff explained that because of his medical condition, he should not be at

Menard; he should be on a medical diet; he was in pain from his kidneys and was supposed to have started dialysis at Stateville; he'd been missing all his doctor appointments; and at his last UIC appointment, Dr. Ricardo had told him that the following month (August 2016) she was going to place an artificial graft in his arm so he could start dialysis. (ECF No. 130-9, Brinson Tr. at 20:2–22:12; id. at 23:23–25:5.)

**RESPONSE: This paragraph is not directed at these moving Defendants. To the extent that a response to this paragraph is deemed necessary, it is disputed that because of the Plaintiff's medical condition, he should not be at Menard as the Plaintiff was able to receive prompt medical review and a referral to a specialist upon his arrival to Menard (Defendants' Ex. "B," 55:15-20, 62:5-8, 95:23-25, 96:1-2, 76:3-5, Dep. Ex. "3," 81:9-17, Dep. Ex. "5," 91:19-25, 92:1-2, and Dep. Ex. "A").**

**It is disputed that the Plaintiff was supposed to have started dialysis at Stateville because there is no order from any physician in the record indicating that the Plaintiff was to start dialysis prior to his transfer at Menard and when he last saw Dr. Ricardo, he was not yet indicated for dialysis. (Doc. # 130-5, Ricardo Tr., 58:14-21; Doc. #145-4, RB_UIC0000154).**

**It is disputed that the Plaintiff had been "missing all his doctor appointments," because the medical records (Doc. #145-2), show that the Plaintiff's appointment dates were rescheduled and Wexford was monitoring the Plaintiff's follow-up appointment at UIC after his July, 2016, visit, and the notes in the Wexcare system show that Wexford's corporate office contacted Stateville and was advised that the Plaintiff's appointment was going to occur in December of 2016. The notes in the Wexford system from September 2016, indicate that Wexford's corporate office contacted Stateville and confirmed that Dr. Obaisi was accepting of the December appointment date *from* UIC. (Defendants' Ex. "A," 25:16-14, 26:1-6, 41:21-24, 42:1-2. 44:1-6). Additionally, appointment dates are dictated and provided by the UIC providers, not Wexford. (Defendants' Ex. "A," 26:7-10, 46:24, 47:1).**

**It is disputed that at his last UIC appointment (July 2016), Dr. Ricardo had told the Plaintiff that the following month (August 2016) she was going to place an artificial graft in his arm so he could start dialysis as the doctor's records contain no such note and show that when the Plaintiff last saw Dr. Ricardo, he was not yet indicated for dialysis. (Doc. # 130-5, Ricardo Tr., 58:14-21; Doc. #145-4, RB_UIC0000154).**

47. The first time Hutchinson and Plaintiff spoke in person, the warden said Plaintiff looked sick and that he could tell Plaintiff was in a lot of pain. Hutchinson said to his knowledge, no renal diet was available at Menard. (ECF No. 130-9, Brinson Tr. at 24:11–22.)

**RESPONSE: This paragraph is not directed at these moving Defendants. To the extent that a response to this paragraph is deemed necessary, this paragraph is disputed as Mr. Hutchinson did not offer any testimony of such observations or conversations with the Plaintiff. (Defendants' Ex. "F,").**

48.     Plaintiff also wrote a letter to Hutchinson the first or second day he was at Menard. In the letter, Plaintiff told the warden he needed a renal diet. Warden Hutchinson told Plaintiff during a subsequent in-person conversation that he received Plaintiff's letter. (ECF No. 130-9, Brinson Tr. at 27:6–28:19.)

**RESPONSE: This paragraph is not directed at these moving Defendants. To the extent that a response to this paragraph is deemed necessary, this paragraph is disputed as Mr. Hutchinson did not offer any testimony of such conversation with the Plaintiff. (Defendants' Ex. "F,").**

49.     On December 7, 2016, Hutchinson received, reviewed, and signed Plaintiff's emergency grievance reporting that Plaintiff (a) was in end stage renal disease; (b) was supposed to have started dialysis before his transfer to Menard; (c) missed his specialist appointments at UIC before being transferred; and (d) was suffering pain. (ECF No. 130-6, Hutchinson Tr. at 42:24–47:17.)

**RESPONSE: This paragraph is not directed at these moving Defendants. To the extent that a response to this paragraph is deemed necessary, this paragraph is disputed to the extent this paragraph asserts as facts the content of the grievance, however, it is not disputed that Mr. Hutchinson testified that he received, reviewed, and signed Plaintiff's grievance.**

50.     Hutchinson determined that the grievance had merit and consequently needed to be addressed by medical director John Trost on an expedited basis as it appeared Plaintiff's condition was serious. (ECF No. 130-6, Hutchinson Tr. at 49:2–24.)

**RESPONSE: This paragraph is not directed at these moving Defendants. To the extent that a response to this paragraph is deemed necessary, this paragraph is not disputed.**

51.     After reviewing Plaintiff's grievance and checking a box to "expedite" review, Hutchinson does not recall taking any steps to address Plaintiff's emergency: Hutchinson does

not recall making any phone calls, sending any emails, speaking to any person, or doing anything to determine why Plaintiff had been transferred to Menard. (ECF No. 130-6, Hutchinson Tr. at 52:10–53:1.)

**RESPONSE: This paragraph is not directed at these moving Defendants. To the extent that a response to this paragraph is deemed necessary, this paragraph is not disputed.**

52.     On December 8, 2016, Hutchinson received an email with the subject "Brinson A82298" alerting him that Menard received about 17-20 prisoners "who were in [Wexford's collegial review] process, on a medical hold and then removed to transfer." The email attached correspondence related to Plaintiff's emergency grievance reporting his medical condition and immediate need for care. (IDOC 001658–62, attached hereto as Exhibit 12; *see also* ECF No. 130-6, Hutchinson Tr. at 53:9–62:20.)

**RESPONSE: This paragraph is not directed at these moving Defendants. To the extent that a response to this paragraph is deemed necessary, it is disputed that the cited attached correspondence to the email indicates that the Plaintiff had an "immediate need," for care. (Plaintiff's Exhibit 1). The remainder of the paragraph is not disputed.**

53.     Dr. Trost is an internist and board-certified general surgeon, but he has no specialized training or accreditation in nephrology, and has not managed the medical treatment of patients with chronic kidney disease. (ECF No. 130-2, Trost Tr. at 34:15–36:3.)

**RESPONSE: Is disputed that Dr. Trost has no specialized training in nephrology as he testified that he has surgical training related to the treatment of kidney disease in renal transplantation, arterial venous access for dialysis, hemodialysis, and insertion of peritoneal dialysis catheters. (Defendants' Ex. "B" 34:23-25, 35:1-5). This paragraph is also disputed to the extent it asserts that Dr. Trost should be managing patients with kidney disease from a nephrology perspective as such management is done by a nephrologist. (Defendants' Ex. "B." 35:20-23).**

54.     Shortly after arriving at Menard, Plaintiff met with Dr. Trost. At that meeting, Plaintiff told Trost about his kidney disease and need to be on a renal diet. Trost reviewed Plaintiff's medical record. He was surprised that Plaintiff had been transferred to Menard, told Plaintiff he should not be there, and told another person over the phone (in Plaintiff's hearing)

that Plaintiff should be transferred back to Stateville immediately. (ECF No. 130-9, Brinson Tr. at 24:1–12; id. at 55:22–57:8; ECF No. 130-2, Trost Tr. at 55:12–17.)

**RESPONSE: It is disputed that this visit accurately characterizes the first encounter between Dr. Trost and the Plaintiff. Dr. Trost did not testify that the Plaintiff told Dr. Trost that he needed to be on a renal diet, that the Plaintiff told Dr. Trost that he should not be there, or that Dr. Trost told another person over the phone (in Plaintiff's hearing) that Plaintiff should be transferred back to Stateville immediately. (Defendants' Ex. "B").**

### F. Plaintiff Required Emergency Surgery Shortly After Arriving at Menard

55.     On December 8, 2016, Plaintiff was brought to Kidney Disease and Medicine Specialty Consultants, a private medical practice near Menard in Carbondale, Illinois, where he was treated by Dr. Muhammad Kamran. (IDOC000528–533, attached hereto as Exhibit 13; *see also* ECF No. 130-3, Kamran Tr. at 22:2–26:6, 34:2–20.)

**RESPONSE: Undisputed.**

56.     Dr. Kamran is a board-certified nephrologist with extensive training and experience treating patients with chronic kidney disease, including PKD. (ECF No. 130-3, Kamran Tr. at 10:2–26:2.)

**RESPONSE: Undisputed.**

57.     Upon examining Plaintiff's symptoms and his blood work from a couple months before the visit, Dr. Kamran determined that Plaintiff needed to start dialysis "right away," "as soon as possible." (ECF No. 130-3, Kamran Tr. at 46:19–47:7, 57:5–21.)

**RESPONSE: Undisputed.**

58.     Dr. Kamran recommended Plaintiff receive a catheter for immediate dialysis access. In addition to recording his findings in the medical records, which his clinic provided to Menard following the visit, Dr. Kamran sent a note with Plaintiff's attendant for the doctor at Menard asking that Plaintiff be transferred to a place where he could start dialysis, or offering to arrange placement of a catheter locally. (ECF No. 130-3, Kamran Tr. at 47:17–50:12, 55:5–19.)

**RESPONSE: This paragraph is disputed to the extent that when Dr. Kamran offered to arrange a catheter placement, the Plaintiff stated that he did not want a catheter. (Defendants' Ex. "C," 47:8-16).**

59. Without notice to the UIC nephrology clinic, Plaintiff missed his December 9, 2016 appointment. (RB_UIC0000251–52, attached hereto as Exhibit 14.)

**RESPONSE: Disputed. The Plaintiff did not miss a nephrology appointment because he was seen by Dr. Kamran nephrologist, <u>the day before</u>, his scheduled UIC appointment (Defendants' Ex. "C," 11:9-11, 22:9-13, 37:13-17), and Menard does not utilize UIC for specialist referrals. (Defendants' Ex. "A," 24:6-9).**

60. More than three weeks later, on December 27, 2016, Plaintiff was brought to Memorial Hospital of Carbondale, where he underwent surgery by Dr. Lyman Hale, a board-certified general surgeon. (RB_MHC0000006–24, attached hereto as Exhibit 15; ECF No. 130-4, Hale Tr. at 14:6–21; 16:22–24.) Dr. Hale has significant experience doing dialysis access surgeries. (*Id.* at 19:7–10.)

**RESPONSE: It is disputed that December 27th is more than three weeks later from December 8th. The remainder of this paragraph is not disputed.**

61. Dr. Hale performed surgery to place a tunneled catheter through Plaintiff's chest into his jugular vein so he could receive dialysis urgently. (ECF No. 130-4, Hale Tr. at 31:9–21.)

**RESPONSE: Undisputed.**

62. A tunneled catheter is a temporary dialysis access point that, ideally, would never be used. In any event, a tunneled catheter should be use for less than 90 days because of the risk of infection and blood clots. (ECF No. 130-5, Ricardo Tr. at 85:23–86:15; *see also* ECF No. 130-4, Hale Tr. at 34:2–21, at 41:8–21 (explaining tunneled catheter is "not the ideal method of access because of increased risk of infection, and, really tunneled catheters just get clotted. They have to be removed"; thus, they should not be left in "longer than necessary unless the patient doesn't have another dialysis option and they have to have a catheter").)

**RESPONSE: Disputed. Dr. Hale, the surgeon who actually performed the placement, testified that the Plaintiff had no veins adequate for graft placement for dialysis and his plan was for the Plaintiff to undergo placement of a tunneled catheter for dialysis access. (Defendants' Ex. "D," 22:19-20, 25:6-10). Dr. Hale also testified that a tunnel catheter can be left in for three to six months, but some patients can keep a tunneled catheter in for three to five years. (Ex. "D," 34:14-16, 41:11-14). Relative to his lack of vein access, the Plaintiff had a history of IV drug use. (Ex. "D," 48:3-7, 15-16).**

63.     Thereafter, Plaintiff began receiving dialysis for the first time. (ECF No. 130-9, Brinson Tr. at 64:24–4.)

**RESPONSE: Undisputed.**

64.     After the surgery, Dr. Hale recommended Plaintiff be evaluated in two to four weeks by a vascular surgeon for a more permanent dialysis access option. (ECF No. 130-4, Hale Tr. at 37:11–24.)

**RESPONSE: Disputed. Dr. Hale testified that two to four weeks is a standard follow-up time and that there was no emergent rush for the Plaintiff to be seen after Dr. Hale had placed the dialysis access. Additionally, Dr. Hale testified that the two to four week note was a nonemergency time period. (Defendants' Ex. "D," 37:11-24).**

65.     On December 22, 2016, Trost submitted a form to Wexford corporate referring Plaintiff to a general surgeon to receive an AV graft. Trost indicated on the referral form that his request was "urgent." (Wexford 64, attached hereto as Exhibit 16; ECF No. 130-2, Trost Tr. at 74:1–77:4.)

**RESPONSE: Undisputed.**

66.     Sometime around January 11, 2017, however, Trost recommended to Wexford's Utilization Management department that Plaintiff's appointment for an AV graft be cancelled. (Wexford 24, attached hereto as Exhibit 17 ("Since Brinson will only be getting a few dialysis treatments here before being transferred, they recommended the surgeon and hospital he will be using to get the dialysis treatments to do the consult."); IDOC 000540, attached hereto as Exhibit 18; ECF No. 130-2, Trost Tr. at 78:6–80:25.)

**RESPONSE: Disputed to the extent this paragraph asserts that the Plaintiff was medically indicated for an AV graft because the surgeon, Dr. Hale, testified that the Plaintiff had no veins adequate for graft placement for dialysis and his plan was for the Plaintiff to undergo placement of a tunneled catheter for dialysis access. (Defendants' Ex. "D," 22:19-20, 25:6-10). Dr. Hale also testified that a tunnel catheter can be left in for three to six months, but some patients can keep a tunneled catheter in for three to five years. (Ex. "D," 34:14-16, 41:11-14).**

### G. Plaintiff Did Not Receive a Permanent Dialysis Access Point until September 2017

67. Plaintiff remained in the infirmary at Menard after the tunneled catheter was in place. Trost testified that the risk of infection from the catheter insertion was "certainly" a reason for him to be observed in the infirmary. He explained: "I mean, you could not send an inmate out to a cell house with a catheter exiting their body." (ECF No. 130-2, Trost Tr. at 88:6–14.)

**RESPONSE: Undisputed.**

68. Plaintiff was transferred from Menard back to Stateville on January 29, 2017, where he is currently imprisoned. (ECF No. 130-9, Brinson Tr. at 19:19–23.)

**RESPONSE: Undisputed.**

69. On January 30, 2017, the day after Plaintiff returned to Stateville, Dr. Obaisi referred Plaintiff to the vascular access clinic at UIC to be evaluated for a permanent dialysis access option; and Wexford corporate approved the referral the next week. (RB_IDOC0000504–505, attached hereto as Exhibit 19.)

**RESPONSE: Undisputed.**

70. Shortly after his return, Plaintiff was released into the general population at Stateville with the catheter still protruding from his chest. (ECF No. 128-7; ECF No. 130-9, Brinson Tr. at 15:2–6 (Brinson testifying he was released into general population shortly after returning to Stateville in January 2017).)

**RESPONSE: It is disputed that any of the cited references state that the Plaintiff had a catheter "protruding from his chest." This paragraph is also disputed to the extent it**

asserts that the Plaintiff was wrongly placed in the general population as he testified that he was released into the general population after completing his disciplinary time in segregation, which arose from being found guilty of making homemade wine at Stateville. (Defendants' Ex. "I," 14:23-24, 15:1-5, 13:21-24, 14:1, 12-16).

71.     Since then, Plaintiff has received dialysis on-site three times per week. (ECF No. 130-9, Brinson Tr. at 64:4–13.)

**RESPONSE: Undisputed.**

72.     Plaintiff was not seen by a vascular surgeon until July 26, 2017 (RB_UIC0000292–294, attached hereto as Exhibit 20), and did not receive surgery to have the graft placed until September 18, 2017 (RB_UIC0000235–250, attached hereto as Exhibit 21), more than nine months after Dr. Hale placed the tunneled catheter, or three times as long as Dr. Ricardo would recommend a patient use a tunneled catheter. (ECF No. 130-5, Ricardo Tr. at 94:18–96:18.)

**RESPONSE: This paragraph is disputed as to the recommended time for use of a tunneled catheter because Dr. Hale (a surgeon, which Dr. Ricardo is not), testified that some patients can keep a tunneled catheter in for three to five years. (Defendants' Ex. "D," 41:12-15).**

73.     Plaintiff's failure to see a vascular surgeon until September 2017 was inconsistent with Dr. Hale's recommendation that Plaintiff follow up with a vascular surgeon in two to four weeks. (ECF No. 130-4, Hale Tr. at 45:12–46:9.)

**RESPONSE: Disputed. Dr. Hale testified that two to four weeks is a standard follow-up time and that there was no emergent rush for the Plaintiff to be seen after Dr. Hale had placed the dialysis access. Additionally, Dr. Hale testified that the two to four week note was a nonemergency time period. (Defendants' Ex. "D," 37:11-24).**

### H.     Plaintiff's Damages

74.     Plaintiff's failure to receive dialysis when his kidneys failed – sometime between July and December 2016 – caused him to experience loss of appetite, loss of energy, fatigue, daytime sleepiness, night sweats, headache, bloody nose, difficulty swallowing, chest pain, shortness of breath, cough, blood when coughing, abdominal pain, nausea, diarrhea, blood in his

stool, painful urination, blood in his urine, urinary incontinence, a weak urine stream, urinary sediment or solids, edema, neuropathy, weakness, joint pain, muscle pain, and low back pain. (Ex. 13.)

**RESPONSE: Disputed. Nothing in the Plaintiff's cited exhibit 13 states that an alleged failure to receive dialysis *caused* (a medical determination) the symptoms set forth in this paragraph.**

75. Plaintiff's delayed dialysis also put him at risk of death. (*See, e.g.,* ECF No. 130-5, Ricardo Tr. at 47:4–15 ("[I]n general, if somebody has complications so severe or symptoms so severe that medically one recommends dialysis and they opt not to receive it, then the end point will be death.").)

**RESPONSE: Disputed. Nothing in the cited testimony from Dr. Ricardo states that the *Plaintiff's* dialysis was delayed or that the *Plaintiff* was put at risk of death. Further, there is no evidence at all that the Plaintiff's dialysis was delayed, and the Plaintiff continues to survive to this day.**

76. When Plaintiff learned he would be transferred to Menard in November 2016, he asked to speak to a member of the crisis team because he experienced a mental breakdown. (ECF No. 130-9, Brinson Tr. at 72:3–14.)

**RESPONSE: This asserted fact should be stricken because the Plaintiff, after receiving leave to file an excess number of statements of additional fact, has already set forth this fact above in paragraphs 28 and 29. In the event a response to this asserted fact is warranted, it is disputed that the Plaintiff was having a mental breakdown as the records relative to this encounter do not reflect any medial or mental health provider finding that the Plaintiff was having a mental breakdown. (Defendants' Ex. "H," Angeloff deposition exhibit 1).**

77. While Plaintiff received dialysis through the temporary catheter in his chest, he was subjected to constant risk of blood clot and infection. (ECF No. 130-5, Ricardo Tr. at 85:23–86:15; ECF No. 130-4, Hale Tr. at 34:2–21, 41:8–21.)

**RESPONSE: Disputed. Neither doctor classified the Plaintiff as being at a "constant" risk for blood clot or infection. Additionally, Dr. Ricardo testified that the risk could arise only beyond 90 days (Defendants' Ex. "E," 86:13-15).**

78.     Indeed, for the two-and-a-half months Plaintiff was imprisoned at Menard, he was

housed in the infirmary because he was so ill from his PKD and at such high risk for infection

from the catheter protruding from his chest. (ECF No. 130-2, Trost Tr. at 87:9–88:14; ECF No.

130-9, Brinson Tr. at 14:17–22; 57:12–19.)

**RESPONSE: Disputed to the extent that Dr. Trost did not testify that the reason for the
infirmary housing was because the Plaintiff was "so ill," as categorized by the Plaintiff.
Otherwise, undisputed.**

79.     Plaintiff's risk of blood clot or infection from the catheter was exacerbated when

he was housed in general population after returning to Stateville in January 2017. (ECF No. 128-

7.)

**RESPONSE: Disputed. Nothing in the cited document states, or in anyway supports, an
asserted fact that the Plaintiff's risk of blood clot or infection from the catheter was
exacerbated when he was housed in general population after returning to Stateville in
January 2017.**

80.     Moreover, because of his failure to promptly see a vascular surgeon as

recommended by Dr. Hale, Plaintiff was forced to keep the catheter protruding from his chest

until September 2017, which amplified the already serious risks he faced. (ECF No. 130-4, Hale

Tr. at 46:410–24.)

**RESPONSE: Disputed. Nothing in the cited testimony from Dr. Hale states, or in anyway
supports, an asserted fact that because the Plaintiff did not promptly see a vascular
surgeon he was forced to keep the catheter protruding from his chest until September 2017,
which amplified the already serious risks he faced. Additionally, Dr. Hale testified that
there was no emergent rush for the Plaintiff to be seen after Dr. Hale had placed the
dialysis access, the two to four week note was a nonemergency time period, and some
patients can keep a can keep a tunneled catheter in for three to five years. (Defendants' Ex.
"D," 37:11-24, 41:12-15).**

81.     Plaintiff suffered and continues to suffer severe emotional distress as a result of

the ordeal described in his complaint. Plaintiff explained:

> I almost died. And for, like, two or three months it was real—real hectic. It was
> real scary because it was [] like, we don't care. Just throw you in the cell. And I

couldn't see no one. I couldn't get no medical attention or nothing. There was nothing I could do physically about it."

(ECF No. 103-9, Brinson Tr. at 72:15–73:4.)

**RESPONSE: Disputed. The cited material does not contain any statement that the Plaintiff suffered and continues to suffer severe emotional distress as a result of the ordeal described in his complaint.**

Respectfully submitted,

CASSIDAY SCHADE LLP

By: /s/ *Ronald E. Neroda*
   One of the Attorneys for Defendants, WEXFORD HEALTH SOURCES, INC., GHALIAH OBAISI, as Independent Executor of the Estate of SALEH OBAISI, M.D., Deceased, and JOHN TROST, M.D.

Matthew H. Weller | 6278685
Ronald E. Neroda | 6297286
CASSIDAY SCHADE LLP
222 West Adams Street, Suite 2900
Chicago, IL 60606
(312) 641-3100
(312) 444-1669 (Fax)
mweller@cassiday.com
rneroda@cassiday.com

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2019, I electronically filed the foregoing Response with the clerk of the court for the Northern District of Illinois using the electronic case filing system of the court. The electronic case filing system sent a "Notice of E-Filing" to the attorneys of record in this case.

/s/ Ronald E. Neroda

9285635