## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| BOB BRINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 17 C 1659 |
| | ) | |
| WEXFORD HEALTH SOURCES, INC., | ) | Judge John Z. Lee |
| JOHN TROST, GHALIAH OBAISI, as | ) | |
| Independent Executor of the estate of | ) | |
| Saleh Obaisi, RANDY PFISTER, and | ) | |
| JEFF HUTCHINSON, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Bob Brinson has sued Defendants Randy Pfister, a former warden of Stateville Correctional Center ("Stateville"); Jeff Hutchinson, a former warden of Menard Correctional Center ("Menard") (collectively "IDOC Defendants"); Wexford Health Sources, Inc. ("Wexford"); Ghaliah Obaisi, the executor of the estate of Dr. Saleh Obaisi, who was formerly Wexford's medical director at Stateville; and Dr. John Trost, Wexford's medical director at Menard (collectively "Wexford Defendants"), all under 42 U.S.C. § 1983. Brinson alleges that Defendants failed to treat his end-stage Polycystic Kidney Disease ("PKD") in violation of the Eighth Amendment (Count I) and that Wexford breached a settlement agreement resulting from a previously filed case (Count II). The IDOC and Wexford Defendants have separately moved for summary judgment. For the reasons below, the motions are granted in part and denied in part.

## Factual Background

### I. Brinson's Medical Condition

Before Brinson was incarcerated, he was diagnosed with PKD, a chronic kidney condition that requires treatment. IDOC Defs.' LR 56.1(a)(3) Stmt. ("IDOC SOF") ¶ 1, ECF No. 128; Pl.'s LR 56.1(b)(3)(C) Stmt. ("Pl.'s SOAF") ¶ 1, ECF No. 145. A person with PKD develops multiple fluid-filled cysts in their kidneys, and the disease eventually progresses to the point where the kidneys are no longer capable of filtering blood. Wexford Ex. B, Trost Dep. ("Trost Dep.") at 37:18–23, ECF No. 130-2.

Brinson has since been diagnosed with end-stage PKD. Pl.'s SOAF ¶ 8. End-stage PKD occurs when the kidneys start to fail. *Id.* at 40:7–10. If a person's end-stage PKD symptoms become so severe that dialysis is necessary, a failure to receive dialysis will cause death. Wexford Ex. E, Ricardo Dep. ("Ricardo Dep.") at 49:11–15, ECF No. 130-5.

### II. The Previous Lawsuit

In 2011, Brinson sued Wexford and its employees, as well as IDOC and Stateville's warden, for failing to provide him with constitutionally required medical care for his PKD. 7/27/11 Order in *Brinson v. Ghosh*, 11 C 4669, ECF No. 5. Brinson and those defendants entered into a settlement agreement in 2014. Pl.'s SOAF ¶ 3.

The settlement agreement required Wexford to:

> follow all medical plans and/or recommendations . . . made by [University of Illinois at Chicago Hospital ("UIC")] specialists relative to Plaintiff's PKD during or at any time after [Plaintiff's initial UIC] Appointment, to the extent that any such recommendations must take into account the security environment in which Plaintiff resides. . . .

2

> [and]
>
>> ensure that a Therapeutic Diet Order for a renal diet, per
>> IDOC guidelines and/or directives, is ordered and in place
>> for Plaintiff so long as it is deemed medically indicated by
>> a UIC or other nephrologist.

*Id.* ¶ 4. In addition, the agreement provides:

>> Wexford reserves the right to substitute treatment at UIC
>> for treatment at another facility or community specialist
>> should UIC be unwilling or unable to provide treatment,
>> otherwise disrupt the contractual relationship between it
>> and IDOC, or if Plaintiff should be moved to another
>> facility by IDOC from which transport to UIC would not be
>> feasible or reasonable.

*Id.*

In keeping with the agreement, Brinson was treated by Dr. Ana Ricardo, a board-certified nephrologist, and Dr. Bishan Charkravarty at the University of Illinois at Chicago ("UIC") renal clinic. *Id.* ¶¶ 6, 8; *see* Pl.'s Ex. 1, Ricardo Clinic Note ("7/29/16 UIC Visit Note"), ECF No. 145-1. Brinson also received a renal diet while incarcerated at Stateville. *Id.* ¶ 5. Without a renal diet, a PKD patient may suffer (1) increased blood pressure, which causes kidney function to deteriorate more quickly; (2) increased phosphorous levels, which is detrimental to kidney function; and (3) increased potassium levels, which can make the heart stop functioning. *See* Ricardo Dep. at 59:11–60:22.

## III. UIC's Recommended Treatment of Brinson's PKD

The UIC doctors usually recommended that Brinson see them for follow-up appointments every six weeks. Pl.'s SOAF ¶ 7. Brinson, however, missed follow-up

appointments on August 1, 2014, September 18, 2015, and October 16, 2015. *Id.*; IDOC Defs.' Resp. Pl.'s SOAF ("IDOC Resp. SOAF") ¶ 7, ECF No. 152.

One day in the beginning of 2016, while in the prison yard, Brinson told Warden Pfister that the facility had not taken him to some of his UIC appointments. Pl.'s SOAF ¶ 20; IDOC Ex. 2, Brinson Dep. ("Brinson Dep.") at 32:9–33:16, ECF No. 128-2.[1] On another occasion, Brinson approached Pfister while Pfister was walking in the prison gallery and told him it had been six months since Brinson had seen a kidney specialist due to the missed appointments. Pl.'s SOAF ¶ 20. To this point, however, it is undisputed that Brinson was seen by UIC nephrologists in January, February, March, June, July, August, and November of 2015, as well as in January, March, and May 2016. Pl.'s Resp. Wexford SOF ¶ 68.

The UIC doctors also saw Brinson on July 29, 2016, and recommended the continuance of a low-sodium, low-phosphorus, and low-potassium renal diet. Pl.'s SOAF ¶ 8. They also recommended that Brinson undergo surgery to receive an arteriovenous ("AV") graft within fourteen days of starting dialysis. *Id.*[2]

---

[1]     Although the IDOC Defendants contend that certain of Brinson's statements are hearsay, the statements are being offered to prove notice to the hearer, not the truth of the matter asserted, see, e.g., Pl.'s SOAF ¶¶ 20, 35, 46–48, 54, 74. *Talmage v. Harris*, 486 F.3d 968, 975 (7th Cir. 2007) ("An out of court statement that is offered to show its effect on the hearer's state of mind is not hearsay.") (internal quotation marks omitted). The IDOC Defendants also float the notion that self-serving affidavits without factual support in the record must be stricken, but that ship has sailed. *See Hill v. Tangherlini*, 724 F.3d 965, 968 (7th Cir. 2013) ("[T]oday we make clear that the following cases are overruled to the extent that they suggest a plaintiff may not rely on 'self-serving' evidence to create a material factual dispute.").

[2]     An AV graft is an internal plastic tube that connects the artery in the arm to the vein, enabling the dialysis nurse to place a large needle into the tube to perform dialysis. *Id.* ¶ 13.

Dr. Charkravarty recommended that Brinson return in six weeks. But, based upon Brinson's rising serum creatinine level, Dr. Ricardo recommended that he return at the end of August so that she could monitor it and evaluate when the AV graft surgery should take place. *Id.* ¶ 10; Ricardo Dep. at 54:5–61:8; Pl.'s SOAF ¶¶ 10–11. As fate would have it, both Dr. Charkravarty's recommendation and Dr. Ricardo's recommendation were transmitted to Dr. Obaisi at Stateville. *Id.* ¶ 12; *see* Ricardo Dep. at 62:21–63:5 ("I forward this note to a team of medical assistants that are in charge of transmitting this information to Dr. Obaisi.").

On August 9, 2016, Dr. Obaisi and Wexford approved Dr. Charkravarty's recommendation that Brinson return to UIC's nephrology clinic in six weeks. Pl.'s SOAF ¶ 17. But Brinson was not sent to UIC, and in September, Wexford's headquarters asked Dr. Obaisi why the approved appointment had not yet occurred and inquired whether he would approve a December follow-up appointment. *Id.* ¶ 22; Wexford Ex. A, Fisher Dep. ("Fisher Dep.") at 42:9–14, ECF No. 130-1.

On September 15, 2016, Dr. Obaisi approved Brinson's UIC follow-up visit to take place on December 9, 2016. Pl.'s SOAF ¶¶ 22, 59; Pl.'s Ex. 14, Failed Appointment Note, ECF No. 145-16; Fisher Dep. at 44:23–45:4. It is unknown whether anyone, including Dr. Obaisi, had attempted to obtain an earlier UIC appointment for Brinson. *See* Fisher Dep. at 47:17–48:8, 48:13–18. And, as we shall see, Brinson did not make the December 9 appointment.

## IV.    The Closing of Stateville's Segregation Unit

Brinson was among 120 inmates, who were housed in a segregation wing at Stateville called "F House."  In October 2016, Pfister was notified that IDOC would be closing F House and that the new segregation unit at Stateville would house only 48 inmates.  *See* IDOC Ex. 3, Pfister Dep. ("Pfister Dep.") at 30:11–12, 94:19–95:6, 96:1–5, 98:3–7, ECF No. 128-3.  As a result, around 70 inmates in F House needed to be transferred to another IDOC facility or another area within Stateville.[3]  *See id.* at 96:6–8.

Pfister worked closely with the clinical services supervisor to facilitate the transfer of these inmates. Pl.'s SOAF ¶ 36.  According to Pfister, he proposed specific inmates for transfer, and the transfer coordinator made the final decision as to which inmates would be transferred and where.    IDOC Resp. SOAF ¶ 34; IDOC Ex. 3, Pfister Dep. at 99:2–4.  By contrast, the transfer coordinator, Douglas Stephens, testified that Pfister had the final decision and was ultimately responsible for the transfers. Pl.'s SOAF ¶ 34; IDOC Ex. 5, Stephens Dep. at 54:4–15.  Although Brinson did not yet know it, he was recommended and approved for transfer in early October 2016. Pl.'s Ex. 11, 10/11/16 IDOC Note ("10/11/16 IDOC Note") (noting transfer), ECF No. 145-13.

From 2014 through most of 2016, Brinson was subject to a "medical hold." Pl.'s SOAF ¶ 24.  The contract between IDOC and Wexford requires that an inmate

---

[3]    Inmates with up to three months of remaining segregation time were given preference to stay at Stateville.  *Id.* at 96:17–23; *see also id.* at 99:6–10 ("And again, the Segregation, . . . what I looked at was the 48 with the least amount of safe time.  Everybody else above that I recommended for transfer.").

undergoing medical treatment be placed on a medical hold, so that he or she would not be transferred to another facility for continuity of treatment. *See id.* ¶ 23; Pl.'s Ex. 8, Contract § 2.2.3.1.2, ECF No. 145-8; Fisher Dep. at 52:1–6;

The IDOC Defendants and the Wexford Defendants dispute whether the ultimate responsibility for placing and enforcing medical holds lies with IDOC's health care unit administrator or Wexford's medical director at the prison. *Compare* IDOC Resp. SOAF ¶¶ 23, 25–27, *with* Wexford Defs.' Resp. Pl.'s SOAF ("Wexford Resp. SOAF") ¶¶ 23, 25–27. It is undisputed, however, that, unbeknownst to Brinson, Dr. Obaisi discontinued his medical hold on October 11, 2016, even though he was continuing to receive treatment. Pl.'s Ex. 11, 10/11/16 IDOC Note (stating "dc medical hold" and "transfer"), ECF No. 145-13; *see* Pl.'s SOAF ¶¶ 24, 28, 35, 52. *But see* Trost Dep. at 47:14–17 (stating he is unaware of any circumstances where a patient needing dialysis treatment in the short-term would not be put on a medical hold).

An IDOC corrections officer informed Brinson on November 20, 2016, that he was going to be transferred to IDOC's prison in Menard; the Menard facility is located over 300 miles southwest of Stateville and, unlike Statesville, does not provide on-site dialysis. *See* Pl.'s SOAF ¶¶ 28, 33. Upon hearing the news, Brinson felt as though he was having a mental breakdown, and he asked the officer to summon a crisis team member. *Id.*

Brinson then spoke to Pfister as the warden was making the rounds. Pl.'s SOAF ¶ 35. Brinson stated that he was in severe pain due to his kidney disease and

urged Pfister not to transfer him out of Stateville due to a medical hold. *Id.* Pfister does not recall the conversation. IDOC Resp. SOAF ¶ 35.

Nurse Franzen, a Wexford employee, responded to Brinson's request for a crisis team member and told him she would go to the health care unit and review his medical chart with a nurse, which she did. Pl.'s SOAF ¶¶ 29–30. Nurse Angeloff also reviewed Brinson's medical records and contacted Dr. Obaisi for clarification. *Id.* Although Dr. Obaisi was aware that on-site dialysis was unavailable at Menard, *id.* ¶ 31, he told Angeloff that Brinson could be transferred to Menard, *id.* ¶ 30.

The transfer coordinator did not know that a medical hold had previously been placed on Brinson's file or that he had been receiving treatment at UIC in anticipation of starting dialysis. *Id.* ¶¶ 38–39. According to Stephens, had his office known these facts, inquiries would have been made, and Brinson's transfer may not have been approved. *Id.*

## V. Brinson is Transferred to Menard

Despite his entreaties, Brinson was transferred to Menard on November 21, 2016, two weeks before his scheduled December 9 appointment at UIC. Pl.'s SOAF ¶ 33. Shortly after arriving, Brinson met with Dr. John Trost, who was Menard's medical director and a Wexford employee. *Id.* ¶ 53. Brinson says that he told Dr. Trost that he was medically required to have a renal diet and was supposed to start dialysis soon. *Id.* ¶¶ 40, 42, 54. As Brinson tells it, Dr. Trost responded that Menard did not offer a renal diet or on-site dialysis. *Id.* ¶ 54; *see id.* ¶ 40.

On his first or second day at Menard, Brinson wrote a letter to Menard's warden, Jeff Hutchinson, stating that he required a renal diet due to his end-stage renal disease. *Id.* ¶¶ 43, 48. Brinson later confirmed with Hutchinson that he had received the letter. *Id.* ¶ 48. As Menard's warden, Hutchinson supervised the Assistant Warden of Programs, Frank Lawrence, who in turn managed the dietary and medical care staffs at the facility. *Id.* ¶ 44.

Brinson also spoke to Hutchinson on at least other two occasions about these concerns. *Id.* ¶ 46. Each time, Brinson explained that, due to his end-stage kidney disease, he was in pain and required a renal diet. *Id.* Brinson also told Hutchinson that, prior to his transfer, he was supposed to undergo AV graft surgery at UIC and start dialysis. *Id.* Hutchinson does not recall any of these conversations. IDOC's Resp. SOAF ¶ 46.

Hutchinson does admit, however, that he reviewed an emergency grievance from Brinson on December 7, 2016. Pl.'s SOAF ¶ 49. Because Brinson's health condition appeared serious, Hutchinson forwarded the grievance to Dr. Trost for expedited review. *Id.* ¶¶ 50–51.

Lisa Prather, Menard's Health Services Coordinator, emailed Hutchinson, among others, about the grievance on December 8, 2016. *Id.* ¶ 52. In the email, Prather acknowledged that the medical holds on seventeen to twenty inmates at Stateville had been lifted so that they could be transferred to another facility. *Id.* Lawrence also emailed Hutchinson to let him know that many of the transferees were creating security problems in Menard's health care unit, because they required

outside treatment and needed transportation to and from medical facilities multiple times each week. Pl.'s Ex. 12, 12/8/16 Emails, ECF No. 145-14.

With the approval of Dr. Trost and Wexford, Brinson was examined by Dr. Muhammad Kamran, a nephrologist, on December 8, 2016. Pl.'s SOAF ¶ 55. Brinson reported to Dr. Kamran that he was experiencing a loss of appetite, loss of energy, fatigue, shortness of breath, nausea, and edema. *Id.* ¶ 74. According to Dr. Ricardo, such symptoms indicated that Brinson needed dialysis. *See* Ricardo Dep. at 82:10–15; *id.* at 49:11–15. Dr. Kamran must have concurred, because after reviewing Brinson's symptoms and his blood-test results, Dr. Kamran concluded that Brinson needed dialysis "right away." Pl.'s SOAF ¶ 57. And, given the exigent circumstances, Dr. Kamran recommended that Brinson undergo surgery to implant a catheter in his chest wall to enable immediate dialysis, rather than waiting for an AV graft. *Id.* ¶ 58.

Almost a month passed before Brinson underwent catheter surgery. It was performed by Dr. Lyman Hale on January 3, 2017, at Memorial Hospital in Carbondale, Illinois. *Id.* ¶ 60. To monitor Brinson's progress, Dr. Hale recommended that Brinson see him for a follow-up visit in two to four weeks. *Id.* ¶ 73.

Because a catheter is not a recommended long-term solution for an individual receiving dialysis, Brinson was scheduled to undergo AV graft surgery on January 11, 2017.[4] But, because the plan was to eventually transfer Brinson back to Stateville

---

[4]     Dr. Hale testified that a catheter is not an ideal method of dialysis access because of increased risks of infection and clotting. *Id.* ¶ 62. In his opinion, a catheter should not be left in any longer than necessary, unless there is no other option. And, unless no other option is available, a patient must eventually undergo a second procedure to remove the catheter. *Id.*

and he was only going to receive a handful of dialysis treatments beforehand, Dr. Trost cancelled the procedure. *Id.* ¶¶ 65–66. In the meantime, Dr. Trost kept Brinson in Menard's infirmary to monitor Brinson and because "you could not send an inmate out to a cell house with a catheter exiting their [sic] body." *Id.* ¶ 67. This was not new to Brinson, who had spent the entire time he was at Menard in the infirmary. *Id.* ¶ 78.

## VI. Brinson Is Transferred Back to Stateville

Brinson was transferred back to Stateville on January 29, 2017. *Id.* ¶ 68. The next day, Dr. Obaisi referred him to UIC to be evaluated for a permanent dialysis solution, and Wexford headquarters approved the referral the following week. *Id.* ¶ 69. Shortly after arriving at Stateville, Brinson was released from segregation to the general population with a catheter protruding from his chest. *Id.* ¶ 70. He received dialysis three times a week thereafter. *Id.* ¶ 71.

Brinson eventually was seen by a vascular surgeon on July 26, 2017, and received AV graft surgery on September 18, 2017. *Id.* ¶ 72.

Based on the foregoing facts, Brinson claims that the wardens and medical directors of Stateville and Menard were deliberately indifferent to his medical needs arising out of his end-stage PKD. Brinson also claims that Wexford breached the prior settlement agreement.

---

Although Dr. Hale recalled some patients who used a catheter for dialysis for three to five years, he did not note whether those patients were in a correctional facility setting. *See* Wexford Ex. D, Hale Dep. at 41:11–14, ECF No. 130-4 ("We try not to leave them in for much longer than three to six months.").

**Legal Standard**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To survive summary judgment, the nonmoving party must "do more than simply show that there is some metaphysical doubt as to the material facts", *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986), and instead must "demonstrate that there is evidence upon which a jury could properly proceed to find a verdict in h[is] favor."  *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (internal quotation marks omitted).

In reviewing a motion for summary judgment, the Court gives the nonmoving party "the benefit of conflicts in the evidence and reasonable inferences that might be drawn from the evidence."  *Pantoja v. Portfolio Recovery Assocs., LLC*, 852 F.3d 679, 682 (7th Cir. 2017). The Court must not make credibility determinations or weigh conflicting evidence.  *McCottrell v. White*, 933 F.3d 651, 655 (7th Cir. 2019).

**Analysis**

## I.    Section 1983 Deliberate Indifference (Count I)

Section 1983 provides a private right of action against those acting under color of state law who violate constitutional rights.   42 U.S.C. § 1983.   The Eighth Amendment proscribes "deliberate indifference to [the] serious medical needs of prisoners."  *Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976) (citation and footnotes omitted).  To prove a claim of deliberate indifference to a serious medical need, a plaintiff must demonstrate (1) that he had an objectively serious medical need; (2)

that the defendant was subjectively aware of the inmate's serious medical need; and (3) that the defendant consciously disregarded the inmate's serious medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011).

For starters, the parties agree that Brinson's end-stage PKD is an objectively serious medical condition. Accordingly, the first element of his claim is satisfied.

As for the second element, only Wardens Pfister and Hutchinson contend that they were not subjectively aware of Brinson's serious medical needs.[5] "Whether a prison official . . . was subjectively aware of a risk 'is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious.'" *Diggs v. Ghosh*, 850 F.3d 905, 909 (7th Cir. 2017) (quoting *Farmer v. Brennan*, 511 U.S. 825, 842 (1994)) (citation omitted).

Brinson recalls a conversation with Pfister at Stateville during which Brinson told him that he had end-stage kidney disease and had been missing his kidney specialist appointments. Pl.'s SOAF ¶ 20; IDOC Ex. 2, Brinson Dep. at 32:9–33:16. Brinson also recalls telling Pfister that he was in severe pain due to his renal disease, that he needed to return to UIC for treatment, and that he should not be transferred to Menard. Pl.'s SOAF ¶ 35. Based upon these conversations, Brinson has created an issue for trial as to whether Pfister had actual knowledge of a substantial risk to Brinson's health.

---

[5] Medical directors Obaisi and Trost concede this point. *See* Wexford Defs.' Mem. Supp. Summ. J. at 7–11, ECF No. 131.

Additionally, Brinson states that he spoke to Hutchinson at least twice within a week of his arrival at Menard in November 2016 and filed a grievance that Hutchinson reviewed on December 7, 2016. *Id.* ¶ 46; Brinson Dep. at 20:9–11, 21:1–13, 24:9–11. Brinson took these opportunities to explain that he was in a lot of pain from his end-stage kidney disease, that he was supposed to have started dialysis prior to his transfer, that he had been missing his doctors' appointments at Stateville, and that he required a renal diet. Pl.'s SOAF ¶ 46; Brinson Dep. at 20:9–11, 21:1–13, 24:9–22; 42:24–47:17. These facts are sufficient to create a triable issue as to whether Hutchinson had actual knowledge of a substantial risk to Brinson's health.

It is true that neither warden recalls any conversation with Brinson, *see* IDOC's Resp. SOAF ¶¶ 35, 46, but this does not necessarily mean that the conversations did not occur. Rather, their position merely raises a factual dispute, and the jury can decide whether to believe them or Brinson. *See McCottrell*, 933 F.3d at 655 (stating that credibility determinations are inappropriate on summary judgment).

Turning to the third element of the claim, the Court must determine whether Brinson has raised a genuine issue of fact regarding whether each of the Defendants consciously disregarded his serious medical needs. The Court first addresses the wardens and then the medical directors.

As an initial matter, the wardens argue that they are not liable because they relied on their medical staffs to care for Brinson's PKD. But "nonmedical officials can be chargeable with ... deliberate indifference where they have a reason to believe (or

14

actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner." *Arnett v. Webster*, 658 F.3d 742, 755 (7th Cir. 2011) (internal quotation marks omitted). "Non-medical defendants cannot simply ignore an inmate's plight." *Id.*; *see Diggs*, 850 F.3d at 911 (7th Cir. 2017).

Pfister, the warden at Stateville, admits that he recommended which inmates would be transferred out of Stateville. Pfister Dep. at 98:15–16. And, while the fact is disputed, a reasonable jury could find that Pfister was ultimately responsible for Brinson's transfer. *See id.* ¶ 34; Pl.'s Resp. IDOC SOF ¶¶ 44, 50. Moreover, nothing in the record indicates that Pfister conducted any investigation into Brinson's situation, after Brinson asked him not to transfer him to Menard given his severe medical condition. *See* Pl.'s SOAF ¶ 31; *see also* Fisher Dep. at 68:12–15 (stating it was common knowledge which IDOC facilities provided dialysis services). Giving credit to Brinson's account of the facts and drawing reasonable inferences in his favor, a rational jury could conclude that Pfister acted with deliberate indifference by transferring him to Menard.

That said, to the extent that Brinson's claim is premised on the theory that Pfister acted with deliberate indifference by ignoring his need to see medical specialists at UIC on August 1, 2014, September 18, 2015, and October 16, 2015, see Pl.'s SOAF ¶ 7, the claim is refuted by Brinson's admission that he attended thirteen UIC appointments during the eighty weeks between October 31, 2014, and May 13, 2016, see Pl.'s Resp. Wexford SOF ¶ 68. This means that Brinson returned to UIC roughly every six weeks, give or take a couple of weeks. Because the UIC doctors

usually recommended that Brinson see them for follow-up appointments every six weeks, see Pl.'s SOAF ¶ 7, no rational jury could find that the missed appointments constituted deliberate indifference.

But Brinson also claims Pfister acted with deliberate indifference by ignoring his need to see medical specialists at UIC following his July 29, 2016, appointment. It is undisputed that the UIC specialists recommended a follow-up appointment in late August or early September. Viewing the disputed facts in Brinson's favor, he told Pfister in November 2016, that, although he had been seeing his UIC specialists regularly for his end-stage renal disease, it had been months since he had been brought to UIC and that the medical staff was not doing anything about it. Pl.'s SOAF ¶ 20; Pfister Dep. at 31:5-8. Nonetheless, Pfister approved Brinson's transfer to Menard before his December 9 appointment at UIC, which further delayed Brinson's treatment. On this record, the Court concludes that a reasonable jury could find in Brinson's favor on this issue, and, accordingly, summary judgment is denied.

As for Hutchinson, the warden at Menard, after he became aware of Brinson's pain and need for dialysis, he asked Dr. Trost, Menard's medical director, to evaluate him. Pl.'s SOAF ¶ 46; Brinson Dep. at 20:10–21:13, 48:17–20, 55:22–24. Furthermore, while Hutchinson oversaw the prison's dietary staff, the record indicates that Menard did not have the capabilities to provide Brinson with a renal diet, and there is no evidence that Hutchinson (rather than some other person at IDOC) had the authority and ability to start such a program at Menard. *See* Pl.'s SOAF ¶ 44; *see also id.* ¶ 40 (stating that no therapeutic diets were available).

16

Finally, given the efforts at Menard to provide Brinson with dialysis treatment and to transfer Brinson back to Stateville only two months later (due largely to the actions of Hutchinson's staff), the undisputed facts indicate that Hutchinson did not ignore Brinson's medical or dietary requirements. *See* Pl.'s Ex. 12, 12/8/16 Emails. In short, no reasonable jury could conclude that Hutchinson consciously disregarded Brinson's kidney condition, and summary judgment is granted in his favor.

Turning to the medical directors, Dr. Obaisi at Stateville was aware of Dr. Ricardo's recommendation that Brinson return to UIC by the end of August 2016, so that the doctors could monitor his rising serum creatinine level and evaluate his dialysis start date. Pl.'s SOAF ¶¶ 10–12; Ricardo Dep. at 54:5–61:8, 62:21–63:5; Pl.'s Ex. 4, Dr. Ricardo's 8/1/16 Notes ("Dr. Ricardo's 8/1/16 Notes"), ECF No. 145-4. Yet, it was not until September 2016 that Dr. Obaisi approved an appointment in *December 2016*. Pl.'s SOAF *Id.* ¶ 22. Nor has Wexford presented any facts indicating any attempt to get Brinson an appointment sooner. *See* Fisher Dep. at 47:17–48:8, 48:13–18. Additionally, it was Dr. Obaisi, who lifted Brinson's medical hold on October 11, 2016, so that he could be transferred from Stateville to Menard. *See* 10/11/16 IDOC Note, Pl.'s SOAF ¶¶ 24, 28, 35, 52. He did this even though he knew that the transfer would cancel Brinson's already-delayed December follow-up appointment and that Menard did not offer on-site dialysis. See *id.* ¶ 31; Fischer Dep. at 68:3–15. Finally, there is a fair question as to whether Dr. Obaisi's decision to leave Brinson's chest catheter in for nine months departed radically from accepted professional practice in a prison setting. *See* Wexford Resp. SOAF ¶¶ 14–15, 62, 64–

17

65, 67, 69. A reasonable jury could conclude from all of these facts that Dr. Obaisi consciously disregarded Brinson's serious medical condition.

The opposite is true of Dr. Trost. After he became aware of Brinson's medical issues, Dr. Trost arranged for Brinson to be examined by Dr. Kamran, a board-certified nephrologist, on December 8, 2016. Pl.'s SOAF ¶¶ 54–55. It is also undisputed that Dr. Trost cancelled the AV graft surgery only because Brinson was about to be transferred back to Stateville. *Id.* ¶ 66. To the extent that Brinson also faults Dr. Trost for failing to provide him with a renal diet or an immediate transfer back to Stateville, he has provided no facts from which a rational jury could conclude that Dr. Trost had the authority or the wherewithal to do so. *Id.* ¶¶ 40–41, 54; *see* Stephens Dep. at 79:12–18 ("The rule is an offender has to receive three dialysis treatments before they're transferred to a dialysis unit. So if that happened he would have received three treatments while at Menard and then sent back to Stateville"). Furthermore, Brinson was transferred back to Stateville in two months, with Dr. Trost's approval. *See* Trost Dep. at 44:1–45:21. Wexford's motion is, therefore, granted as to Dr. Trost.

For these reasons, summary judgment is granted as to Count I with respect to Brinson's claim that Pfister acted improperly by ignoring his medical appointments, but denied as to Pfister's involvement in Brinson's transfer. In addition, Defendants' motion is granted as to Hutchinson and Dr. Trost, but denied as to Dr. Obaisi.

## II.    Breach of Contract (Count II)

In support of its summary judgment motion, Wexford argues that there are no triable issues as to whether it breached its previous settlement agreement with Brinson. To prevail on a breach-of-contract claim under Illinois law, a plaintiff must prove four elements: "(1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) a breach by the defendant; and (4) resultant damages." *Reger Dev., LLC v. Nat'l City Bank*, 592 F.3d 759, 764 (7th Cir. 2010).

The operative language in the settlement agreement bears repeating. In it, Wexford promised to:

> follow all medical plans and/or recommendations . . . made by [University of Illinois at Chicago Hospital ("UIC")] specialists relative to Plaintiff's PKD during or at any time after [Plaintiff's initial UIC] Appointment, to the extent that any such recommendations must take into account the security environment in which Plaintiff resides. . . .

> [and]

> ensure that a Therapeutic Diet Order for a renal diet, per IDOC guidelines and/or directives, is ordered and in place for Plaintiff so long as it is deemed medically indicated by a UIC or other nephrologist.

Pl.'s SOAF ¶ 4.

### A.    Failure to Follow UIC Recommendations for Follow-up Appointment and AV Graft Surgery

Brinson claims that Wexford breached its obligation to "follow all medical plans and/or recommendations . . . made by [University of Illinois at Chicago Hospital ("UIC")] specialists [or substitute specialist] relative to Plaintiff's PKD" in two ways.

19

First, Brinson asserts that Wexford failed to follow the UIC doctors' recommendation that he needed a follow-up appointment within four to six weeks of July 29, 2016; instead, Wexford scheduled his appointment for December 9, 2016,. Pl.'s SOAF ¶¶ 22, 59; Fisher Dep. at 42:9–14, 44:23–45:4, 47:17–48:8, 48:13–18; Failed Appointment Note. Second, according to Brinson, Wexford failed to follow Dr. Hale's recommendation that Brinson receive an AV graft for permanent dialysis access within two to four weeks of December 27, 2016. Pl.'s SOAF ¶ 64.

In response, Wexford argues that, when a contract does not specify a time for performance, a reasonable time should be implied. *See Abellan v. Lavelo Prop. Mgmt., LLC*, 948 F.3d 820, 829 (7th Cir. 2020). Even so, a rational jury could conclude from this record that the length of Wexford's delay in scheduling Brinson's follow-up appointment and arranging for the AV graft surgery was unreasonable. Accordingly, summary judgment on this basis is denied.

### B. Failure to Provide Brinson with a Renal Diet

Next, Brinson claims that Wexford breached its promise to "ensure that a Therapeutic Diet Order for a renal diet, per IDOC guidelines and/or directives, is ordered and in place for Plaintiff so long as it is deemed medically indicated by a UIC or other nephrologist." *See* Pl.'s SOAF ¶ 4; *see also* Dr. Ricardo's 8/1/16 Notes (recommending that Brinson continue a low-sodium, low-phosphorus, and low-potassium diet).

Wexford argues it was not responsible for transferring Brinson to Menard and, therefore, cannot be liable. But this fact is fiercely disputed. *See id.* ¶ 27 (stating

that only the medical director could lift a medical hold); *see also id.* ¶ 37 (stating that Dr. Obaisi lifted Brinson's medical hold so that the transfer could be approved); Stephens Dep. at 44:8–13 (stating that the Offender 360 system will not allow a transfer if there is a medical hold).

Nonetheless, Wexford contends that the phrase "per IDOC guidelines and/or directives" demonstrates the parties' understanding that Wexford's obligations would be subject to any actions by IDOC, including a transfer to a facility that does not provide renal diets. But this is a strained reading of the agreement. Reasonably read, the phrase "per IDOC guidelines and/or directives," which is set off by commas and immediately follows the words "renal diet," modifies "renal diet" and describes the type of renal diet that Wexford promised to Brinson—a renal diet as defined by IDOC guidelines. By contrast, Wexford's theory would have the phrase modify "in place" (that is, a renal diet could not be "in place" because of Brinson's transfer by IDOC), but the placement of the phrase "per IDOC guidelines and/or directives" within the sentence does not support such a construction.

In sum, Wexford promised to ensure that Brinson had access to a renal diet, and, based on this record, a reasonable jury could conclude that by lifting the medical hold on Brinson, Wexford failed to do so. And, to the extent that a jury finds liability here, it is entitled to determine the appropriate amount of damages.

### Conclusion

For the above reasons, Defendants' motions for summary judgment are granted in part and denied in part. With respect to Count I, summary judgment is granted to the extent that the deliberate indifference claim against Pfister is premised on Brinson's missed appointments on August 1, 2014, September 18, 2015, and October 16, 2015, but is denied to the extent that the claim is based on Brinson's missed follow-up appointment in August through November and Brinson's transfer to Menard. Defendants' request for summary judgment also is granted as to Hutchinson and Dr. Trost; they are dismissed as Defendants. Summary judgment is denied as to Dr. Obaisi. Wexford's motion as to Count II is denied.

**IT IS SO ORDERED.**                    **ENTERED   3/9/20**

_____
**John Z. Lee**
**United States District Judge**